

ENTERED
04/21/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 08-32362-H4-11 |
| WILL CLAY PERRY, | § | |
| | § | Chapter 11 |
| Debtor. | § | |

**MEMORANDUM OPINION REGARDING DEBTOR'S OBJECTIONS TO PROOFS OF
CLAIM NUMBER 38, 39, AND 40**
[Docket Nos. 490, 491, & 493]

## I. INTRODUCTION

Sour grapes and hindsight do not a lawsuit make. Three investors have filed proofs of claim in this Chapter 11 case alleging that they were induced to purchase class B shares in a limited partnership by way of a prospectus that contains omissions of material fact in violation of the Texas Securities Act. The investors contend that the debtor is personally liable for these omissions as a "control person" of the general partner of the limited partnership. More specifically, the investors complain that the prospectus does not expressly disclose (a) that the holders of class A shares may transfer shares among themselves; and (b) that the general partner may replace members of the investment committee. The debtor has objected to the investors' proofs of claim on the grounds that the prospectus does disclose these details.

For the reasons set forth below, the Court agrees with the debtor. The material facts that the investors contend were not disclosed in the prospectus were, in fact, conspicuously disclosed. That the prospectus does not contain a prominent warning that the general partner's broad management authority would be the harbinger of doom for the partnership does not translate to securities fraud. The debtor's objection should be sustained, and the investors' claims should be disallowed.

## II. FINDINGS OF FACT

### The Offering

1.      On May 5, 2006, W.C. Perry Properties, L.P. (Perry Properties or the Partnership), by and

through its general partner, W.C. Perry Brokerage Services Group, LLC (Perry Brokerage

or the General Partner), issued a confidential Private Placement Memorandum (the

Memorandum).  [Debtor's Exhibit No. 2.]

2.      On page 3 of the Memorandum, a history of Perry Properties is described:

> Founded in 2000, Perry Properties is a private, real estate brokerage,
> development and consulting firm specializing in a variety of real estate
> services to investors, developers and institutional owners.  In addition to third
> party brokerage activities, Perry Properties was created to focus on the
> sourcing, planning and development of real estate assets ranging from
> commercial office buildings to retail and single-family lot development
> through, among other things, its investment in and relationship with W.C.
> Perry Properties Realty Fund, L.P. Perry Properties currently has 9 full-time
> employees and five brokers that are independent contractors of the
> Partnership.

[Debtor's Exhibit No. 2.]

3.      On page 1 of the Memorandum, the initial limited partners of Perry Properties were disclosed

as follows:

| Name of Limited Partner | Initial Capital Contribution | Initial Ownership Interest |
|---|---|---|
| 1. Perry Brokerage | $ 10.00 | 1.00% |
| 2. Will Perry | $336.60 | 33.66% |
| 3. Costa Bajjali | $327.70 | 32.67% |
| 4. Whitney Leigh Wallace 1996 Sub-S Trust | $163.35 | 16.335% |
| 5. Jacquelyn Marie Wallace 1996 Sub-S Trust | $163.35 | 16.335% |

[Debtor's Exhibit No. 2.]

4.       Additionally, on page 1 of the Memorandum, the offering is described as follows:

> The existing limited partners of the Partnership [i.e. Perry Properties] are listed below.  In connection with this offering, the existing partners and the investors purchasing Class B Units in this offering will execute an Amended and Restated Limited Partnership Agreement of the Partnership, a copy of which is attached hereto marked "Exhibit A" (the "Partnership Agreement"). Pursuant to the terms of the Partnership Agreement, each of Will Perry, Costa Bajjali, Whitney Leigh Wallace 1996 Sub-S Trust and Jacqueline Marie Wallace 1996 Sub-S Trust (both of which trusts are affiliates of David Wallace) will become Class A Limited Partners holding Class A Units of limited partnership interest ("Class A Units") having the ownership interests in the Partnership, assuming the sale of all Class B Units pursuant to this offering, as reflected in the second table below:

| PARTNER | INITIAL CAPITAL CONTRIBUTION | UNITS | INITIAL OWNERSHIP INTEREST |
|---|---|---|---|
| *Class A Limited Partners* | | | |
| 1. Perry Brokerage | $10.00 | 3.6 | 0.90% |
| 2. Will Perry | $336.60 | 121.2 | 30.294% |
| 3. Costa Bajjali | $326.70 | 117.6 | 29.403% |
| 4. Whitney Leigh Wallace 1996 Sub-S Trust | $163.35 | 58.8 | 14.701% |
| 5. Jacqueline Marie Wallace 1996 Sub-S Trust | $163.35 | 58.8 | 14.702% |
| | | | |
| *Class B Limited Partners* | | | |
| 1. New Investors | $1,000,000 | 40.0 | 10.00% |
| | | | |
| *TOTAL* | $1,001,000 | 400.0 | 100.00% |

[Debtor's Exhibit No. 2.]

5.       On page 2, the Memorandum contains a description of what it means to be a Class B limited partner:

> The Class B limited partners are the persons subscribing for Class B limited partnership interests in this offering (the "Class B Units") as Class B limited partners of the Partnership (the "Class B Limited Partners") and accepted by

3

the General Partner. The rights, attributes, obligations and preferences of the Class B Units, along with the Class A Units, are fully set forth in the Partnership Agreement . . .

Terms

The Partnership is seeking to raise one million dollars ($1,000,000) through the sale of Class B Units. The minimum purchase of a Class B Limited Partner will be 2 Class B Units or $50,000, although individual commitments of lesser amounts may be accepted at the discretion of the General Partner. Generally speaking, each Class B Unit should represent 0.25% of the Partnership as of the closing of this offering and should have the other preferences described herein and in the Partnership Agreement.

The intended use of the proceeds from this offering is for general Partnership operations, certain debt repayments and working capital. The Class B Units will accrue a preferred return of 8% per annum, which shall be payable by the Partnership monthly, provided that if at any time there is insufficient available cash to pay such preferred return, it shall accrue and be payable immediately upon cash being available to pay all or any portion of such accrued and unpaid amounts. Commencing the 25th month following the effective date of the Amended and Restated Limited Partnership Agreement of the Partnership, the preferred return that will accrue over the three year period thereafter and the capital contribution amounts paid by the Class B Limited Partners to acquire their Class B Units in this offering shall be amortized over a three year period and paid to the Class B Limited Partners by the Partnership in 36 equal consecutive monthly installments. In the event that there is at any time insufficient cash to make any installment of return of capital and preferred return, such amount shall accrue and be payable immediately upon cash being available to pay all or such portion of the accrued and unpaid amounts. Amortized installment payments shall be applied to accrued and unpaid preferred return and then to return of capital. The Partnership may prepay the Class B Limited Partners' return of capital at any time without penalty or premium. No distributions shall be made to Class A Limited Partners on account of the Class A Units (i.e. not including compensation for services in other capacities such as employees of Perry Properties or the repayment of loans) until the Class B Limited Partners have been paid all of their accrued and unpaid preferred return and capital contributions. Thereafter, distributions of available cash shall be paid in accordance with their Partnership Interests. Partnership Interests are determined by dividing the number of Units (whether Class A or Class B) held by a Partner and dividing it by the total number of then outstanding Class A and Class B Units.

