

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
02/24/2010

| | | |
|---|---|---|
| In re: | § | **Case No. 08-32362-H4-11** |
| | § | |
| **WILL CLAY PERRY,** | § | |
| | § | |
| **Debtor**. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION REGARDING ESTIMATION OF THE CLAIMS OF UNITED DEVELOPMENT FUNDING, L.P. AND UNITED DEVELOPMENT FUNDING III, L.P.
[Main Case Docket No. 695][1]

### I. INTRODUCTION

The Purpose of this Memorandum Opinion is to set forth this Court's findings of fact and

conclusions of law regarding its estimation of certain claims for plan confirmation procedures.

The Court conducted a two-day mini trial in order to estimate the claims of two large claimants

---

[1]All docket cites are to the adversary docket except when the main case docket is explicitly cited. In the main case, this Memorandum Opinion relates to main case docket no. 695, which is the Debtor's Motion for Estimation of Claims. In this adversary proceeding, the Memorandum Opinion relates to adversary docket no. 23, which is an order that this Court issued abating the adversary proceeding. The Court abated this proceeding while this Court estimated the claims of the defendants in this adversary proceeding.

in this Chapter 11 case. The claims, which are the subject of an adversary proceeding, involve relatively complex areas of the law, primarily usury. The Court hopes that by issuing its estimation ruling in writing, the parties will be better able: (1) to narrow the issues to be tried in a full-blown trial on the merits; and (2) to assess whether filing a motion for summary judgement would be appropriate.

## II. PROCEDURAL BACKGROUND

On July 23, 2009, the Plaintiffs – WC Southern Colony Development, LLC (Southern Colony); Hidden Lakes Investments, LP (Hidden Lakes); and Will Clay Perry (Perry) – filed a complaint entitled "Plaintiffs' Original Complaint" (the Complaint) [Docket No. 1] naming United Development Funding, LP (UDF) and United Development Funding III, LP (UDF III) as defendants (together, "the Defendants"). The Complaint requests the disallowance of the following Proofs of Claim, each of which arose from Perry's guarantees of a series of loans made by UDF and UDF III: (1) Proof of Claim number 43 by UDF III; (2) Proof of Claim number 44 by UDF; (3) Proof of Claim 45 by UDF III; and (4) Proof of Claim 46 by UDF III. In addition to the disallowance of these Proofs of Claim, the Complaint seeks: (1) actual damages pursuant to Tex. Fin. Code §§ 305.003 and 305.004 in favor of Hidden Lakes and Southern Colony; (2) equitable subordination of any claim that this Court may allow in favor of UDF or UDF III; and (3) court costs and reasonable attorneys' fees in favor of Hidden Lakes and Southern Colony.

On August 24, 2009, UDF and UDF III filed a "Motion to Dismiss for Lack of Subject Matter Jurisdiction, for Failure to State A Claim Upon Which Relief Can be Granted and, Alternatively, for More Definite Statement" [Docket No. 10]. Shortly thereafter, on August 28, 2009, the Plaintiffs filed an amended complaint entitled "Plaintiffs' First Amended Complaint" [Docket No. 12]. On

2

September 8, 2009, the Defendants responded by filing a "Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction, for Failure to State a Claim Upon Which Relief Can Be Granted and, Alternatively, for More Definite Statement and Brief in Support Thereof" (the Second Motion to Dismiss) [Docket No. 14]. On October 9, 2009, the Plaintiffs filed "Plaintiffs' Motion For Leave to File Second Amended Complaint" (the Motion to Amend) [Docket No. 19], which was accompanied by "Plaintiffs' Second Amended Complaint" (the Second Amended Complaint) attached as Exhibit A. On October 14, 2009, the Court held a hearing on the Second Motion to Dismiss, and took the matter under advisement. On October 22, 2009, this Court issued an order [Docket No. 23] granting leave to the Plaintiffs to file the Second Amended Complaint and abating the adversary proceeding until the Court could hold a mini-trial to estimate the claims of UDF and UDF III. With the issuance of this Memorandum Opinion on the estimation of these claims, the Court will now set a status conference to discuss the posture of the adversary proceeding with the parties' counsel.

The Court held a mini-trial on November 19 & 20, 2009 (the Hearing). The Court set the Hearing so that a timely confirmation hearing can be held – *i.e.*, so that there would not be the inevitable substantial delay in the main case while the parties fully litigated, for months if not years, the amount of the claims to a final judgment.[2]

At the Hearing, this Court heard testimony from the following witnesses:

---

[2]No plan confirmation hearing has yet been held, but the Court intends to hold a status conference in this case soon after the order estimating the claims of UDF and UDF III is entered on the docket; and at this status conference, the Court will discuss scheduling a plan confirmation hearing with counsel for the Debtor and counsel for all other creditors and parties-in-interest.

- (1) Dwayne Iselt (Iselt), a land developer employed by Perry Properties to develop the Hidden Lakes Property. Iselt was subsequently hired by UDF to assist with bringing the Hidden Lakes Property into compliance with various legal requirements;

- (2) Patricia Osenbaugh (Osenbaugh), an appraisal expert who holds a Masters Degree in Land Economics and Real Estate as well as MAI and CCIM designations. Osenbaugh also has over 20 years of experience as an appraiser. Osenbaugh was hired by the Plaintiffs to appraise the Hidden Lakes and Southern Colony Properties;

- (3) Perry, a Plaintiff in this adversary proceeding and the Debtor-in-Possession in the main case. Perry is a limited partner in W.C. Perry Properties, LP (Perry Properties); and

- (4) Mehrdad Moayedi (Moayedi), an experienced land developer and an agent of the purchaser of the Hidden Lakes property at a foreclosure sale, CTMGT LP (CTMGT). Moayedi has worked with UMTH Land Development, LP (UMTH), the general partner of UDF III, on a number of projects in the past.

At the Hearing, the Court also admitted the following exhibits: (a) Plaintiffs' Exhibits 2-10, 12-41, 44, and 97-107 (admitted without objection; Plaintiffs' exhibits 12-41 were admitted with the caveat that any missing pages may be supplemented later under the Doctrine of Completeness); (b) Plaintiffs' Exhibits 1, 11, and 42-43 (admitted over the Defendants' objection to their relevance); and (c) UDF and UDF III's exhibits 109-111 (admitted over the Plaintiffs' objection to the legal conclusions contained therein).

After listening to the testimony of these witnesses and hearing oral argument of counsel, the Court took the matter under advisement.

4

The Court now makes the following findings of fact and conclusions of law pursuant to Federal Bankruptcy Rules 7052 and 9014. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

### III. FINDINGS OF FACT

1. Perry is an individual residing in the State of Texas and is the Debtor-in-Possession in the main case.

2. Southern Colony is a Texas limited partnership, with its principal place of business located in the State of Texas.

3. Hidden Lakes is a Texas limited partnership, with its principal place of business in the State of Texas.

4. Hidden Lakes GP is a Texas limited liability company and the general partner of Hidden Lakes.

5. UDF is a Nevada limited partnership doing business in the State of Texas.

6. UDF III is a Delaware limited partnership doing business in the State of Texas.

7. UMTH is the general partner of UDF III.

8. Perry is a limited partner in Perry Properties.

9. Perry Properties is a limited partnership, a limited partner of Hidden Lakes, a member of Southern Colony, and a shareholder of Hidden Lakes GP, LLC (Hidden Lakes GP) .

10. Hidden Lakes GP owns general partnership and limited partnership interests in Hidden Lakes.

11. On February, 21, 2007, Southern Colony executed a promissory note in the principal amount of $1,911,500.00 in favor of UDF III (the Original Southern Colony/UDF III Note) [Exhibit No. 3]. This loan was secured by a security agreement (the Southern Colony Security Agreement) [Exhibit No. 5] and a deed of trust (the Southern Colony Deed of Trust) [Exhibits No. 4 & 5] in favor of UDF III. On that same date, Perry, along with Perry Properties, executed an unsecured guaranty agreement (the Southern Colony Guaranty Agreement) [Exhibit No. 10] guaranteeing payment of the Original Southern Colony/UDF III Note. Finally, this loan was secured by a pledge agreement (the Southern Colony Pledge Agreement) [Exhibit No. 6] executed by Perry Properties pledging all right and title to any interest in Southern Colony to UDF III.