4

[Debtor's Exhibit No. 2.]

6.      On page 8 of the Memorandum, it is set forth that "The offering will terminate at 5:00 p.m. Houston, Texas time on June 30, 2006, unless otherwise extended by the General Partner to a date no later than August 31, 2006 (the "Offering Period"), or upon prior acceptance of subscription for all Class B Units offered hereby.  Such extension shall be at the General Partner's sole discretion without notice to the Limited Partners."  [Debtor's Exhibit No. 2.]

7.      The Offering Period was in fact extended until July 31, 2006.  [Testimony of the Debtor.]

8.      On page 11 of the Memorandum, in a section entitled SUMMARY OF PARTNERSHIP AGREEMENTS, the following sentence begins the section: "The following is a summary of certain of the material terms and provisions in the Partnership Agreement and the Fund Partnership Agreement."  [Debtor's Exhibit No. 2.]

9.      On page 14, the Memorandum contains the following language:

> Certain provisions of the Partnership Agreement have been described and summarized in this Memorandum. ***However, all statements relating to the Partnership Agreement are qualified in their entirety by reference to the Partnership Agreement. Therefore, each investor should carefully read and review the entire Partnership Agreement because the actual provisions contained therein control the obligations of the Partners. The Partnership Agreement is a legal instrument and each potential investor is advised to discuss it with his attorney, accountant or business advisor.***

[Debtor's Exhibit No. 2], (emphasis in original).

10.     Additionally, on page 11 of the Memorandum, under a subsection entitled "**Term and Dissolution**," it is set forth that:

> Generally speaking the Partnership will remain in existence until a Super Majority in Interest (defined in the Partnership Agreement as 65%) of the Class A and Class B Units, voting as separate classes vote to dissolve the Partnership, unless sooner dissolved pursuant to any provision of the

Partnership Agreement or by applicable law.

[Debtor's Exhibit No. 2.]

11.     On page 13 of the Memorandum, under a subsection entitled "**Transfer of Limited**

**Partnership Interests**," it is set forth that:

> Except as otherwise provided in the Partnership Agreement, no Class A or
> Class B Limited Partner may transfer any of their respective Units to any
> person or entity, other than certain specified affiliates, without the prior
> written consent of the General Partner, which the General Partner may
> withhold for any reason in its sole discretion. Notwithstanding the foregoing,
> the Class A Limited Partners have certain rights to offer to one or more of the
> other Class A Limited Partners to buy their Class A Units or sell the Class A
> Units held by the offeror to such offeree.  Upon a Class A Unit holder
> receiving such an offer, that offeree then has the choice to buy the offeror's
> Class A Unit or to sell all of such offeree's Class A Units to the offeror all at
> the price and terms as set forth in the original offer presented by the offeror.
> The Partnership Agreement also contains certain options to the Partnership
> and then to the other Class A Limited Partners to acquire a Class A Limited
> Partner's Class A Units at Fair Market Value (as defined in the Partnership
> Agreement) upon the occurrence of certain happenings such as the death,
> divorce or bankruptcy of a Class A Limited Partner. Such buy-sell rights and
> restrictions are not available to encumber the Class B Units.

[Debtor's Exhibit No. 2.]

12.     On page 11 of the Memorandum, the management of the Partnership is described. Under

the heading "**Management**," the Memorandum sets forth that

> The General Partner will have the full, exclusive and complete discretion in
> the management and control of the affairs of the Partnership, including
> without limitation, the management of the Partnership and correspondingly
> through the Partnership's ownership of the Funds General Partner, of the
> affairs of the Fund; however, the General Partner may not do anything in
> violation of the Partnership Agreement.

[Debtor's Exhibit No. 2.]

13.     Aside from references to the Partnership and Perry Brokerage, the Memorandum also

referred to two other entities: W.C. Perry Properties Realty Fund, L.P. (the Fund) and W.C.

Perry Properties Investments, LLC ( Investments), which is the general partner of the Fund

(the Fund General Partner). [Debtor's Exhibit No. 2.]

14.     On pages 3-4 of the Memorandum, a history of the Fund and its relationship to Perry

Properties is described:

> During 2005, Perry Properties sponsored the foundation of W.C. Perry
> Properties Realty Fund, L.P., a Texas limited partnership ("the Fund"). More
> specifically, the Fund was organized on March 3, 2005, and in approximately
> June 2005, the Fund completed an offering in which it received capital
> commitments in the aggregate amount of $3,550,000. Although investors in
> the Fund were only required to fund 25% of their aggregate capital
> commitments upon the closing of the offering and to fund the balance pursuant
> to the terms of a promissory note, all but one investor waived such right and
> funded the full amount of their capital commitments. As of the date of this
> Memorandum, there are only $412,500 of unfunded capital contributions
> owing to the Fund. The general partner of the Fund is W.C. Perry Property
> Investments, LLC, a Texas limited liability company (the "Fund General
> Partner"). The Fund General Partner was initially owned by Will Perry, Costa
> Bajjali and certain affiliates of David Wallace. However, in connection with
> the consummation of the Amended and Restated Limited Partnership
> Agreement for the Partnership, such parties will contribute all their ownership
> interests in the Fund General Partner to the Partnership in exchange for their
> respective Class A Units in the Partnership, such that the Fund General Partner
> will be wholly owned by the Partnership. In exchange for its general partner
> interest in the Fund and all the rights attributable thereto, the Fund General
> Partner contributed to the Fund the sum of $36,869, representing
> approximately 1% of the Fund's total capital commitments.
>
> The Fund is engaged in various aspects of the real estate business, including,
> but not limited to buying, selling, holding, improving, managing and
> exchanging real property of all types, developing, operating, and holding for
> investment such property, as well as acquiring interests in or participations in
> real estate secured debt obligations and other real estate related securities. The
> Fund General Partner anticipates that all of these activities will be conducted
> in the state of Texas; however, the General Partner has reserved the right to
> conduct Fund activities in other areas including those outside the State of
> Texas. The Fund has and may continue to invest in corporations, joint
> ventures, general partnerships, limited partnerships and other entities acquiring

interests in real estate and in real estate related securities, and may incur indebtedness in connection with its activities. The properties or investments acquired by the Partnership are sometimes referred to herein as the "Properties."

[Debtor's Exhibit No. 2.]

15.    On page 4 of the Memorandum, the investment strategy of the Fund is described:

> The strategic investment objective of the Fund is to preserve and protect the capital of the Fund while positioning the Fund to enjoy the potential for capital appreciation. The Fund has a three-pronged investment strategy:
> - To acquire properties that appear to be opportunistic due to underperformance.
> - To plan, design and develop commercial real properties in certain under-developed markets.
> - To acquire undeveloped real property and to develop thereon single-family master planned communities and, to the extent possible, pre-sell the to-be-developed single-family lots to qualified, highly capitalized homebuilders.

[Debtor's Exhibit No. 2.]