12. On February 21, 2007, Southern Colony closed on its purchase of a tract of real property – approximately 65.47 acres in Fort Bend County along FM 521 and Highway 6, south of Sienna Plantation (the Southern Colony Property). The Southern Colony Deed of Trust  [Exhibits No. 4 & 5] grants a lien on this property to UDF III.

13. An appraisal done by Sam Boyd on April 3, 2007 [Exhibit No. 6] of a tract of real property located in League City, Galveston County, Texas (the Hidden Lakes Property) set forth that the fair market value of this property on March 20, 2007 was $5,290,000.00 "as-is," and $14,360,000.00 upon completion of development. This latter number represents $4,350,000.00 for the 65 foot lots, $6,210,000.00 for the 75 foot lots, and $3,800,000.00 for the present value of receivables due from a Municipal Utility District (MUD).

14. On May, 21, 2007, Hidden Lakes executed a promissory note in the principal amount of $1,931,250.00 in favor of UDF III (the Original Hidden Lakes/UDF III Note) [Exhibit No. 22]. This loan was accompanied by a security agreement (the Hidden Lakes/UDF III Security

Agreement)[3] [Exhibit No. 23] granting UDF III a continuing security interest in all assets owned

by both Hidden Lakes and Hidden Lakes GP. On that same date, Perry executed an unsecured

guaranty agreement (the Hidden Lakes/UDF III Guaranty Agreement)[4] [Exhibit No. 25] along

with Hidden Lakes GP, David Randolph, and Reggie Jacob, the other partners of Hidden Lakes,

guaranteeing payment of the UDF III Loan.  Finally, this loan was secured by a pledge agreement

(the Hidden Lakes/UDF III Pledge Agreement) [Exhibit No. 24] executed by Hidden Lakes GP,

Perry Properties, David Randolph, and Reggie Jacob in favor of UDF III, each pledging all rights

and privileges in, *inter alia*, any equity interests in Hidden Lakes.

15. On or about the same date (*i.e.*, May 21, 2007), Hidden Lakes also executed a promissory note

in the original principal amount of $2,600,750.00 in favor of UDF (the Hidden Lakes/UDF Note)

[Exhibit No. 28]. This loan was accompanied by a deed of trust (the UDF Deed of Trust)

[Exhibit No. 29], executed by Hidden Lakes in favor of UDF, as well as a security agreement

(the Hidden Lakes/UDF Security Agreement) [Exhibit No. 29] granting UDF a continuing

security interest in all assets owned by Hidden Lakes and Hidden Lakes Investments GP. Perry,

David Randolph, and Reggie Jacob also executed a guaranty agreement (the Hidden Lakes/UDF

Guaranty Agreement)[5] guaranteeing payment of the UDF loan. Finally, this loan was secured by

a pledge agreement (the Hidden Lakes/UDF Pledge Agreement) [Exhibit No. 31] executed by

Hidden Lakes GP, Perry Properties, David Randolph, and Reggie Jacob in favor of UDF, each

---

[3]Hereinafter, when the Hidden Lakes/UDF III Security Agreement and the Southern Colony Security Agreement are referred to together, they are defined as the UDF III Security Agreements.

[4] Hereinafter, when the Hidden Lakes/UDF III Guaranty Agreement and the Southern Colony Guaranty Agreement are referred to together, they are defined as the UDF III Guaranty Agreements.

[5]Hereinafter, when the Hidden Lakes/UDF Guaranty Agreement is referred to together with the UDF III Guaranty Agreements, they are defined as a group as the Guaranty Agreements.

pledging all rights and privileges in, *inter alia*, any equity interests in Hidden Lakes. UDF and UDF III executed a subordination agreement [Exhibit No. 23] with Hidden Lakes in which UDF subordinated its loan and security rights to UDF III.

16. On or about May 22, 2007, Hidden Lakes executed a promissory note to RBC Centura Bank (RBC) in the original principal amount of $9,986,762.00 (the RBC Note). The Hidden Lakes/UDF Note [Exhibit No. 28] and the Original Hidden Lakes/UDF III Note [Exhibit No. 22] are subordinate to the RBC Note.

17. On May 22, 2007, Hidden Lakes closed on its purchase of the Hidden Lakes Property. The UDF Deed of Trust [Exhibit No. 29] grants a lien on this property in favor of UDF.

18. After closing on the purchase of the Hidden Lakes Property, Hidden Lakes began development of this property.

19. On August 20, 2007, the Original Southern Colony/UDF III Note was modified to reflect an increased principal amount of $2,998,845.00 (the Amended Southern Colony/UDF III Note)[6] [Exhibit No. 28]. The purpose of this amendment was to continue UDF III's forbearance towards the interest accruing monthly, and to increase the interest reserve under the note from $40,000.00 to $1,040,000.00 in order to reflect UDF III's continued forbearance.

20. On April 11, 2008, Perry filed for protection under Chapter 11 of the Bankruptcy Code in this Court. On that same date, Perry Properties ceased all operations.

21. On or about May 2008, UDF hired Iselt to oversee efforts to bring the Hidden Lakes Property into compliance with various legal requirements (by finishing, *inter alia*, the dry utilities) so that

---

[6] Hereinafter, when the Amended Southern Colony/UDF III Note and the Original Southern Colony/UDF III Note are referred to together, they are defined as the Southern Colony/UDF III Notes.

permits necessary to the beginning of home construction could be obtained. Iselt acted as a go-between for UDF and the various contractors who were working on the Hidden Lakes Property.

22. In June of 2008, due to a shortfall in payments on the RBC Note, UDF III funded a Certificate of Deposit in the amount of $1,720,320.00, pledged it to RBC, and allowed RBC to sweep it and apply the proceeds to Hidden Lakes' obligation under the RBC Note. This transaction between UDF III and RBC was essentially a payment by UDF III on behalf of Hidden Lakes. The Original Hidden Lakes/UDF III Note [Exhibit No. 22] was subsequently or concurrently amended in order to increase the face value of this Note to $3,651,570.00 to reflect this payment on Hidden Lakes' behalf. This amendment is memorialized by an amended promissory note (the Amended Hidden Lakes/UDF III Note)[7] [Exhibit No. 40].[8] On June 25, 2008, UDF III filed a "Motion for Order Approving Modification of Pre-Petition Guaranty Made by Debtor to United Development Funding III, L.P." [Main Case Docket No. 95.][9] On July 23, 2008 the Court granted this motion pursuant to "Order Granting Motion for Approval" [Main Case Docket No. 139].

23. On August 27, 2008, UDF and UDF III filed four Proofs of Claim arising from Perry's guarantees of the Notes. UDF III filed Proof of Claim number 43 [Exhibit No. 100] in the

---

[7] Hereinafter, when the Amended Hidden Lakes/UDF III Note and the Original Hidden Lakes/UDF III Note are referred to together, they are defined as the Hidden Lakes/UDF III Notes.

[8] Hereinafter, when the Hidden Lakes/UDF III Notes (*i.e.*, the Original Hidden Lakes/UDF III Note and the Amended Hidden Lakes/UDF III Note) are referred to together with the Southern Colony/UDF III Notes (*i.e.*, the Original Southern Colony/UDF III Note and the Amended Southern Colony/UDF III Note), they are defined as a group as the UDF III Notes. When these UDF III Notes are referred to together with the Hidden Lakes/UDF Note (in other words when all promissory notes at issue in the suit at bar are referred to as a group), they are all defined together as the Notes.

[9] This motion for modification requested approval of an increase to the amount guaranteed by Perry under the Hidden Lakes/UDF III Guaranty Agreement [Exhibit No. 25] by $1,720,320.000, mirroring the increase in the amount owed under the Hidden Lakes/UDF III Notes.

amount of $3,619,902.00. Of this total amount, $1,636,649.00 represents UDF III's claim as of

April 11, 2008, the date Perry filed his petition for Chapter 11, and $1,983,253.00 represents the

claim arising from the post-petition modification. On August 27, 2008, UDF filed Proof of Claim

number 44 [Exhibit No. 101] in the amount of "at least" $1,891,528.35. On August 29, 2008,

UDF III filed Proof of Claim number 45 [Exhibit No. 102] in the amount of $3,619,902.00,

where $1,636,649.00 of this amount represents UDF III's claim as of April 11, 2008, the date

Perry filed his petition for Chapter 11, and where $1,983,253.00 of this amount represents the

claim arising from the post-petition modification. On August 29, 2008, UDF III filed Proof of

Claim number 46 [Exhibit No. 103] in the amount of $2,538,945.03, where $2,177,260.03 of this

amount represents UDF III's claim as of April 11, 2008, the date Perry filed his petition for

Chapter 11, and where $361,685.00 of this amount apparently represents a claim for post-petition

interest and fees. As explained in greater detail in section V(B)(viii) of this opinion, *infra*, the

Court finds Proof of Claim 45 to be duplicative of Proof of Claim 43, and disallows Proof of

Claim 45 in its entirety.