16.    On page 7 of the Memorandum, the management of the Fund—which is comprised of the

Fund General Partner and an investment committee (the Investment Committee)—is

described:

> The Fund General Partner manages and controls the affairs of the Fund. The Fund has an investment committee (the "Investment Committee"), comprised of such members, not less from three (3), as determined by the General Partner. The General Partner selects and presents the investment opportunities to the Investment Committee for final approval. The Fund Investment Committee will require a majority vote for all decisions. As compensation for the services provided by the Investment Committee members, the Fund General Partner has granted each of them the contractual right to receive three percent (3%) of the aggregate future distributions made by the Fund to the Fund General Partner. Before an Investment Committee member is entitled to receive such a payment, the Fund General Partner must receive a distribution from the Fund that is directly related to the Fund General Partner's general partnership interest in the Fund. Such distributions specifically exclude, among other things, reimbursements and management fees payable

8

by the Fund to the Fund General Partner.  However, one such member has agreed to serve on the Investment Committee on a pro bono basis and will not receive such described benefits.  In addition, Will Perry, Costa Bajjali and David Wallace will also not be granted such rights for their services as Investment Committee members.  The Fund General Partner has also issued to two critical employees the contractual right to receive three percent (3%) each of the aggregate future distributions made by the Fund to the Fund General Partner, subject to vesting at the rate of one percent (1%) on each of the first three anniversaries of their respective dates of employment with Perry Properties.

The Fund will not invest more than 33% of the Fund's aggregate commitments in any one Property.  Acquisitions will generally be structured through investments directly in real estate assets or subordinated participations in the senior lender's debt facilities.  The Fund may also invest in corporations, joint ventures, general partnerships, limited partnerships, limit liability companies, and other entities acquiring interests in real estate and in real estate related securities.  The term of the Fund is intended to be 5 years, which may be extended by the Fund General Partner, for such additional amount of time necessary to strategically liquidate the Properties and investments.  The Fund will not make any new investments after the third anniversary of the closing of its offering (June 2008).

[Debtor's Exhibit No. 2.]

17.   In addition to the above-cited description of the Fund's management, page 15 of the

Memorandum expressly sets forth the following:

The Fund General Partner will have the full, exclusive discretion in the management and control of the affairs of the Fund, including without limitation, the management of the Fund and the sale of the Properties, except for certain decisions reserved to the Investment Committee; however, the Fund General Partner may not do anything in violation of the Fund Partnership Agreement.

[Debtor's Exhibit No. 2.]

18.   Page 15 of the Memorandum contains a description of the Investment Committee:

The Investment Committee consists of a number of persons, not less than three (3), selected by the Fund General Partner.  The Fund General Partner will select and present to the Investment Committee for final approval the

Properties and other investments (and related due diligence materials) to be purchased by the Fund. The Investment Committee will require majority vote for all decisions. The Fund will not invest more than thirty-three percent (33%) of the Fund's aggregate capital commitments in any one real estate project.

[Debtor's Exhibit No. 2.]

19.     Page 22 of the Memorandum contains a description of the duties of the Investment

Committee:

> All investments made by the Fund are subject to the prior approval of the Investment Committee. The Investment Committee consists of a highly respected team of individuals having significant experience in the real estate industry in the state of Texas. The current Investment Committee members are Daniel Frishberg, Bob Perry, Fred Ziedman, Cost Bajjali, Michael McGrath, Will Perry, Taseer Badar and David Wallace, who serves as the Investment Committee Chairman. As compensation for the services provided by the Investment Committee members, the Fund General Partner has granted each of them the contractual right to receive three percent (3%) of the aggregate future distributions made by the Fund to the Fund General Partner. Before an Investment Committee member is entitled to receive such a payment, the Fund General Partner must receive a distribution from the Fund that is directly related to the Fund General Partner's general partnership interest in the Fund. Such distributions specifically exclude, among other things, reimbursements and management fees payable by the Fund to the Fund General Partner. However, one such member has agreed to serve on the Investment Committee on a pro bono basis and will not receive such described rights. In addition, Will Perry, Costa Bajjali and David Wallace will also not be granted such rights for their services as Investment Committee members.

> The Fund General Partner has also issued to two critical employees the contractual right to receive three percent (3%) each of the aggregate future distributions made by the Fund to the Fund General Partner, subject to vesting at the rate of one percent (1%) on each of the first three anniversaries of their respective dates of employment with Perry Properties. Accordingly, to date, up to 18% of the aggregate distributions to the Fund General Partner from the Fund will not be available to the Partnership for operations and distributions to its Partners.

[Debtor's Exhibit No. 2.]

20.  Immediately after describing the duties of the Investment Committee, the Memorandum, on

pages 22 through 26, provides biographical information on various individuals who comprise

what the Memorandum refers to as the "Leadership Team."  Some of the individuals whose

backgrounds are discussed are: (a) Costa Bajjali (Bajjali); (b) Will Clay Perry (Perry); and

(c) David Wallace (Wallace).  [Debtor's Exhibit No. 2.]

21.  On page 33, the Memorandum expressly provides the following with respect to

"**Dependence on Key Personnel**":

Pursuant to the Partnership Agreement, the General Partner has very broad powers
to manage and control the Partnership . . . and make all decisions affecting the
management and operation of the Partnership without the consent of the Limited
Partners, including the decision to sell, transfer, exchange or otherwise dispose of all
or any portion of the assets of the Partnership.  Therefore, the Partnership will be
dependent upon the business expertise and judgment of the General Partner and its
managers and officers.  The loss of any individuals active in the Leadership Team
could have a material adverse effect on the Partnership.

[Debtor's Exhibit No. 2.]

22.  The biographical information of Bajjali represents that:

Mr. Bajjali is the President and co-founder of W.C. Perry Properties, LP.
Since the creation of W.C. Perry Properties, LP, Mr. Bajjali has assisted the
Perry Properties' clients with both the sales and acquisition of real estate
assets for investment and development purposes.

Prior to joining W.C. Perry Properties, LP, Mr. Bajjali served as a business
consultant specializing in applying technology to improve business
performance for Fortune 500 companies.  His clients and employers included
high profile companies such as Dell, AXA, Boeing, Compaq/HP, Keane,
Stewart Title, Bechtel Engineering and Shell Oil Company, to name a few.
Mr. Bajjali's responsibilities as a Global Program Executive included global
management and overall P&L accountability for a $600MM account at Dell.
As a Senior Management member and a Director of Service Delivery for
Keane Inc., a $1 Billion Consulting Company, Mr. Bajjali had overall
accountability for Business Development and Service Delivery Excellence for
all consulting projects within his Strategic Business Unit.

Mr. Bajjali also has extensive experience in negotiating complex, multi-year/multi-million dollar contract with several Fortune 500 companies.  Mr. Bajjali's leadership, as evidenced by his track record, has helped several companies achieve their targeted objective and maximum potential.  His experience in both start-up and turn-around environments make him an asset to any company.  Mr. Bajjali received his BBA from the University of Houston.

[Debtor's Exhibit No. 2.]

23.    The biographical information on Perry represents that:

Mr. Perry is the founder and Chief Executive Officer of W.C. Perry Properties, LP, with numerous years of experience in the real estate industry.

Following the successful business relationship and educational experiences in land acquisition and single-family home building with Perry Homes, Mr. Perry elected to create W.C. Perry Properties, LP in an effort to benefit from this enormous experience.  Offering a diverse array of services in the commercial real estate industry, W.C. Perry Properties, LP has a focus on land brokerage, development and investments providing multi-use development opportunities and client investments.