24. On February 9, 2009, a notice of the substitute trustee's sale of the Hidden Lake Property was

posted and sent. On March 3, 2009, the substitute trustee sold the Hidden Lakes Property at a

foreclosure sale in Galveston County, Texas to CTMGT for $2,100,000.00. At the time of

purchase, the Hidden Lakes Property was subject to a lien securing a debt to RBC in the amount

of approximately $6,700,000.00. CTMGT purchased the Hidden Lakes Property by borrowing

funds from UDF III.

25. On March 16, 2009, Ernest Randall (Randall), an owner of land adjoining the Hidden Lakes

Property, filed a Fourth Amended Petition and Application for Temporary Restraining Order and

Temporary Injunction in State District Court in Galveston County concerning drainage on the Hidden Lakes Property and water levels of an artificial lake that is contained by the Hidden Lakes Property and Randall's property (the Hidden Lakes Lawsuit). CTMGT was named as a defendant in the lawsuit along with BG Group, LLC d/b/a Perry Properties[10] and Hidden Lakes.

26. On July 23, 2009, the Plaintiffs filed the Complaint [Docket No. 1] naming UDF and UDF III as defendants. The Complaint requests the disallowance of the following Proofs of Claim, each of which arose from Perry's guarantees of the previously described loans made by UDF and UDF III: (1) Proof of Claim number 43 by UDF III; (2) Proof of Claim number 44 by UDF; (3) Proof of Claim 45 by UDF III; and (4) Proof of Claim 46 by UDF III. In addition to the disallowance of these Proofs of claim, the complaint seeks: (1) actual damages pursuant to Tex. Fin. Code §§ 305.003 and 305.004 in favor of Hidden Lakes and Southern Colony; (2) equitable subordination of any of the above referenced claims that this Court may allow; and (3) court costs and reasonable attorneys' fees in favor of Hidden Lakes and Southern Colony.

27. As noted above, a lengthy trial, with substantial time for discovery, will be required to adjudicate the Complaint. Accordingly, in order to hold a timely confirmation hearing, the Court decided to estimate these claims and therefore scheduled the Hearing. The Hearing was, in effect, a mini-trial of the issues in dispute.

---

[10]BG Group, LLC's listing as a defendant in Exhibits 112–116 are the only references to this legal entity in the record. The Court has been provided no other information on BG Group, LLC. However, the Court is very familiar with Perry Properties, and because BG Group, LLC does business as Perry Properties, the Court will continue to refer to this entity solely as Perry Properties.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding, and this claim estimation matter,[11] pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute about estimation of claims is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B. Issues Relating to the Estimation of the Four Proofs of Claim

*i. The Court's approach to estimating UDF and UDF III's claims*

In a claims estimation proceeding pursuant to 11 U.S.C. § 502(c), the Court has much latitude in the method it chooses to evaluate a claim. *See In re Brints Cotton Mktg., Inc.*, 737 F.2d at 1340–41; *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135–36 (3d Cir. 1982).

---

[11]The Court has the legal authority to estimate these claims under 11 U.S.C. § 502(c), which provides that contingent or unliquidated claims which would unduly delay the administration of the case shall be estimated by the Court. 11 U.S.C. § 502(c) (2006) Moreover, the Court has an *affirmative duty* to estimate such claims in order to facilitate the administration of the case. *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1340-41 (5th Cir. 1984); *In re Towner Petroleum*, 48 B.R. at 187 *citing Nova Real Estate*, 23 B.R. 62 (Bankr. Va. 1982).

Generally, the Court may estimate claims by "whatever method is best suited to the particular contingencies at issue," so long as the underlying purposes of the Code are not contravened. *Bittner*, 691 F.2d 134 at 135-36; *see also In re Brints Cotton Mktg., Inc.*, 737 F.2d at 1340-41. The Court *is* required evaluate claims pursuant to the legal rules which may govern the ultimate value of the claim. *In re Brints Cotton Mktg., Inc.*, 737 F.2d at1340-41; *Bittner*, 691 F.2d at 135-36 ("For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law."). The Court is not otherwise limited in its approach to the estimation process.

In the current suit, the Court employs a five-step process to estimate the UDF and UDF III's claims. First, the Court estimates the claims of UDF and UDF III by evaluating the various issues and record currently before the Court. Second, the Court then estimates the likelihood of this Court coming to a different conclusion in a full trial on these same issues. It estimates this probability by taking into consideration the relative strength of the various arguments made by the parties, how complete the record is in regard to the relevant facts, as well as the nature of the analysis required to reach a given conclusion (*i.e.*, the more mechanical and objective the analysis for a particular finding or conclusion, the lower the probability of this Court coming to a different conclusion). Based on these considerations, the Court then assigns a numerical percentage value to the probability of coming to this different conclusion (*e.g.*, 20%). Third, the Court estimates the likely effect of this different result on the Defendants' claims (*i.e.,* is the effect is to eliminate the Defendants' claim entirely, or is the effect to reduce the Defendants' claim by, say, $500,000.00?). Fourth, the Court then multiplies the percentage chance of reaching

the different result in a full trial on the merits by the estimated effect of the different result on the Defendants' claims. Fifth, the Court then discounts the Defendants' claims by this amount.

For example, if the Court estimates a given claim to be $1,000,000.00 based on the applicable rules of law and the record before it, and then estimates a 20% likelihood of reaching a different result in a full trial on the merits, and, further, estimates that reaching this different result would reduce the Defendants' claim by $1,000,000.00, the Court would then discount the estimated claim by 20% x $1,000,000.00, or $200,000.00. The final estimated claim in this example would be $800,000.00 (*i.e.,* $1,000,000.00 - $200,000.00). Alternatively, if the Court estimated that the consequence of reaching this different result would instead reduce the Defendants' claim by only $500,000.00, the Court would then discount this claim by 20% x $500,000.00, or $100,000.00. The final estimated claim in this example would therefore be $900,000.00 (*i.e.,* $1,000,000.00 - $100,00.00).

The Court believes this approach is best suited for this particular dispute because many of the issues raised in this claims estimation proceeding may be analyzed largely, or in their entirety, on the basis of the language of the various agreements pertaining to the loan transactions between the parties, or various other documents on the record memorializing the transaction, (*e.g.,* the Loan Histories [Exhibits No. 18, 27, & 36] or the Settlement Statements [Exhibits No. 17 & 35]). As a result, the record is reasonably complete for these issues, providing a solid foundation for the Court to evaluate the applicable rules of law and the relative certainty of its own conclusions–*i.e.,* the probability of reaching a different result in a full trial. Discounting the claims by the probability of reaching a different result in a full trial leads to a more equitable estimation proceeding because the discount acts as a check against possible errors resulting from

14

the mini-trial of November 19-20, 2009. Stated differently, discounting claims in this manner helps to ensure that a party will not unduly benefit from the special and abbreviated nature of a claims estimation proceeding.

*ii. Issues Relating to the Estimation of the Proofs of Claim Submitted by UDF III.*

In the Complaint [Docket No. 1], the Plaintiffs request the disallowance of Proofs of Claim number 43[12], 45, and 46, filed by UDF III, and arising from Perry's guaranty of the UDF III Notes, due to any one of the following legal grounds: (1) errors in the Proofs of Claim; (2) usury; (3) equitable subordination; (4) right to credits as a result of the foreclosure sale of the Hidden Lakes Property; (5) unliquidated claims; (6) ability of the borrower to pay the obligation; or (7) Proof of Claim 45 is duplicative of Proof of Claim 43.

UDF III denies these allegations and raises the following legal grounds in its defense: (1) the Plaintiffs are equitably estopped from asserting a claim of usury; (2) Perry, as guarantor, lacks standing to assert a claim of usury or obtain setoff from usury penalties; and (3) the savings clauses in each of the UDF III Notes protect UDF III from contracting for, charging, or receiving usurious interest. UDF III argues that, for purposes of estimation, this Court should hold that the amount of its claims should be the amounts set forth in its Proofs of Claim. Stated differently, UDF III argues that there should be no discount of these amounts. Hence, UDF III asserts that its estimated total claim should be $9,778,749.03 (which is the sum of the pre and post-petition

---

[12] The Plaintiffs' initial complaint identifies UDF as filing Proof of Claim number 43. It was clarified at the Hearing that Proof of Claim 43 was filed on behalf of UDF III.