Mr. Perry is an active participate with the Fort Bend Chamber of Commerce, as well as its Fort Bend Leadership Program.  Mr. Perry considers community service an important component to one's life, and has served on the "Keep Sugar Land Beautiful" Board of Directors and is an active member of the Sugar Land Rotary Club.  He is also an active participant and contributor to the new development, "The Oaks of Rio Bend" that offers a unique environment and an improved lifestyle for foster children.

Mr. Perry received his MBA and BA from Loyola University in Chicago.

[Debtor's Exhibit No. 2.]

24.    The biological information on Wallace represents that:

Mr. Wallace currently serves as the Chairman of the Investment Committee for the W.C. Perry Properties Realty Fund, LP and has a background in acquisition and/or formation of over 100 companies and/or partnerships, and has secured over $300 million in equity and debt.  As a result of the numerous portfolio holdings, he has served on the boards for several private and public companies.  Mr. Wallace served as a partner and Chief Executive

Officer of Wallace & Associates Investment, Inc., formerly The Markpoint Company, a venture capital and merchant banking operation and also, the Grantham Company, a private investment-banking firm.

During the past four years Mr. Wallace served as the Chief Financial Officer for both Assets Plus and Asset Campus Houston. In such capacity, he was actively involved in the transactional structuring, investment banking and capital market activities for both firms. Early in his career, Mr. Wallace served as the Vice President of Equity Management Corporation, a private real estate syndication firm. In this capacity, Mr. Wallace was responsible for the acquisition and/or sale of over $250 million of income producing properties. In connection with such real estate activities, he was a charter member of the North Texas Association of Real Estate Professionals, a former member of the Real Estate Securities and Syndication Institute (RESSI) and a former member of the American Association of Financial Planners.

Mr. Wallace received his Bachelor of Business Administration in Real Estate Finance from the University of North Texas. In addition to this schooling, Dave attended Union College in Schenectady, New York and received a scholarship to study International Real Estate, International Finance and International Law at the University of Reading located in Reading, England.

Mr. Wallace considers charitable works of great importance, as reflected by his extensive efforts in both the Dallas and Houston communities. Mr. Wallace is presently serving his second term as Mayor of the City of Sugar Land, Texas, where he previously served on city council representing the Single Member District Number 4. In such capacity, Mr. Wallace serves as Co-Chairman of the United States Conference of Mayors-Urban Water Council and a member of the United States Conference of Mayors Urban Economic Policy, Membership Committee, and Arts, Park, Entertainment & Sports Committee. In addition, Mr. Wallace was most recently appointed to the Advisory Board for United States Conference of Mayors, as well as the Co-Chair of the United States Conference of Mayors-Homeland Security Task Force.

[Debtor's Exhibit No. 2.]

25.     Pages 29 through 34 of the Memorandum discusses the risks of investing in Class B Units.

With respect to Wallace, the following paragraph was included:

**SPECIAL RISKS RELATED TO INVOLVEMENT OF DAVID WALLACE**

DAVID WALLACE, AS A KEY MEMBER OF THE GENERAL PARTNER AND THE FUND GENERAL PARTNER, IS CURRENTLY THE MAYOR OF SUGAR LAND, TEXAS. MAYOR WALLACE HAS INDICATED THAT HE IS PLANNING ON RUNNING FOR UNITED CONGRESS DURING THE NEXT GENERAL ELECTION IN NOVEMBER 2006. SUCH RACE IS EXPECTED TO REQUIRE A GREAT DEAL OF MAYOR WALLACE'S TIME AND ATTENTION, AND SHOULD HE WIN THE ELECTION HIS DUTIES AS CONGRESSMAN WILL LIKEWISE REQUIRE A GREAT DEAL OF MAYOR WALLACE'S TIME AND ATTENTION. MAYOR WALLACE INTENDS TO CONTINUE TO ADMINISTER HIS DUTIES FOR THE PARTNERSHIP AND THE FUND TO THE EXTENT THAT HE CAN BUT INVESTOR'S SHOULD NOT RELY ON MR. WALLACE'S ABILITY TO DEVOTE THE SAME AMOUNT OF TIME TO THE PARTNERSHIP AND THE FUND THAT HE HAS HISTORICALLY, PARTICULARLY DURING THE UPCOMING ELECTION AND FOR THE FORESEEABLE FUTURE THEREAFTER SHOULD MAYOR WALLACE WIN.

[Debtor's Exhibit No. 2.]

26.     Daniel Frishberg (Frishberg) sat on the Investment Committee. Frishberg was a member of the Investment Committee to protect the interests of his clients. He is a sophisticated financial advisor who has advised many clients regarding investing their money. Frishberg claims that his employees read the Memorandum carefully, and that he may have glanced over it. [Testimony of Mr. Frishberg.]

27.     The biographical information of Frishberg on page 23 of the Memorandum is as follows:

### Daniel S. Frishberg – Investment Committee Member

Mr. Frishberg is a nationally known radio and television personality and the founder of one of the premier financial services companies in the Southwest.

On the radio, he has been sharing his secrets for over 12 years. His passion for money and the markets inspired The MoneyMan Report, one of the most popular and successful talk radio programs in Houston, Texas. He has been integrally involved in many aspects of radio, with a knack for programming, advertising and sponsorship sales.

Mr. Frishberg is also the creator of the MoneyGame™, an interactive financial history seminar that has sold out every year in its existence. He was invited to host The MoneyGame™ at Kinkaid High School, one of the finest preparatory schools in the nation. It quickly became such a hit that it was added as part of the senior economics curriculum and required for every member of the graduating class. The MoneyGame™ will debut on video early in 2005.

In 1992, Mr. Frishberg started Daniel Frishberg Financial Services from the ground up, and in 1997, it evolved into Frishberg Jordan & Stewart Advisors. Mr. Frishberg spend some of his early career working at Prentice-Hall, writing textbooks for accountants and lawyers. After moving into the marketing division, he found another niche in advertising. He co-owned and co-operated the Danal Advertising Agency until 1970.

Mr. Frishberg has raised millions of dollars for Jewish charities including the Jewish Federation. In 2003, he created Project Impact, which facilitates the development of talented youth. In addition, he set up a charitable trust college fund in San Antonio, and secured all of the necessary funding.

[Debtor's Exhibit No. 2.]

## The Class B Investors

28.     Frishberg sat on the Fund's Investment Committee and also advised the following investors regarding their Class B Unit investments:

a.      James and Carol Maas (The Maases)

i.      On July 26, 2006, the Maases executed a Subscription Agreement whereby they purchased $100,000.00 of Class B Units. [Creditor's Exhibit No. 6.]

ii.     On August 2, 2006, the Maases delivered a check to Perry Properties for $100,000.00 made payable to W.C. Perry Properties, LP. [Debtor's Exhibit No. 3 for Maas.]

iii.    On March 9, 2007, Perry Properties delivered a check for $4,383.56 to the Maases, representing interest earned on their Class B Unit investment.