15

claims made by UDF III under its Proofs of Claim 43, 45, and 46 – *i.e.*, $3,619,902.00 +

$3,619,902.00 + $2,538,945.03 = $9,778,749.03).

*iii. Issues Relating to the Estimation of the Proofs of Claim Submitted by UDF.*

In the Complaint [Docket No. 1], the Plaintiffs request the disallowance of Proof of

Claim number 44 filed by UDF, arising from Perry's guaranty of the Hidden Lakes/UDF Note,

due to any one of the following legal grounds: (1) errors in the Proof of Claim; (2) usury; (3)

actions to recover deficiency are barred by Nevada law; (4) equitable subordination; (5) right to

credits as a result of the foreclosure sale of the Hidden Lakes Property; or (6) ability of the

borrower to pay the obligation.

UDF denies these allegations and raises the following legal grounds in its defense: (1) the

Plaintiffs are equitably estopped from asserting a claim of usury; (2) Perry, as guarantor, lacks

standing to assert a claim of usury or obtain setoff from usury penalties; and (3) the savings

clauses in the Hidden Lakes/UDF Note protect UDF from contracting for, charging, or receiving

usurious interest. UDF argues that, for purposes of estimation, this Court should hold that the

amount of its claim should be the amount set forth in Proof of Claim 44. Stated differently, UDF

argues that there should be no discount of this amount. Hence, UDF asserts that its estimated

claim should be "at least" $1,891,528.35.

**C. Conclusions of Law pertaining to the Loans made by UDF III**

*i. What is the Proper Aggregate Amount of the Proofs of Claim?*

The first step in the analysis is to determine the initial proper amount of UDF III's Proofs of Claim before any reduction due to the legal grounds raised by the Plaintiffs. Three issues must be addressed: (1) whether UDF III is entitled to post-petition interest and costs; (2) the amount of principal actually advanced on the loans; and (3) the amount of interest due on the amount of principal actually advanced.[13] Texas law applies to the UDF III Notes pursuant to the express language of these Notes. The Court addresses each issue in turn.

## (1) Is UDF III entitled to post-petition interest and costs on the Hidden Lakes/UDF III Notes?

The Bankruptcy Code[14] is very clear on when creditors are entitled to post-petition interest and costs. Section 506(b) provides that "to the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable costs or charges . . . ." 11 U.S.C. § 506(b) (2006). The definition of a "secured claim" is provided in Section 506(a)(1), which states that "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. . . ." *Id.* § 506(a)(1). Section 506(a)(1) goes on to provide that an allowed claim "is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such secured claim." *Id.* Finally, and importantly for the analysis here, Section 502(b) provides that a creditor is not entitled to

---

[13]These same issues are addressed with respect to the Hidden Lakes/UDF Note below, in Section D(i) of the Conclusions of Law.

[14] Any reference hereinafter to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (*i.e.* §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" or "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

"unmatured interest" on an unsecured claim. *Id.* § 502(b)(2). Thus, the initial inquiry is to determine the value of the estate's interest in the collateral securing the Hidden Lakes/UDF III Notes in order to determine the amount, if any, of UDF III's secured claim. If the value of the estate's interest in the collateral is greater than the amount of UDF III's claim, then UDF III is entitled to post-petition interest and costs up to the point that total principal, plus interest and costs, is equal to the value of the estate's interest in the collateral. If the value of the estate's interest in the collateral is less than the amount of UDF III's claim, then some portion of UDF III's claim will be an unsecured claim, and UDF III will not be entitled to post-petition interest and costs.

Given the record before this Court, the value of the estate's interest in the collateral should be valued at zero dollars, and, therefore, the Court finds that UDF III is not entitled to post-petition interest and costs. As noted above, in order to be counted towards a secured claim, collateral securing a debt must be property of the bankruptcy estate–*i.e.*, Perry, as the Debtor-in-Possession, must have had an interest in the collateral at the time of his Chapter 11 filing. Here, Perry had no interest in any of the collateral securing the Hidden Lakes/UDF III Notes [Exhibits No. 22 & 40]. Therefore, the value of his estate's interest in the collateral must be placed at zero dollars. As a result, UDF III has only an unsecured claim and it is not entitled to receive post-petition interest or costs relating to the Hidden Lakes/UDF III Notes [Exhibits No. 22 & 40].

(2) Is UDF III entitled to post-petition interest and costs on the Southern Colony/UDF III Notes?

As noted in the preceding analysis, the Court may only consider collateral securing the Southern Colony/UDF III Notes in Perry's bankruptcy estate in determining whether UDF III has

a secured claim under the Southern Colony/UDF III Notes [Exhibits No. 3 & 14]. And, just as with the Hidden Lakes/UDF III Notes, the Southern Colony/UDF III Notes are not secured by any property in Perry's bankruptcy estate. As such, UDF III has no secured claim and is not entitled to any post-petition interest or costs relating to the Southern Colony/UDF III Notes [Exhibits No. 3 & 14].

## (3) What is the dollar amount of principal actually advanced by UDF III under the Hidden Lakes/UDF III Notes?

- ### (a) The Original Hidden Lakes/UDF III Note

Neither party contends that the full principal face value of the Original Hidden Lakes Note was advanced, but there is disagreement over the amount of principal that actually was advanced. The Plaintiffs assert that the face principal value of the of the Original Hidden Lakes/UDF III Note was reduced by an "interest reserve" in the amount of $450,000.00; a one-half share of a "commitment fee" purportedly paid to UMTH in the amount of $37,875.00 (the full fee being in the amount of $75,750.00); a "2% consulting fee" in the amount of $28,500.00 to Winchester Equities, LLC; a "commitment fee" to UDF III in the amount of $56,250.00; and a "second lien fee" purportedly paid to UDF III in the amount of $6,500.00. All of these reductions appear to be taken directly from items on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. The Plaintiffs assert that these fees reduce the principal actually advanced on the Original Hidden Lakes/UDF III Note from a face value of $1,931,250.00 down to $1,332,625.00.

Because the Plaintiffs argue that UDF III contracted for, charged, or received usurious interest under the UDF III Notes, and Texas usury law may require a recharacterization of certain fees as interest, these fees require two separate characterizations by the Court:[15] first, the Court must characterize these fees under Texas contract and applicable non-usury finance law in order to determine UDF III's threshold claim under the contract alone; and second, the Court must determine whether these fees should properly be characterized as interest under usury law in determining whether the interest contracted for, charged, or received under the UDF III Notes was in excess of the legal limit.  In this section, the Court characterizes the fees under Texas contract law in order to determine the amount of principal actually advanced. The fees are characterized for the usury analysis below, in section C(ii) of the Conclusions of Law.

There is a threshold issue concerning the Plaintiffs' assertions that the Court must address before proceeding with its analysis of the amount of principal actually advanced under the Hidden Lakes/UDF III Notes. Assuming that each of the fees or interest reserve is an item properly characterized as *not* being principal actually advanced, the Court cannot recreate the figure of $1,332,625.00 advanced by the Plaintiffs, as shown below:

---

[15] *See Perry v. Stewart Title Co.*, 756 F.2d 1197, 1206 (5th Cir. 1985) ("Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note *to determine whether a loan is usurious.*") *citing First State Bank of Bedford v. Miller*, 563 S.W.2d 572, 575 (Tex. 1978) ("'In a cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly *in testing for usury.*") *quoting Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 782-83 (Tex. 1977). Even if the Court finds that usurious interest is contracted for, charged, or received, the Notes remain valid and enforceable by UDF and UDF III, "provided allowance is made for the penalty." *Vordenbaum v. Rubin*, 611 S.W.2d 463, 465 (Tex.Civ.App.–Dallas 1980) *citing Wall v. E. Texas Teachers Credit Union*, 526 S.W.2d 148, 151-54 (Tex.Civ.App.-Texarkana 1975), *rev'd on other grounds*, 533 S.W.2d 918 (Tex. 1976). Finally, Texas law requires no forfeiture of principal for usurious interest for commercial loans. Tex. Fin. Code Ann. § 305.001(a-1)(Vernon 2009).

| | |
|---|---|
| $1,931,250.00 | (face principal value) |
| − $450,000.00 | (interest reserve) |
| − $37,875.00 | (½ share of commitment fee to UMTH) |
| − $28,500.00 | (consulting fee to Winchester Equities) |
| − $56,250.00 | (commitment fee to UDF III) |
| − $6,500.00 | (second lien fee to UDF III) |
| $1,352,125.00 | (principal actually advanced) |

Because $1,352,125.00 is the lowest amount of actual principal advanced that the Court can calculate assuming all of the Plaintiffs' allegations regarding the fees at issue are true, the Court will assume that $1,352,125.00 is the amount that the Plaintiffs concede was principal actually advanced for the purposes of the analysis.