[Debtor's Exhibit No. 4 for Maas.]

iv.    On June 7, 2007, Perry Properties delivered a check for $2,104.11 to the Maases, representing interest earned on their Class B Unit investment for the period March 1, 2007 through May 31, 2007.  [Debtor's Exhibit No. 5 for Maas.]

v.    Aside from these two checks, the Maases received nothing more from Perry Properties.  [Testimony of Mr. Maas.]

vi.    Mr. Maas read most of the Memorandum.  What intrigued him about the investment was the diversification of property, the strong investment committee, and the strong management team.  [Testimony of Mr. Maas.]

b.    Mary Irvine (Irvine)

i.    On May 8, 2006, Irvine executed a Subscription Agreement whereby she purchased $100,000.00 of Class B Units.  [Creditor's Exhibit No. 8.]

ii.    On or about August 14, 2006, Irvine paid $100,000.00 in good funds to Perry Properties.  [Debtor's Exhibit No. 4 for Irvine.]

iii.    On March 9, 2007, Perry Properties delivered a check for $5,428.01 to Irvine, representing interest earned on her Class B Unit Investment.  [Debtor's Exhibit No. 4 for Irvine.]

iv.    On June 7, 2007, Perry Properties delivered a check for $2,123.05 to Irvine, representing interest earned on her Class B Unit investment for the period of March 1, 2007 through May 31, 2007.  [Debtor's Exhibit No. 7 for Irvine.]

v.    Aside from these two checks, Irvine received nothing more from Perry

Properties. [Testimony of Ms. Irvine.]

vi.   Frishberg had advised Irvine with respect to other investments. [Testimony of Ms. Irvine.]

c.   Martin and Barbara Grosboll (the Grosbolls)

i.   On June 30, 2006, the Grosbolls executed a Subscription Agreement whereby they purchased $50,000.00 of Class B Units. [Creditor's Exhibit No. 7.]

ii.   On June 28, 2006, the Grosbolls delivered a check to Perry Properties for $50,000.00 made payable to W.C. Perry Properties, LP. [Debtor's Exhibit No. 3 for Grosboll.]

iii.   On March 9, 2007, Perry Properties delivered a check for $2,575.34 to the Grosbolls, representing interest earned on their Class B Unit investment. [Debtor's Exhibit No. 4 for Grosboll.]

iv.   On June 7, 2007, Perry Properties delivered a check to the Grosbolls for $1,062.02, representing interest earned on their Class B Unit investment for the period of March 1, 2007 through May 31, 2007. [Debtor's Exhibit 5 for Grosboll.]

v.   Aside from these two checks, the Grosbolls received nothing more from Perry Properties. [Testimony of Mr. Grosboll.]

vi.   Frishberg had advised Mr. Grosboll with respect to other investments and Mr. Grosboll read through the Memorandum for the current investment. [Testimony of Mr. Grosboll.]

29.   Sometime in September of 2006, the Debtor had a "falling out" with Wallace and Bajjali.

17

[Testimony of the Debtor.]   As a result, on November 15, 2006, Wallace and Bajjali thereafter transferred their Class A Units to the Debtor. [Plaintiffs' Exhibit 12.] Throughout 2007, the Partnership's business waned and the Partnership ceased making distributions to Class B Unit holders.

**Perry's Bankruptcy**

30.   On April 11, 2008, Perry (the Debtor) filed a voluntary Chapter 11 petition, initiating the above-referenced Chapter 11 case. [Docket No. 1.]

31.   On August 20, 2008, the Maases filed proof of claim number 38, Irvine filed proof of claim number 39, and the Grosbolls filed a proof of claim number 40.  The Maases assert an unsecured claim in the amount of $100,000.00, Irvine asserts an unsecured claim in the amount of $100,000.00, and the Grosbolls assert an unsecured claim in the amount of $50,000.00.   Hereinafter, this Court shall refer to the Maases, Irvine, and the Grosbolls collectively as "the Investors."

32.   The basis for the respective claims of the Investors is as follows:  Each asserts that they are entitled to rescission of their investment under the Texas Securities Act, article 581-1 because certain material facts were omitted from the Memorandum.  More specifically, each Investor alleges that the Debtor—as a "control person" of the General Partner of Perry Properties—should be held personally liable for the alleged omissions pursuant to article 581-33 of the Texas Securities Act.

33.   On January 7, 2009, the Debtor filed written objections to claims 38, 39, and 40 (the Objections).  [Docket Nos. 493, 491, & 490, respectively.]

34.   On February 5, 2009, this Court held a hearing on the Objections. At this hearing, the Court

imposed discovery limitations and deadlines, and continued the hearing on the Objections until March 16, 2009.

35.     On March 16, 2009, this Court held the hearing on the Objections. At this hearing, the Court admitted the parties' exhibits and heard testimony from the following witnesses: (1) the Debtor, (2) Daniel S. Frishberg, (3) James W. Maas, (4) Mary M. Irvine, and (5) Martin P. Grosboll.  After the close of the evidence, this Court continued the hearing until March 18, 2009.

36.     On March 18, 2009, this Court concluded the hearing on the Objections. At this final hearing, the Court heard the closing arguments of counsel and took the matter under advisement.

### III. CONCLUSIONS OF LAW

**A.      Jurisdiction and Venue**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This contested matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A),[1] (B), and (O).  Venue is proper pursuant to 28 U.S.C. § 1408(1).

**B.      Omissions of Material Fact from a Securities Offering**

The Investors allege that the Debtor—by and through the General Partner—violated the Texas Securities Act (TSA) when issuing the Memorandum.  The TSA applies to persons and corporations who offer or sell unregistered securities. *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 115 (Tex. 1971).  Specifically, the Investors contend that they are entitled to rescission

---

[1] No plan of reorganization has been confirmed in this Chapter 11 case.  Therefore, the bankruptcy estate still exists such that this claim objection dispute is a "matter[] concerning the administration of the estate" pursuant to 28 U.S.C. § 157(b)(2)(A).

19

of their respective investments pursuant to article 581-33(A)(2) of the TSA because certain material facts were omitted from the Memorandum and the Debtor is personally liable for such omissions as a "control person" of the General Partner. Article 581-33(A)(2) of the TSA provides that "a person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to a person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (Vernon Supp. 2006). The TSA also makes "control persons" personally liable for such untrue statements or omissions. Article 581-33(F)(1) of the TSA provides that "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A . . . jointly and severally with the seller, buyer, or issuer, and to the same extent of the seller, buyer, or issuer."[2] Tex. Rev. Civ. Stat. Ann. art. 581-33(F)(1) (Vernon Supp. 2006).

Courts have found that "to recover under article 581-33(A)(2), a plaintiff must prove that a security was sold by means of (1) untrue statement of material fact, or (2) an omission to state a material fact that is necessary to make the statement made not misleading." *Aegis Ins. Holding Co., L.P. v. Gaiser*, No. 04-05-00938-CV, 2007 WL 906328, at *6 (Tex. App.—San Antonio Mar. 28, 2007, pet. filed). Normally, the plaintiff must introduce evidence of a material misrepresentation or omission that related to the security and induced its purchase and must also prove that the material misrepresentation or omission occurred prior to the time of the purchase. *Id*. The dispute at bar, however, occurs in the context of a claim objection in the Debtor's Chapter 11 bankruptcy case. In

---

[2] The Debtor has stipulated that he is a "control person" of the General Partner under article 581-33(F)(1).

a bankruptcy case, a claimant bears the initial burden of timely filing a proof of claim against the debtor's bankruptcy estate—which the Investors have done in this case. *See In re Gilbreath*, 395 B.R. 356, 362-63 (Bankr. S.D. Tex. 2008). A proof of claim that compiles with the Bankruptcy Rules is deemed prima facie valid until the debtor overcomes the presumption of validity pursuant to 11 U.S.C. § 502(b). *Id.* at 364-65. Once the debtor raises a valid objection—as the Debtor has done here—the claim's validity becomes a contested matter and the burden shifts back to the claimant to prove ownership and validity of the claim. *Id.* Pursuant to this framework, the Investors now have the burden to prove their claims are valid—which, in this case, requires the Investors to establish that they are entitled to rescission of their investment under article 581-33(A)(2) of the TSA.