The Defendants, in their Brief of November 11, 2009 [Main Case Docket No. 738], simply make a blanket request that the claims asserted under the Proofs of Claim be allowed in their full amounts. In so doing, the Defendants do not specify an amount advanced as principal, and instead appear to rely on the Original Hidden Lakes/UDF III Note [Exhibit No. 22] and the Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] for the amount of principal actually advanced under this Note. The Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] indicates a disbursement of funds to Hidden Lakes on May 22, 2007 in the amount of $1,425,000.00, which is the amount listed as the "Commitment" in the Original Hidden Lakes/UDF III Note [Exhibit No. 22](the Commitment is expressly characterized as principal in this Note). The loan history documents do not indicate how this number was derived, but the Court will assume that this number represents the full principal face value of

21

$1,931,250.00, reduced by the interest reserve of $450,000.00 and the commitment fee to UDF III of $56,250.00, which results the amount of $1,425,000.00 stated on the loan history.

By implication, the Court assumes that both parties agree that the interest reserve of $450,000.00 does not represent principal actually advanced (pursuant to the uncontested express language of this Note). The next step in the analysis is to characterize the four items which are in dispute: (1) the commitment fee to UDF III of $56,250.00;  (2) the 2% consulting fee of $28,500.00 to Winchester Equities, LLC; (3) the second lien fee allegedly paid to UDF III in the amount of $6,500.00; and (4) the one-half share of a commitment fee paid to UMTH in the amount of $37,875.00. These items are addressed in turn.

Under Texas contract law, "[w]hen construing a contract, the court's primary concern is to give effect to written expression of the parties' intent. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). A contract "is to be construed in accordance with its plain language." *Gen. Am. Indem. Co. v. Pepper*, 339 S.W.2d 660, 661(Tex. 1960). Where the words in a contract are "clear and unambiguous," the rules of construction are not to be applied. *Id.*  The unambiguous words of a contract are deemed to "express the intention of the parties, because objective, not subjective, intent controls." *Derr Constr. Co. v. City of Houston*, 846 S.W.2d 854, 861 (Tex.App.–Houston [14th dist.] 1992). In determining the meaning of the words of a contract, the Court is "bound to read all parts of a contract together to ascertain the agreement of the parties." *Forbau*, 876 S.W.2d at 133. "The contract must be considered as a whole" and "[m]oreover, each part of the contract should be given effect." *Id.* Accordingly, the Court will look first to the language of the entirety of the Hidden Lakes/UDF III Notes to determine how the parties intended the fees to be characterized. Only if the terms of the Hidden Lakes/UDF III

22

Notes are ambiguous as to how a fee should be characterized will the Court look to the rules of construction or extrinsic evidence to classify the fees at issue.

The first item to be characterized is the commitment fee to UDF III in the amount of $56,250.00 (the UDF III Commitment Fee). Under the Original Hidden Lakes/UDF III Note [Exhibit No. 22], a commitment fee in the amount of $56,250.00 is contemplated at Section 2(c)- "Loan Expenses; Fees – Commitment Fee." This paragraph clearly characterizes the UDF III Commitment Fee as principal. In plain language, it states that "[b]orrower agrees that such amount *shall automatically constitute principal* outstanding hereunder and caused [*sic*] *a corresponding increase in the aggregate outstanding amount of Borrower's obligations hereunder*." Accordingly, the Court finds that the UDF III Commitment Fee is properly characterized as principal actually advanced.

The second item to be characterized is the 2% consulting fee in the amount of $28,500.00 to Winchester Equities, LLC. This fee is item 805 on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. Item 805 on a HUD Settlement Statement is used to itemize inspections done at the request of the lender, so the Court will assume this fee represents a payment to an inspector of the Hidden Lakes Property. As with the commitment fee above, the Original Hidden Lakes/UDF III Note [Exhibit No. 22] clearly contemplates such fees. The plain language of Section 2(a) states that "Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all expenditures . . . in connection with any of the following: (i). . . the closing . . . of any loan or creditor facility represented by or secured by the Loan Documents, including . . . inspection services and disbursements." Unlike the language in Section 2(c) of the Original Hidden Lakes/UDF III Note [Exhibit No. 22] (concerning the commitment fee), this

23

paragraph does not specifically designate such expenses as principal. But Section 2(f)–"Loan Expenses; Fees – Advance of Certain Fees"–clearly contemplates the payment of such fees as an advance out of the Commitment of $1,425,000.00. Therefore, the Court finds that the 2% consulting fee of $28,500.00 to Winchester Equities, LLC constitutes principal actually advanced.

The third item to be characterized is the second lien fee paid to UDF III in the amount of $6,500.00.  The second lien fee is listed as item 811 on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] as "2nd Lien Fee to United Development Funding *III*," (*emphasis added*). However, for reasons that will be discussed below, the Court believes that this entry is incorrect and that the second lien fee was actually paid, or in any case should have been paid, to UDF. If this item was actually rightfully paid to UDF III, it is likely that, as with the 2% consulting fee of $28,500.00, the plain language of Original Hidden Lakes/UDF III Note [Exhibit No. 22] Section 2(a) encompasses this second lien fee.  Section 2(a) states that the "[b]orrower will pay all reasonable costs and expenses and reimburse Lender for any and all expenditures . . . in connection with any of the following: . . . (ii) Lender's creating, perfecting, and realizing upon Lender's security interest in, and the Liens on, the Pledged Collateral or any other collateral granted or pledged as security for this loan." Accordingly, Section 2(f)–"Loan Expenses; Fees – Advance of Certain Fees"–clearly contemplates the payment of such fees as an advance out of the Commitment of $1,425,000.00, and the amount of the fee will be characterized as principal for that reason if UDF III was the proper payee.

However, the Court believes that there is ample evidence that the second lien fee was actually paid, or should have been paid, to UDF(and not to UDF III). First and foremost, UDF is

24

described as the intended and actual lienholder on the Hidden Lakes Property in almost every document pertaining to the loan between Hidden Lakes and UDF, whereas UDF III is never mentioned in connection with the lien except for the entry on item 811 of the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. For example, the Loan Commitment Letter from UDF to Hidden Lakes [Exhibit No. 20] sets forth that such a lien will be created in favor of UDF ("The Loan will be secured by (i) a deed of trust creating a lien against the Property, second in priority only to a senior lender providing financing for the acquisition of the Property . . . ") whereas the Loan Commitment Letter from UDF III to Hidden Lakes [Exhibit No. 21] for the loan between Hidden Lakes and UDF III does not. Moreover, the Original Hidden Lakes/UDF Note [Exhibit No. 28] provides that it will be secured by a "Deed of Trust" giving UDF "a security interest in and a Lien on the Property." In contrast, the Original Hidden Lakes/UDF III Note contemplates no such deed of trust or lien. The UDF Deed of Trust, itself, which is the only evidence on the record showing a lien on the Hidden Lakes Property held by either UDF or UDF III, states that it "is made to secure and enforce the payment of . . . that certain Secured Promissory Note . . . payable to the order of [UDF]." Moreover, the UDF Deed of Trust makes no mention of UDF III, nor is there a corresponding deed of trust securing the loan between Hidden Lakes and UDF III. The Assignment of Promissory Notes, Deed of Trust and Loan Documents [Exhibit No. 32] assigns UDF's rights, title and interest in the Deed of Trust relating to Hidden Lakes. There is no corresponding assignment document in the record assigning a lien on the Hidden Lakes Property held by UDF III. There *is,* however, an Assignment of Deed of Trust, Security Agreement and Fixture Filing and Loan Documents by UDF III [Exhibit No. 15] which assigns UDF III's rights, title, and interest in the Southern

25

Colony Deed of Trust. These circumstances reflect a pattern in the loan transactions where UDF and UDF III assigned their rights in the liens on real property, making the absence of a Hidden Lakes/UDF III assignment more conspicuous.