Here, the Investors assert that material facts were omitted from the Memorandum in violation of article 581-33(A)(2) of the TSA. Each of the Investors testified that: (1) they reviewed the Memorandum before they purchased their representative Class B Units; (2) by receiving the Memorandum, they were invited to purchase their respective Class B Units; and (3) they thereafter purchased their respective Class B Units for good and valuable consideration.[3] The Investors seek rescission of the sale of Class B Units. *See* Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (Vernon Supp. 2006) (providing that a purchaser who sues under article 581-33 may sue "either at law or in equity for rescission or for damages if the buyer no longer owns the security"). The TSA's rescission remedy "is intended to restore the plaintiffs to their original position," and does not require a

---

[3] The Investors also contend that if the Memorandum had contained the omitted statements, they would not have purchased the Class B Units. However, section 581-33(A)(2) does not require a showing that the Investors would not have purchased the Class B Units if they had known of the omitted material statements. *Aegis*, 2007 WL 906328, at *6. Rather, "[t]he focus under article 581-33(A) is on the conduct of the seller, not on the conduct of individual buyers." *Id.* (citing *Tex. Cap. Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)).

showing of actual damages. *Sandefer*, 58 S.W.3d at 776.

### 1.    Alleged Material Omissions from the Memorandum

An omission of a fact is material if "there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest.'" *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 649-50 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.).   Statements of opinion or "puffing" are to be expected of securities dealers and are generally not actionable under the TSA. *See, e.g.*, *Sandefer*, 58 S.W.3d at 776 (determining that dealer's comments "amounted to nothing more than puffing or dealers' talk" and, as such, did "not amount to actionable misrepresentation"); *Paull v. Capital Res. Mgmt.*, 987 S.W.2d 214, 218-19 (Tex. App.—Austin 1999, writ denied) (determining that offeror's statements that he thought a project would meet buyer's needs and that the project was "one of the lowest risk projects he had ever worked on" were "'puffing,' or dealers' talk, and . . . do not amount to actionable misrepresentations").

Some Texas courts have defined material omissions in the following manner: "an omission is material if there is a substantial likelihood that proper disclosure would have been viewed by a reasonable investor as 'significantly altering the total mix of information made available.'" *Aegis*, 2007 WL 906328, at *6; *see also Beebe v. Compaq Corp.*, 940 S.W.2d 304, 306 (Tex. App.—Houston [14th Dist.] 1997, no writ) (stating that an omission is material "if there was an appreciable likelihood that it could have significantly affected the investment decision of a reasonable investor by substantially altering the information available to him in deciding whether to invest.")

Regardless of which definition of "material omission" is used, "[a]n investor is not required to prove that he would have acted differently but for the omission or misrepresentation," but rather

"the focus under the Texas Securities Act is on the conduct of the seller or issuer of securities, i.e., whether they made a material misrepresentation, not on the conduct of individual buyers." *Weatherly*, 905 S.W.2d at 649-50.   Thus, it is "no defense that the investor could have discovered the truth by exercising ordinary care." *Duperier v. Tex. State Bank*, 28 S.W.3d 740, 745 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.).   An investor is, however, held to a reasonable investor standard.

The test for the reasonable investor is an objective one, which inquires "whether the information disclosed would have been misleading, on those points about which the information's adequacy is questioned, to a reasonable potential investor who read the information as a whole." *Isquith v. Middle S. Util., Inc.*, 847 F.2d 186, 201 (5th Cir. 1988); *see also Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1306 (9th Cir. 1982) (inquiring "whether an investor who had been reasonably diligent in reviewing [the prospectus] would have been mislead (sic)").   The Court need not decide whether these specific Investors would have been significantly affected by the alleged omission, but whether the omission would change the total mix of information made available to a hypothetical reasonable investor.   Therefore, the Investors in this case can only prevail if material facts were omitted from the Memorandum that a reasonably diligent investor—and not necessarily these particular Investors—would have considered important.   It goes without saying that a reasonable investor would have at least read the Memorandum describing the investment opportunity.[4]   *See, e.g., Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 253 n.17 (3d Cir.

---

[4] The District Court for the District of Massachusetts collected the following cases in order to highlight the "common practice of imputing knowledge of the contents of offering materials to investors." *See, e.g., Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1517 (10th Cir. 1983) ("Knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who failed to read such documents."); *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 466 n.18 (7th Cir. 1990) ("[P]laintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice.");

23

2001) ("[A] reasonable investor of ordinary intelligence would have read the prospectus."); *Rankow v. First Chi. Corp.*, 678 F. Supp. 202, 205 (N.D. Ill. 1988) *rev'd on other grounds*, 870 F.2d 356 (7th Cir. 1989) ("Knowledge of material contained in a prospectus is imputed to investors, even if they have not read such a document."). Indeed, a prospectus—in this case, the Memorandum—is "the single most important document and perhaps the primary resource an investor should consult in seeking . . . information" about the investment opportunity and its risks. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).

### a. Alleged Omission Regarding Class A Limited Partners

The Investors have alleged that the Debtor is liable for two material omissions from the Memorandum: First, the Investors allege that the Memorandum fails to include a provision that discloses that the Class A limited partners are subject to change and that the failure to include such a provision misleads a reasonable investor into believing that three specific Class A limited

---

*Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1344 (8th Cir. 1980) (dismissing claims of inexperienced investor as time-barred on the basis of her receipt of investment materials despite the fact that she did not "understand" them or "examine them carefully"); *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991) (dismissing as time-barred claims of plaintiffs who failed to "study" the relevant investment materials, noting that "knowledge of information should be imputed to investors who fail to exercise caution when they have in their possession documents apprising them of the risks attendant to the investments."); *see also Marks v. CDW Computer Centers, Inc.*, 901 F. Supp. 1302, 1316 (N.D. Ill. 1995) (holding that a plaintiff has an affirmative duty to investigate when he "has materials in his possession, even if he chose not to read them, that would have put a reasonable person on inquiry notice of securities fraud."); *Marlow v. Gold*, 1991 WL 107268, at *9 (S.D.N.Y. 1991) (plaintiff cannot avoid statute of limitations by alluding to "an assurance from his accountant that the accountant would read the relevant materials. . . . [because a] reasonable investor would have read the [private placement memorandum]."); *Parkhurst v. N. Am. Fin. Servs.*, 919 F.Supp. 270, 274 (E.D. Mich. 1996) (referring to "ample case law" which "stand[s] for the proposition that an investor who receives written offering materials containing full and objective disclosures and who declines to read these documents, relying instead upon the general assurances of the defendant, does so at his peril."); *Rankow v. First Chicago Corporation*, 678 F. Supp. 202, 205 (N.D. Ill. 1988) *rev'd on other grounds*, 870 F.2d 356 (7th Cir. 1989) ("Knowledge of material contained in a prospectus is imputed to investors, even if they have not read such a document."); *Davidson v. Wilson*, 763 F. Supp. 1465, 1467 (D. Minn. 1990) (same); *Bull v. Chandler*, 1992 WL 103686, at *3-5 (N.D. Cal. 1992) (same); *Calvi v. Prudential Sec., Inc.*, 861 F. Supp. 69, 70-72 (C.D. Cal. 1994) (same); *but see Luksch v. Latham*, 675 F. Supp. 1198, 1204 (N.D. Cal. 1987) (holding that the "mere receipt of a prospectus containing information that contradicts material representations made orally to investors, standing alone, does not put such investors on constructive notice of section 10(b) and rule 10b-5 claims as a matter of law.").