The loan documents also tend to identify UDF as the *second* lienholder on the Hidden Lakes Property, occupying a subordinate position to the lien held by RBC. The Term Sheet by United Development Funding, LP and United Development Funding III, LP to Perry Properties and Hidden Lakes provides that a *second* lien deed of trust will serve as collateral for the loan.[16] The Loan Commitment Letter from United Development Funding to Southern Colony [Exhibit No. 20] for the loan between Hidden Lakes and UDF provides that the deed of trust to be provided to UDF is "second in priority only to a senior lender providing financing for the acquisition of the Property." The Deed of Trust [Exhibit No. 29] contains a Hidden Lakes warranty that it will defend title to the Hidden Lakes Property against all claims except, inter alia, "encumbrances associated with the loan agreement . . . between Grantor and [RBC]." The Subordination Agreement between UDF and RBC [Exhibit No. 33] provides that UDF's liens under the Deed of Trust "are and shall continue to be expressly subject and subordinate to [RBC]'s senior loan." Accordingly, under all of these circumstances, the Court finds it reasonable to assume that the second lien fee identified as item 811 of the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] was properly payable to UDF, not UDF III.

---

[16] The term sheet pertains to the loans to Hidden Lakes from both UDF and UDF III. The Court believes that there are enough other documents indicating that the second lien deed of trust contemplated in the term sheet applies only to UDF and not UDF III, or alternatively, that sometime after the term sheet was drafted, the parties agreed that the second lien deed of trust would be held solely by UDF.

Accepting this assumption as true means that, more than likely, one of two things took place: either (1) the second lien fee was paid to UDF, as the second lienholder, and the entry for item 811 the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] erroneously identifies UDF III as the payee; or, (2) UDF III actually received the second lien fee as stated in the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] by mistake or according to a transaction structure that is not apparent in the record. Because there is no evidence in the record currently before the Court that indicates which of these possibilities is the case, the Court employs Occam's Razor[17] as a guideline in finding that the simpler explanation for this seemingly contradictory entry on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] is that the second lien fee was, in reality, paid to UDF, and the identification of UDF III as the recipient on the Settlement Statement [Exhibit No. 35] was simply a scrivener's error. With no supporting evidence one way or the other, it is far easier for the Court to believe that a typographical error was entered on a document misidentifying a party, than that a sum of of $6,500.00 was paid to the wrong party, or that a transaction took place in which a payment to the holder of the second lien was actually intended to go to a party other than the actual holder of the second lien. For these reasons, the Court finds that the Plaintiffs improperly removed the second lien fee of $6,500.00 from the amount of principal actually advanced by UDF III under the Original Hidden Lakes/UDF III Note [Exhibit

---

[17]"When competing hypotheses are equal in other respects, the principle recommends selection of the hypothesis that introduces the fewest assumptions and postulates the fewest entities while still sufficiently answering the question." http://en.wikipedia.org/wiki/Occam%27s_Razor (Jan. 29, 2010); *see, e.g.*, Stephen Hawking, A Brief History of Time 55 (1990).

No. 22], because this payment was not actually made to UDF III and is in no way pertinent to the loan transaction between Hidden Lakes and UDF III.

The fourth and final item to be characterized is the one-half share of a commitment fee paid to UMTH in the amount of $37,875.00. The Court believes that the Plaintiffs have improperly ascribed this fee to UDF III as well. For instance, the Original Hidden Lakes/UDF III Note [Exhibit No. 22] makes no mention of such a commitment fee. Whereas, the Hidden Lakes/UDF Note [Exhibit No. 28] specifically contemplates a commitment fee in the amount of $75,750.00 at Section 2(c)-"Loan Expenses; Fees – Commitment Fee." $75,750.00 is the exact amount of the fee which the Plaintiffs argue should be charged, in equal parts, to UDF and UDF III. Furthermore, the amount listed as paid to UMTH in item 807 of Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] is also listed as the UDF commitment fee at item 104. Thus, the Court finds that the Plaintiffs have erred in asserting that the principal actually advanced under the Original Hidden Lakes/UDF III Note should be a one-half share of the commitment fee paid to UMTH. This commitment fee is not a part of the loan transaction between UDF III and Hidden Lakes, and therefore has no impact on the Court's determination of the amount of principal actually advanced.

To reach the final amount of principal advanced under the Original Hidden Lakes UDF III Note [Exhibit No. 22], the Court aggregates the various amounts of principal found to be actually advanced under the Original Hidden Lakes/UDF III Note:

1.      The Commitment under the Original Hidden Lakes/UDF III Note [Exhibit No. 22] in the amount of $1,425,000.00. The Loan History of UDF III on Loan of Hidden

28

Lakes [Exhibit No. 27] indicates a disbursement of funds to Hidden Lakes on May 22, 2007 in an identical amount. As noted in the analysis above, the 2% consulting fee of $28,500.00 to Winchester Equities, LLC, and the second lien fee to UDF III (if the fee was, in actuality, paid to UDF III) both make up part of the Commitment pursuant to the Original Hidden Lakes/UDF III Note [Exhibit No. 22]. As these fees are properly characterized as principal, neither necessitates a reduction in the amount of the Commitment for the purposes of the Court's determination of the principal actually advanced under the Original Hidden Lakes/UDF III Note.

2.        The UDF III Commitment Fee in the amount of $56,250.00. Pursuant to the Original Hidden Lakes/UDF III Note [Exhibit No. 22], Section 2(c)-"Loan Expenses; Fees – Commitment Fee," the UDF III Commitment Fee is an additional component of principal actually advanced under the Original Hidden Lakes/UDF III Note [Exhibit No. 22] on May 22, 2007, and separate from the Commitment.

Adding the Commitment (*i.e.*, $1,425,000.00) and the Commitment Fee (*i.e.*, $56,250.00) together, the calculated amount of principal actually advanced increases to $1,481,250.00 (*i.e.*, $1,425,000.00 (including the $28,500.00 2% consulting fee to Winchester Equities, LLC) + 56,250.00 = $1,481,250.00).

- (b) The Amended Hidden Lakes/UDF III Note

29

The parties agree on the amount of principal advanced under the Amended Hidden Lakes/UDF III Note [Exhibit No. 40]. The facts surrounding the making of this amendment are summarized as follows: In June of 2008, due to a shortfall in payments on the RBC Note, UDF III funded a Certificate of Deposit in the amount of $1,720,320.00, pledged the Certificate of Deposit to RBC, and allowed RBC to sweep the Certificate of Deposit and apply the proceeds to Hidden Lakes' obligation under the RBC Note. [Finding of Fact No. 22.] The Original Hidden Lakes/UDF III Note [Exhibit No. 22] was modified in order to increase the principal amount to $3,651,570.00 to reflect this transaction, which was essentially a payment on behalf of UDF III. [Finding of Fact No. 22.] On June 25, 2008, UDF III filed a motion for "Order Approving Modification of Pre-Petition Guaranty Made by Debtor to United Development Funding III, L.P." [Main Case Docket No. 95.][18] [Finding of Fact No. 22.] On July 23, 2008, the Court granted this motion on July 23rd, 2008 pursuant to "Order Granting Motion for Approval" [Main Case Docket No. 139.] [Finding of Fact No. 22.] This principal amount was used to provide RBC with a pledged certificate of deposit, which UDF III then allowed RBC to sweep in satisfaction of the shortfall. [Finding of Fact No. 22.]

The face of the Amended Hidden Lakes/UDF III Note [Exhibit No. 40] states that the modification is to increase the principal amount of the Original Hidden Lakes/UDF III Note [Exhibit No. 22], by $1,720,320.00, the amount of the shortfall on the RBC Note at the time the amendment was made. Neither party contends that this amount was not actually advanced. Adding the amount of the additional funds actually advanced under the Amended Hidden

---

[18] This motion for modification requests approval of an increase to the amount guaranteed under the Hidden Lakes/UDF III Guaranty Agreement [Exhibit No. 25] by $1,720,320.000, mirroring the increase in the amount owed under the Hidden Lakes/UDF III Notes.

Lakes/UDF III Note [Exhibit No. 40] (*i.e.*, $1,720,320.00) to the amount of principal advanced

under the Original Hidden Lakes/UDF III Note [Exhibit No. 22] (*i.e.*, $1,481,250.00) **brings the**

**total principal actually advanced  under the Hidden Lakes/UDF III Notes to $3,201,570.00**.


(4) What is the dollar amount of principal actually advanced by UDF III under the Southern

Colony/UDF III Notes?