partners—the Debtor, Wallace, and Bajjali—would manage the partnership indefinitely.   The Investors contend that this omission misleads a reasonable investor as to the duration of Class A partners and causes such an investor to rely on a "carefully marketed tri-partite management." The Court disagrees.

Although the real estate business acumen of the Class A limited partners is certainly touted throughout the Memorandum, the document makes clear that the General Partner, and not the Class A partners, has ultimate authority to manage the Partnership.   For example, under the heading "**Management**," the Memorandum expressly sets forth that "[t]he General Partner will have the full, exclusive and complete discretion in the management and control of the affairs of the Partnership, including without limitation, the management of the Partnership and correspondingly through the Partnership's ownership of the Fund General Partner, of the affairs of the Fund." [Finding of Fact No. 12.]

Additionally numerous provisions of both the Memorandum and the Partnership Agreement attached to it warn that the persons comprising the Class A limited partners are subject to change. For example, in the section conspicuously entitled "**RISKS ASSOCIATED WITH OWNERSHIP OF CLASS B UNITS**" the Memorandum expressly provides the following with respect to "**Dependence on Key Personnel**":

> Pursuant to the Partnership Agreement, the General Partner has very broad powers to manage and control the Partnership . . . and make all decisions affecting the management and operation of the Partnership without the consent of the Limited Partners, including the decision to sell, transfer, exchange or otherwise dispose of all or any portion of the assets of the Partnership. Therefore, the Partnership will be dependent upon the business expertise and judgment of the General Partner and its managers and officers.   The loss of any individuals active in the Leadership Team could have a material adverse effect on the Partnership.

[Finding of Fact No. 21.]  With respect to David Wallace's involvement in the Partnership, the

Memorandum also expressly provides the following under the even more conspicuous heading

"**SPECIAL RISKS RELATED TO INVOLVEMENT OF DAVID WALLACE**":

> DAVID WALLACE, AS A KEY MEMBER OF THE GENERAL PARTNER AND
> THE FUND GENERAL PARTNER, IS CURRENTLY THE MAYOR OF SUGAR
> LAND, TEXAS.   MAYOR WALLACE HAS INDICATED THAT HE IS
> PLANNING ON RUNNING FOR UNITED CONGRESS DURING THE NEXT
> GENERAL ELECTION IN NOVEMBER 2006. SUCH RACE IS EXPECTED TO
> REQUIRE A GREAT DEAL OF MAYOR WALLACE'S TIME AND
> ATTENTION, AND SHOULD HE WIN THE ELECTION HIS DUTIES AS
> CONGRESSMAN WILL LIKEWISE REQUIRE A GREAT DEAL OF MAYOR
> WALLACE'S TIME AND ATTENTION.  MAYOR WALLACE INTENDS TO
> CONTINUE TO ADMINISTER HIS DUTIES FOR THE PARTNERSHIP AND
> THE FUND TO THE EXTENT THAT HE CAN BUT INVESTOR'S SHOULD
> NOT RELY ON MR. WALLACE'S ABILITY TO DEVOTE THE SAME
> AMOUNT OF TIME TO THE PARTNERSHIP AND THE FUND THAT HE HAS
> HISTORICALLY, PARTICULARLY DURING THE UPCOMING ELECTION
> AND FOR THE FORESEEABLE FUTURE THEREAFTER SHOULD MAYOR
> WALLACE WIN.

[Finding of Fact No. 25.]

These provisions specifically warn investors that the General Partner—an entity which the

Debtor controls—has complete authority to manage the Partnership without the consent of the other

Class A limited partners.  When taken together with the provision notifying investors that Wallace's

role in the Partnership could potentially be limited if he wins the congressional seat, the

Memorandum would not cause a reasonable investor to presume that the Partnership will be

managed at all times by a "tripartite" management team consisting of the three original Class A

limited partners. Rather, the Memorandum expressly notifies potential investors that the General

Partner, and not the other Class A limited partners, has exclusive control over management

decisions.

The Investors also argue that the Memorandum fails to disclose that the Partnership Agreement contains a "buy/sell" provision that allows Class A limited partners to transfer their partnership interests to one another. The Investors contend that the Memorandum should have included the following language: "The Partnership Agreement has a buy/sell provision allowing complete change of partnership makeup, management and control at any time by any Class A partner."[5] However, this argument also lacks merit.

Not only was the Partnership Agreement actually provided along with the Memorandum such that the Investors could have reviewed the buy/sell provision,[6] the Memorandum itself contains numerous provisions instructing potential investors to review the Partnership Agreement. The Memorandum also contains a summary of the Partnership Agreement which contains the following language:

> Certain provisions of the Partnership Agreement have been described and summarized in this Memorandum. *However, all statements relating to the Partnership Agreement are qualified in their entirety by reference to the Partnership Agreement. Therefore, each investor should carefully read and review the entire Partnership Agreement because the actual provisions contained therein control the obligations of the Partners. The Partnership Agreement is a legal instrument and each potential investor is advised to discuss it with his attorney,*

---

[5] This language is taken from a chart submitted by counsel for the Investors outlining the specific omissions that the Investors contend were made from the Memorandum. The Investors assert that these specific disclosures would have adequately informed a hypothetical reasonable investor about the operations of the Partnership.

[6] Some courts have determined that material facts hidden within a mass of language in a prospectus are the same as "material omissions" under what has been termed "the buried facts doctrine." *See, e.g., Bluebonnet Sav. Bank v. FDIC*, 891 F. Supp. 332, 337 (N.D. Tex. 1995) (acknowledging that important facts "buried" within the disclosure materials have not really been disclosed). However, this doctrine is not applicable here. As discussed below, the material facts that the Investors allege were omitted from the Memorandum were not "buried" within a jumble of collateral information. Rather, they were highly conspicuous and, in most cases, set off in a separate subsection. The Second Circuit has explained that "disclosure in a prospectus must steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment." *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir. 1980). Though material facts must be accessible to potential investors, "corporations are not required to address their stockholders as if they were children in kindergarten." *Richland v. Crandall*, 262 F. Supp. 538, 554 (S.D.N.Y. 1976).