- (a) The Original Southern Colony/UDF III Note

Neither party contends that the full face principal value of the Original Southern Colony/UDF

III Note  [Exhibit No. 3] was advanced, but there is disagreement over the amount actually

advanced.  The Plaintiffs assert that the principal face value of the Original Southern

Colony/UDF III  Note [Exhibit No. 3] was reduced by the following amounts: (a) an "interest

reserve" in the amount of $40,000.00; (b) $100,000.00 in "option payments"; (c) a $150,000

"extension fee"; and (d) a $38,200.00 "commitment fee." All of these reductions are taken

directly from items on the Settlement Statement for Purchase of the Southern Colony Property

[Exhibit No. 17]. The Plaintiffs contend that these reductions bring the actual principal advanced

on the Original Southern Colony/UDF III Note [Exhibit No. 3] to $1,583,300.00, down from a

face value of $1,911,500.00.

The Defendants, in their Brief of November 11, 2009 [Main Case Docket No. 738], simply

make a blanket request that the claims asserted under the Proofs of Claim be allowed in their full

amounts. In so doing, the Defendants do not specify an amount advanced as principal, and

instead appear to rely on the Original Southern Colony/UDF III Note [Exhibit No. 3] and the

Loan History of UDF III on Loan of Hidden Lakes on Loan of Southern Colony [Exhibit No. 18]

for the principal actually advanced. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] indicates a disbursement of funds to Southern Colony in the amount of $1,829,185.00 on February 21, 2007. The Loan History documents do not indicate how this number was reached, but the Court will assume that this number represents the full principal face value of $1,911,500.00, reduced by the interest reserve of $40,000.00, the administration fee of $4,115.00, and the commitment fee to UDF of $38,200.00 – which results in the amount of $1,829,185.00.

By implication, the Court assumes that both parties agree that the interest reserve of $40,000.00 does not represent principal actually advanced (pursuant to the uncontested express language of this Note). In addition, because the accuracy of an entry on the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] showing a payment made under this Note on June 7, 2007 in the amount of $24,696.27 has not been challenged, the Court assumes that this entry is accurate. The next step in the analysis is to characterize the four items over which the parties impliedly dispute: (1) the $38,200.00 commitment fee to UDF III; (2) the $4,115.00 administrative fee to UDF III; (3) the $150,000.00 extension fee; and (4) the $100,000.00 in option payments. The Court also finds it necessary to characterize a legal fee in the amount of $693.20 charged against the principal under the Southern Colony/UDF III Note [Exhibit No. 3], as recorded on the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18].These items are addressed in turn.

Under Texas contract law, "[w]hen construing a contract, the court's primary concern is to give effect to written expression of the parties' intent. *Forbau*, 876 S.W.2d at 133. A contract "is to be construed in accordance with its plain language." *Gen. Am. Indem. Co.*, 339 S.W.2d at 661.

32

Where the words in a contract are "clear and unambiguous," the rules of construction are not to be applied. *Id.* The unambiguous words of a contract are deemed to "express the intention of the parties, because objective, not subjective, intent controls." *Derr Constr. Co.*, 846 S.W.2d at 861. In determining the meaning of the words of a contract, the Court is "bound to read all parts of a contract together to ascertain the agreement of the parties." *Forbau*, 876 S.W.2d at 133. "The contract must be considered as a whole." *Id.* "Moreover, each part of the contract should be given effect." *Id.* Accordingly, the Court will look first to the language of the entire Southern Colony/UDF III Notes to determine how the parties intended the fees to be characterized. Only if the terms of these Notes are ambiguous as to how a fee should be characterized, will the Court look to the rules of construction or extrinsic evidence to classify the fees at issue.

The Court will first characterize the $38,200.00 commitment fee and the $4,115.00 administrative fee because the analysis is almost identical to the second lien fee  and the commitment fee to UDF III under the Original Hidden Lakes/UDF III Note [Exhibit No. 22], above. The plain language of Section 2(c)–"Loan Expenses; Fees–Commitment Fee"–of the Original Southern Colony/UDF III Note [Exhibit No. 3] clearly contemplates a commitment fee of $38,200.00 that constitutes an advance of principal. Section 2(c), in relevant part, states that the commitment fee, "upon disbursement . . . shall automatically constitute principal outstanding hereunder, and cause a corresponding increase in the aggregate outstanding amount of Borrower's obligations hereunder . . . ." The plain language of Section 2(b)–"Loan Expenses; Fees–Loan Administration Fee" of the Original Southern Colony/UDF III Note [Exhibit No. 3] also clearly contemplates an administration fee of $4,115.00 constituting principal actually advanced in language nearly identical to that used for the commitment fee. Therefore, the Court

33

finds that the $38,200.00 commitment fee and the $4,115.00 administrative fee are properly characterized as principal actually advanced under the Original Southern Colony/UDF III Note [Exhibit No. 3].

The next items to be characterized are the $150,000.00 extension fee and the $100,000.00 option payments. The extension fee and the option payments are listed as items 208 and 209 on the Settlement Statement for Purchase of the Southern Colony Property [Exhibit No. 17] under the heading "200. AMOUNTS PAID BY OR IN BEHALF OF THE LENDER." This section of the Settlement Statement is organized with payments on the left side of the table matched with corresponding amounts received by the seller on the right side. Because there is no other evidence in the record as to either fee's nature, the Court assumes that these items represent payments made by UDF III to the seller on behalf of Southern Colony. Section 2(a) of the Original Southern Colony/UDF III Note [Exhibit No. 3], titled "Loan Expenses; Fees–Loan Expenses,"states that "upon Lender's demand . . . Borrower shall pay Lender the full amount of all Loan Expenses incurred by lender." "Loan Expenses" are defined in the Original Southern Colony/UDF III Note [Exhibit No. 3] as "all fees and expenses incurred by the Lender in connection with the Loan . . . including . . . closing costs." Thus, the Court finds that the $150,000.00 extension fee and the $100,000.00 option payments constitute Loan Expenses incurred in closing, and which are properly characterized as Commitment Advances of Principal under Section 3(a) of the Original Southern Colony/UDF III Note [Exhibit No. 3].

Finally, the Court must characterize the legal fee in the amount of $693.20 charged against principal under the Original Southern Colony/UDF III Note [Exhibit No. 3] on May 11, 2007. The Court is persuaded that this fee is properly characterized as principal for two reasons. First, it

34

is characterized as such under the Southern Colony/UDF III Notes [Exhibits No. 3 & 14].[19]

Second, the accuracy of the Loan History of UDF III on Loan of Southern Colony [Exhibit No.

18] has not been contested, and it, along with the Settlement Statement for purchase of Hidden

Lakes Property [Exhibit No. 17], is the only record of the transactions that occurred in

connection with the loan between UDF III and Southern Colony.  As such, the Court will assume

the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 36] to be an accurate

statement of the transactions in connection with the Southern Colony/UDF III Notes [Exhibits

No. 3 & 14] to the extent that it is not contradicted by other evidence on the record. To reach the

final tally under the Original Southern Colony/UDF III Note [Exhibit No. 3], the Court

aggregates the various items identified as principal in the analysis above:

---

[19]Section 2(d) of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that "such fees and expenses are not, are not intended to be, and shall not be characterized as, interest or as compensation for the use, forebearance or detention of money." This language tracks the language of Tex. Fin. Code Ann. § 301.002(a)(4) which defines "interest" as "compensation for the use, forebearance, or detention of money." Tex. Fin. Code § 301.002(a)(4) (Vernon 2009). Thus, the express language of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that the extension fee is not interest, and therefore, by implication, the fee should be characterized as principal.