**accountant or business advisor.**

[Finding of Fact No. 9], (emphasis in original). This language advises potential investors to review the Partnership Agreement attached as Exhibit A to the Memorandum. Given this provision and the fact that the Partnership Agreement was attached to the Memorandum, this Court concludes that a reasonable investor would have reviewed the Partnership Agreement and would have read and understood the actual language of the buy/sell provision contained therein.

Even if a reasonable investor would not have taken the time to read the Partnership Agreement despite its ready availability and despite the Memorandum's multiple references to the document, the Memorandum itself more than adequately summarizes the Partnership Agreement's buy/sell provision. In a section entitled "**SUMMARY OF PARTNERSHIP AGREEMENTS**," under the heading **"Transfer of Limited Partnership Interests,"** the Memorandum sets forth the following language:

> . . . [T]he Class A Limited Partners have certain rights to offer to one or more of the other Class A Limited Partners to buy their Class A Units or sell the Class A Units held by the offeror to such offeree. Upon a Class A Unit holder receiving such an offer, that offeree then has the choice to buy the offeror's Class A Units or to sell all of such offeree's Class A Units to the offeror all at the price and terms as set forth in the original offer presented by the offeror. . .

[Finding of Fact No. 11.]

This language encapsulates the buy/sell provision of the Partnership Agreement. Thus, even if this Court were to presume that a reasonable investor would not have read the Partnership Agreement attached to the Memorandum, the above provision adequately describes the terms of the buy/sell provision of the Partnership Agreement: it states that Class A limited partners may transfer their partnership interest to other Class A limited partners subject to certain terms and limitations.

That this provision is not worded precisely in the manner the Investors would have preferred does not amount to a material omission.   A reasonable investor, upon reading this provision of the prospectus, would have understood that the Class A limited partners may transfer partnership interests between themselves and that such a transfer could result in the Class A units being consolidated in the General Partner as a Class A Unit holder.

In sum, this Court concludes that the Memorandum does not contain a material omission with respect to the General Partner's exclusive management authority or the transferability of Class A partnership interests.

**b.**      **Alleged Omission Regarding the Investment Committee's Oversight**

The Investors also allege that the General Partner's discretion to manage the Fund and change the composition of the Investment Committee is a material fact that was omitted from the Memorandum.  The Investors contend that the following language should have been included in the Memorandum: "Perry Properties retains the sole discretion to remove anyone from the Investment Committee at any time, for any reason, and replace them with employees of Perry Properties."  They assert that the omission of this phrase would lead a reasonable investor to believe that the discretion of the General Partner is subject to control of an objective, independent investment committee.  Once again, the Court disagrees.

The Memorandum expressly provides that the Fund General Partner—and not the Investment Committee—has complete discretion to manage the affairs of the Fund.  The subsection of the Memorandum entitled "**Management**," states that "[t]he Fund General Partner will have the full, exclusive and complete discretion in the management and control of the affairs of the Fund, including without limitation, the management of the Fund and the sale of the Properties, except for

29

certain decisions reserved to the Investment Committee." [Finding of Fact No. 17.] And, as discussed above, the Memorandum also informs potential investors that the General Partner controls the Fund General Partner: "the General Partner will have the full, exclusive and complete discretion in the management and control of the affairs of the Partnership, including without limitation, the management of the Partnership *and correspondingly through the Partnership's ownership of the Fund General Partner, of the affairs of the Fund*." [Finding of Fact No. 12], (emphasis added). Immediately following this provision, under the heading "**Investment Committee**," the Memorandum provides that "[t]he Investment Committee consists of a number of persons, not less than three (3), selected by the Fund General Partner." [Finding of Fact No. 18.] Although the next few sentences of this provision provide that "[t]he Fund General Partner will select and present to the Investment Committee for final approval the Properties and other investments (and related due diligence materials) to be purchased by the Fund," the Memorandum makes clear that the members of the Investment Committee are selected by the Fund General Partner—an entity controlled by the General Partner.

After reading these provisions, a reasonable investor would understand that although some of the Fund General Partner's management decisions are subject to the approval of the Investment Committee, the Fund General Partner may select the persons comprising that committee. That the Memorandum does not explicitly state that the Fund General Partner may select "employees of Perry Properties" to comprise the Investment Committee does not constitute an omission of material fact. It is enough that the Memorandum informs potential investors that the Fund General Partner has unfettered discretion to appoint members of the Investment Committee. To conclude otherwise would require securities offerings to inform investors of all possible outcomes of providing the

managing entity with broad authority to appoint key personnel.

The Court concludes that the Memorandum does not contain the material omissions alleged by the Investors. A reasonable investor would have read the Memorandum and understood the plain language of its terms.  The language that the Investors contend was omitted would not have "significantly altered the 'total mix' of the information made available" to a reasonable investor. *Aegis*, 2007 WL 906328, at *6

It is noteworthy that article 581-33(A)(2) of the TSA premises liability for material omissions "in light of the circumstances."  The circumstances here involve a Memorandum that contained all of the information which the Investors allege was omitted—albeit not in the exact wording they now say should have been included.  What the Investors consider "material omissions," in retrospect, are nothing more than the after-effects of providing the General Partner and the Fund General Partner with broad discretion to manage the Partnership and the Fund.  The Memorandum expressly provides that the General Partner may exercise exclusive management control over the Partnership and the composition of the Investment Committee; the Investors' core complaint is that the General Partner decided to invoke this authority.  As stated above, the plain language of the Memorandum would not be confusing to a reasonable investor.  Additionally, that the Investors were advised by Frishberg—a sophisticated financial advisor with extensive knowledge of this particular investment and the General Partner, and who, in fact, sat on the Investment Committee [Finding of Fact Nos. 26 & 28]—militates in favor of the conclusion that the Memorandum would not have been misleading to a reasonable investor in light of the circumstances.

31

## IV. Conclusion

Investment is, by nature, a risky enterprise. The individuals who have lost their substantial capital contributions in the Partnership have likely suffered much chagrin due to the disappointing return on their investment. However, a failed investment is not necessarily a mark of securities fraud, and it is not in this case. It is noteworthy that the Investors did not complain when the Class A Units were transferred to the General Partner in November of 2006. Rather, the Investors filed their claims on August 20, 2008—long after they stopped receiving a return on their investment and only after the Debtor filed this Chapter 11 case.

The Investors have not established that any material facts were omitted from the Memorandum. This Court must review the Investors' allegations from the perspective of a reasonable investor. A reasonable investor would, at the very least, have read the Memorandum outlining the investment opportunity. A reasonable investor would also have reviewed the Partnership Agreement attached to the Memorandum, which the Memorandum advises investors to read. *See, e.g., Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) (determining that the "minimal diligence" expected of a reasonable investor includes consulting important documents that the brochure describing the investment directs investors to review). Had the Investors in the case at bar acted reasonably, they would have discovered the conspicuous provisions contained in both documents expressly stating that the General Partner had broad management authority and the ability to appoint key personnel. The Investors' retrospective desire to have the effects of the General Partner's management authority spelled out in painstakingly detailed chapter and verse does not amount to a meritorious claim for securities fraud under article 581-33(A)(2) of the TSA.

32

For the foregoing reasons, the Court concludes that the Debtor's objections to proofs of claim number 38, 39, and 40 should be sustained and the Investors' claims should be disallowed. An order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 21st day of April, 2009

Jeff Bohm
United States Bankruptcy Judge