- Additions to the principal actually advanced under the Original Southern Colony/UDF III Note:

1.      The disbursement of $1,829,185.00[20];

2.      The Commitment Fee in the amount of $38,200.00;

3.      The Administrative fee in the amount of $4,115.00; and

4.      The legal fee in the amount of $693.20.

- Reductions to the principal actually advanced under the Original Southern Colony/UDF III Note [Exhibit No. 3]:

1.      The payment made under this Note on June 7, 2007 in the amount of $24,696.27.

The result, after aggregating these items, is the sum of $1,847,496.93.

|  | $1,829,185.00 | (Disbursement) |
|---|---|---|
| + | $38,200.00 | (Commitment Fee) |
| + | $4,115.00 | (Administrative Fee) |
| + | $693.20 | (Legal Fee) |
| − | $24,696.27 | (Payment) |
| | **$1,847,496.93** | **(principal actually advanced under the Original Southern Colony/UDF III Note)** |

**Therefore, the Court finds that the amount of principal advanced under the Original Southern Colony/UDF III Note [Exhibit No. 3] is $1,847,496.93.**

---

[20]The $150,000.00 extension fee and the $100,000.00 in option payments, characterized as principal above, are components of the disbursement, pursuant to the language of the Original Southern Colony/UDF III Note. As such, they are not listed as "Additions to the principal actually advanced under the Original Southern Colony/UDF III Note."

- (b) The Amended Southern Colony/UDF III Note

The purpose of the Amended Southern Colony/UDF III Note [Exhibit No. 14] was to extend

the term of the Original Southern Colony/UDF III Note [Exhibit No. 3] and to increase the

interest reserve under these Notes from $40,000 to $1,040,000 to reflect this longer term.

[Finding of Fact No 19.] The Court assumes, pursuant to the uncontested express language of the

Amended Southern Colony/UDF III Note [Exhibit No. 14], that the parties agree that this

increase in the interest reserve is not properly characterized as principal actually advanced under

the Amended Southern Colony/UDF III Note [Exhibit No. 14].

Neither party addresses the following pre-petition fees and charges found on the Loan History

of UDF III on Loan of Southern Colony [Exhibit No. 18] in their pleadings, but the Court finds it

necessary to characterize these fees and charges in order to reach an accurate estimate of the

principal actually advanced under the Amended Southern Colony/UDF III Note [Exhibit No. 14]:

(1) an extension fee in the amount of $87,345.00 on August 22, 2007; (2) a "Draw" in the

amount of $41,376.15 on August 22, 2007; (3) a "Curtailment" payment in the amount of

$30,000.00 on August 22, 2007; (4)  a "Curtailment" payment in the amount of $57,345.00 on

August 22, 2007 (together, the Curtailment Payments); (5) Legal Fees in the amount of $3,383.60

on September 11, 2007; (6) Legal Fees in the amount of $263.75 on October 16, 2007 (together,

the Legal Fees); and (7) Miscellaneous Fees in the amount of $2,400.00 on December 10, 2007.

The first item to be characterized is the extension fee in the amount of $87,345.00 on August

22, 2007. This extension fee is not explicitly characterized in the Amended Southern

37

Colony/UDF III Note [Exhibit No. 14] as interest or principal.[21] However, the Court is persuaded

that it is properly characterized as principal. The Amended Southern Colony/UDF III Note

[Exhibit No. 14] explicitly provides that it is an amendment to, and not a restatement of, the

Original Southern Colony/UDF III Note [Exhibit No. 3]. Under Texas law, "even in the absence

of an express merger clause, all prior oral and written agreements are presumed to merge into a

subsequent written contract." *Yasuda Fire & Marine Ins. Co. of Am. v. Criaco*, 225 S.W.3d 894,

899 (Tex.App.–Houston [14th Dist.] 2007). Thus Sections 2(a) & (d) of the Original Southern

Colony/UDF III Note [Exhibit No. 3] operate to characterize this extension fee as principal.[22]

Accordingly, the Court finds that the execution of the Amended Southern Colony/UDF III Note

added $87,345.00 to the principal obligation under the Southern Colony/UDF III Notes.

The second and third items to be characterized are the Curtailment Payments. The Loan

History of UDF III on Loan of Southern Colony [Exhibit No. 18] shows a flurry of activity on

August 22, 2007 including entries for, *inter alia*: (1) the extension fee in the amount of

$87,345.00; (2) the Curtailment Payments; and (3) the "Draw" in the amount of $41,376.15. The

---

[21]The Original Southern Colony Note [Exhibit No. 3] has a face value of $1,911,500.00. The Amended Southern Colony Note [Exhibit No. 14] has a face value of $2,998,845.00, which, by the express language of the Amended Note, was to "accommodate" the increase to the interest reserve $1,040,000.00. However, the face value of the Original Southern Colony Note [Exhibit No. 3], $1,911,500.00, added to the increase in the interest reserve under the Amended Southern Colony Note [Exhibit No. 14], *i.e.*, $1,000,000.00 (from $40,000.00 to $1,040,000.00), results in a sum of $2,911,500.00 – which is $87,345.00 less than the face amount of the Amended Southern Colony Note [Exhibit No. 14]. This additional amount of $87,345.00 is explained by the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18], which records a "LOC Ext Fee," in the exact amount of $87,345.00, charged against principal on 08/22/2007.

[22]Section 2(d) of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that "such fees and expenses are not, are not intended to be, and shall not be characterized as, interest or as compensation for the use, forebearance or detention of money." This language tracks the language of Tex. Fin. Code Ann. § 301.002(a)(4) which defines "interest" as "compensation for the use, forebearance, or detention of money." Tex. Fin. Code Ann § 301.002(a)(4) (Vernon 2009). Thus, the express language of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that the extension fee is not interest, and therefore, by implication, the fee should be characterized as principal.

Curtailment Payments are listed on the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] as payments against the principal of the loan, *i.e.*, they reduce the outstanding principal under the Southern Colony/UDF III Notes. The Southern Colony/UDF III Notes [Exhibits No. 3 &14] provide that "all payments on this Note shall be applied first to unpaid Loan Expenses due hereunder, next, to unpaid accrued interest, and last, to principal outstanding under this note."[23] Pursuant to the terms of the Southern Colony/UDF III Notes [Exhibits No. 3 &14], the fees that had been charged as of August 22, 2007 were characterized as principal, and the accrued interest was "paid" out of the interest reserve upon maturity, also becoming principal. Accordingly, the Curtailment Payments are properly deducted from the amount of principal actually advanced under the Southern Colony/UDF III Notes. The sum of the two Curtailment Payments listed above comes to the exact amount of the extension fee– *i.e.*, $87,345.00. So, on the same day the amount of the extension fee was added to the principal actually advanced under the Southern Colony/UDF III Notes, it was eliminated by the Curtailment Payments.

The fourth item to characterize under this analysis is the Draw in the amount of $41,376.15 on August 22, 2007. The Draw is not referenced anywhere in the record besides the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18]. It is not memorialized in the Southern Colony/UDF III Notes, so the Court cannot rely on the language of these Notes to properly characterize the Draw. However, the accuracy of the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] has not been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes Property [Exhibit No. 17], is the only record of the

---

[23]Section 5(a) of the Original Southern Colony Note [Exhibit No. 3] (incorporated by reference to the Amended Southern Colony Note [Exhibit No. 14]).

transactions that occurred in connection with the loan between UDF III and Southern Colony. As such, the Court will assume the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] to be an accurate statement of the transactions in connection with the Southern Colony/UDF III Notes [Exhibits No. 3 & 14] to the extent that it is not contradicted by other evidence in the record. Moreover, as the Plaintiffs have not challenged the characterization of the Draw, the Court finds it reasonable to conclude that the characterization of the Draw in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] as principal is accurate. Buttressing this conclusion is the designation of each of the transactions involved in the original disbursement of the Commitment under the Original Southern Colony/UDF III Note [Exhibit No. 3] as a "draw" in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18]–the only other recorded transactions in the Loan History to bear that designation. Implicit in this common designation is that the Draw being analyzed also involved the advance of funds, which is the type of loan transaction most commonly associated with the concept of "principal" under a loan. Accordingly, the Court finds that the Draw in the amount of $41,376.15 on August 22, 2007 to be properly characterized as principal.

The fifth, sixth, and seventh items to be characterized are the Legal Fees and the Miscellaneous Fees in the amount of $2,400.00. The Court is persuaded that these fees are properly characterized as principal for two reasons. First, as with the extension fee, they are characterized as such under the Southern Colony/UDF III Notes.[24] Second, as was the case with

---

[24]Section 2(d) of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that "such fees and expenses are not, are not intended to be, and shall not be characterized as, interest or as compensation for the use, forebearance or detention of money." This language tracks the language of Tex. Fin. Code § 301.002(a)(4) which defines "interest" as "compensation for the use, forebearance, or detention of money." Tex. Fin. Code Ann. § 301.002(a)(4) (Vernon 2009). Thus, the express language of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that the extension fee is not interest, and therefore, by implication, the fee should be characterized as principal.