the Draw, the Court assumes that the characterization of these fees as principal is accurate unless it is contradicted by some other evidence in the record. As there is no contradictory evidence in the record, the Court concludes that these fees are properly characterized as principal actually advanced.

To come to the final tally for principal actually advanced under the Amended Southern Colony/UDF III Note, the Court aggregates all of the items characterized as principal in the analysis above:

- <u>Additions to the principal actually advanced under the Amended Southern Colony/UDF III Note</u>:
  - The Extension Fee in the amount of $87,345.00;

  - The Draw in the amount of $41,376.15;

  - The Legal Fees in the amounts of $3,383.60 and $263.75; and

  - The Miscellaneous Fees in the amount of $2,400.00.

- <u>Reductions to the principal actually advanced under the Amended Southern Colony/UDF III Note</u>:
  - The Curtailment Payments in the amounts of $30,000.00 and $57,345.00.

The calculation is shown below:

|   | $87,345.00 | (Extension Fee) |
|---|---|---|
| + | $41,376.15 | (Draw) |
| + | $3,383.60 | (Legal Fees) |
| + | $263.75 | (Legal Fees) |
| + | $2,400.00 | (Miscellaneous Fees) |
| − | $30,000.00 | (Curtailment Payment) |
| − | $57,345.00 | (Curtailment Payment) |
| | **$47,423.50** | **(principal actually advanced under the Amended Southern Colony/UDF III Note)** |

**Accordingly, the Court finds that a net total of $47,423.50 was advanced under the Amended Southern Colony/UDF III Notes at the time Perry filed his Chapter 11 petition.**

To reach the final tally for the combined Southern Colony/UDF III Notes, the Court adds the

principal actually advanced under the Original Southern Colony/UDF III Note (*i.e.*,

$1,847,496.93), as found above, to the principal actually advanced under the Amended Southern

Colony/UDF III Note (*i.e.*, $47,423.50). **Accordingly, the Court finds that the total principal**

**actually advanced under the Southern Colony/UDF III Notes comes to $1,894,920.43.**

(5) What is the dollar amount of interest due on the principal actually advanced under the Hidden

Lakes/UDF III Notes?

The accuracy of the Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] has

not been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes

Property [Exhibit No. 35], is the only transaction record relating to the loan from UDF III to

Hidden Lakes.  As such, to the extent that it is not contradicted by other evidence in the record,

the Court will assume Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] to be

an accurate statement of the interest due on the Hidden Lakes/UDF III Notes. As noted above,

UDF III is not entitled to post-petition interest, so the Court need only calculate up to the date

Perry filed his Chapter 11 petition (*i.e.*, up to April 11, 2008).  The Loan History of UDF III on

Loan of Hidden Lakes [Exhibit No. 27] gives the dollar amounts of interest accrued each month

up to April 1, 2008 as shown in Table 1, below. The amount of interest accrued between April 1,

2008, and April 11, 2008, which is not recorded in the Loan History of UDF III on Loan of

Hidden Lakes [Exhibit No. 27], is computed by the Court in the following way:

43

The aggregate principal is calculated as of April 1, 2008 (the principal actually advanced under the Hidden Lakes/UDF III Notes added to the matured interest[25] that has accrued as of April 1, 2008):

- $1,481,250.00 (principal actually advanced) + $195,818.91 (matured interest)[26]

    = $1,677,068.91 (Aggregate Principal as of April 1, 2008).

The Court then multiplies the aggregate principal as of April 1, 2008 by the interest rate under the Hidden Lakes/UDF III Notes (15%), and then divides this number by 365 days[27] in order to reach a dollar amount for the interest that accrues each day:

- $1,677,068.91 (Aggregate Principal as of April 1, 2008) x 0.15

    = $251,560.34 (dollars of interest per year);

- $251,560.34 (dollars of interest per year) / 365 days =

    = $689.21 (interest accrued per diem between April 1, 2008 and April 11, 2008).

The Court then multiplies this interest accrued per diem by the number of days that interest accrued between April 1, 2008 and April 11, 2008. The Court sets this number at 10 full days between April 1 and April 10:[28]

- $689.21 (interest accrued per diem) x 10 days = $6,892.06.

---

[25]The Hidden Lakes/UDF III Notes contract for compound interest, which means matured interest accrues interest just as the principal does.

[26]This number is the sum of all matured interest from the inception of this Note to April 1, 2008. The monthly components making up this sum are listed in Table 1, below.

[27]Interest is computed based on a year of 365 days.

[28]Some fraction of the per diem interest probably accrued under this Note on April 11, 2008, prior to the moment of the official filing of Perry's Chapter 11 petition. But because this amount is not large enough to materially affect the Court's analysis, and accurate calculation of the amount would be burdensome, the Court simply uses the 10 full days that interest accrued in April for the purposes of the interest computation.

The computed interest between April 1, 2008 and the aggregate interest accrued *and* currently due over the full pre-petition life of the loan April 11, 2008, as computed by the Court, are shown in Table 1, below.

**Table 1–Interest Matured and Still Owed Under the Hidden Lakes/UDF III Notes**

| Due Date[29] | Interest Accrued since Last Due Date |
|---|---|
| May 31, 2007 | $5,856.16 |
| June 30, 2007 | $17,640.69 |
| July 31, 2007 | $18,466.20 |
| August 31, 2007 | $18,704.37 |
| September 30, 2007 | $18,331.61 |
| October 31, 2007 | $19,176.20 |
| November 30, 2007 | $18,794.03 |
| December 31, 2008 | $19,659.93 |
| January 31, 2008 | $19,910.39 |
| February 29, 2008 | $18,866.53 |
| March 31, 2008 | $20,412.80 |
| Date Perry filed Ch. 11 petition | Interest accrued since last due date ($) |
| April 11, 2008 | $6,892.06 |
| **Sum Total of interest as of April 11, 2008:** | **$202,710.97** |

---

[29]Dates listed are actually the last day interest accrued each month before maturing. These  dates were chosen because they frequently coincide with the date the interest payment was made and, because they are helpful in showing the number of days that had passed between each due date–*i.e.* it is easily recognized from the dates listed that interest accrued over a period of 30 days in November 2007 (11/**30**/2007) and 31 days in December 2007 (12/**31**/2007).

The sum of these amounts represents the amount of interest properly due under these Notes. **As a result, the Court finds that $202,710.97 of interest has accrued under the Hidden Lakes/UDF III Notes.**

(6) What is the dollar amount of interest due on the principal actually advanced under the Southern Colony/UDF III Notes?

The accuracy of the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] has not been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes Property [Exhibit No.17], is the only record of the transactions that occurred in connection with the loan transaction. As such, the Court will assume Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] to be an accurate statement of the interest charged and accrued on the Southern Colony/UDF III Notes [Exhibits No. 3 & 14] for the purposes of this claims estimation procedure, and to the extent that it is not contradicted by other evidence in the record. Unlike the situation with the Hidden Lakes/UDF III Notes, where all matured interest accrued under the loan is still owing, the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] indicates that some matured interest was paid off by Southern Colony. In this section, the Court will calculate both the amount of matured interest *charged* under the loan, and the amount of matured interest *currently owed* under the loan.

First, the Court calculates the amount of interest charged under the Southern Colony/UDF III Notes up to April 11, 2008, the date of Perry's Chapter 11 filing. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] gives the dollar amounts of interest accrued each month up to April 1, 2008, which is organized by month in Table 2, below. The amount of interest accrued

between April 1, 2008, and April 11, 2008, which is not recorded in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] is computed by the Court.

As before, the Court calculates the interest accrued up to April 11, 2008, the date of Perry's Chapter 11 filing. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] gives the dollar amounts of interest accrued each month up to April 1, 2008, which is organized by month in Table 2, below. The amount of interest accrued between April 1, 2008, and April 11, 2008, which is not recorded in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] is computed by the Court in the following manner: First, the aggregate principal is calculated as of April 1, 2008 (the principal actually advanced under the Southern Colony/UDF III Notes added to the matured interest[30] that has accrued as of April 1, 2008):

- $1,894,920.43 (principal actually advanced) + $247,709.75 (matured interest)[31]

  = $2,142,630.18 (Aggregate Principal as of April 1, 2008).

The Court then multiplies the aggregate principal as of April 1, 2008 by the interest rate under the Southern Colony/UDF III Notes of 15% and then divides this number by 360 days[32] in order to reach a dollar amount for the interest that accrues each day:

- $2,142,630.18 (Aggregate Principal as of April 1, 2008) x 0.15

  = $321,394.53 (dollars of interest per year);

---

[30]The Hidden Lakes/UDF III Notes contract for compound interest, which means matured interest accrues interest just as the principal does.

[31]This number is the sum of all matured interest still owing under this Note, from the inception of this Note to April 1, 2008. The monthly components making up this sum are listed in Table 2, below.

[32]Interest is computed based on a 360-day year. This differs from the interest calculation under the Hidden Lakes/UDF III Notes, which uses a year of 365 days, as noted above in fn.27. Under the Texas Finance Code, parties may agree to calculate interest based on a 360-day year. Tex. Fin. Code Ann. § 306.003 (Vernon 2009). Such an agreement does not affect the usury analysis, which uses a 365-day year. *See, e.g., Lawler v. Lomas & Nettleton Mortg. Investors*, 691 S.W.2d 593, 596 (Tex. 1985); *Fed. Sav. & Loan Ins. v. Kraj*, 968 F.2d 500, 505 (5th Cir. 1992).

47

- $321,394.53 (dollars of interest per year) / 360 days

  = $892.76 (interest accrued per diem between April 1, 2008 and April 11, 2008).

The Court then multiplies this interest accrued per diem by the number of days that interest accrued between April 1, 2008 and April 11, 2008. The Court sets this number at 10 full days between April 1 and April 10:[33]

- $892.76 (interest accrued per diem) x 10 days

  = $8,927.62 (interest accrued between April 1, 2008 and April 11, 2008).

Both the computed interest between April 1, 2008 and April 11, 2008, and the aggregate interest accrued over the full pre-petition life of the loan April 11, 2008, as computed by the Court, are also shown in Table 2, below:

---

[33]Some fraction of the per diem interest probably accrued under this Note on April 11, 2008, prior to the moment of the official filing of Perry's Chapter 11 petition. But because this amount is not large enough to materially affect the Court's analysis, and accurate calculation of the amount would be burdensome, the Court simply uses the 10 full days that interest accrued in April for the purposes of the interest computation.

**Table 2–Interest Matured and Still Owed Under the Southern Colony/UDF III Notes**

| Due Date[34] | Interest Accrued since Last Due Date[35] |
|---|---|
| 02/28/2007 | $6,238.33 |
| 03/31/2007 | $24,254.12 |
| 04/30/2007 | $9,507.55 |
| 05/31/2007 | $0[36] |
| 06/30/2007 | $0 |
| 07/31/2007 | $0 |
| 08/31/2007 | $24,871.56 |
| 09/302007 | $24,758.70 |
| 10/31/2007 | $25,920.13 |
| 11/30/2007 | $25,409.59 |
| 12/31/2007 | $26,606.78 |
| 01/31/2008 | $26,959.45 |
| 02/29/2008 | $25,545.89 |
| 03/31/2008 | $27,637.65 |
| Date Perry filed Ch. 11 petition | Interest accrued since last due date ($) |
| April 11, 2008 | $8,927.62 |
| **Sum Total of interest accrued as of April 11, 2008:** | **$256,637.37** |

[34]Dates listed are actually the last day interest accrued each month before maturing. This date was chosen because it frequently coincides with the date the interest payment was made and, because it is helpful in showing the number of days that had passed between each due date–*i.e.* it is easily recognized from the dates listed that interest accrued over a period of 30 days in November 2007 (11/**30**/2007) and 31 days in December 2007 (12/**31**/2007).

[35] Interest is calculated based on a 360-day year. This differs from the interest calculation under the Hidden Lakes/UDF III Notes, which uses a year of 365 days, as noted above in fn.27. Under the Texas Finance Code, parties can agree to calculate interest based on a 360-day year. Tex. Fin. Code Ann. § 306.003 (Vernon 2009). Such an agreement does not affect the usury analysis, which uses a 365-day year. *See, e.g., Lawler*, 691 S.W.2d at 596; *Fed. Sav. & Loan Ins.*, 968 F.2d at 505.

[36] The Loan History of UDF III on the Loan of Southern Colony [Exhibit No. 18] does not record any interest accrued between 4/30/2007 and 07/31/2007.

49

**The sum of these amounts represents the amount of interest properly due under this Note. As such, the Court finds that $256,637.37 has matured and is still owing under the Southern Colony/UDF III Notes.**

Next, the Court calculates the amount of interest charged (all interest that has matured, whether still owed or not) under the Southern Colony/UDF III Notes up to April 11, 2008, the date of Perry's Chapter 11 filing. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] gives the dollar amounts of interest accrued each month up to April 1, 2008, which is organized by month in Table 3, below. The amount of interest accrued between April 1, 2008, and April 11, 2008, is not recorded in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18]. However, because there is no evidence of a payment applying to the interest accrued in this period, the amount of interest charged is equal to the amount found still owing for this period – i.e., $8,927.62. The amount of interest charged under the Southern Colony/UDF III Notes is summarized in Table 3, below:

**Table 3–Interest Charged Under the Southern Colony/UDF III Notes**

| Due Date[37] | Interest Accrued since Last Due Date[38] ($) |
|---|---|
| 02/28/2007 | $6,238.33 |
| 03/31/2007 | $24,254.12 |
| 04/30/2007 | $23,774.91 |
| 05/31/2007 | $24,696.27 |
| 06/30/2007 | $23,902.41 |
| 07/31/2007 | $24,699.16 |
| 08/31/2007 | $24,871.56 |
| 09/302007 | $24,758.70 |
| 10/31/2007 | $25,920.13 |
| 11/30/2007 | $25,409.59 |
| 12/31/2007 | $26,606.78 |
| 01/31/2008 | $26,959.45 |
| 02/29/2008 | $25,545.89 |
| 03/31/2008 | $27,637.65 |
| Date Perry filed Ch. 11 petition | Interest accrued since last due date ($) |
| April 11, 2008 | $8,927.62 |
| **Sum Total of interest accrued as of April 11, 2008:** | **$344,202.57** |

[37]Dates listed are actually the last day interest accrued each month before maturing. This date was chosen because it frequently coincides with the date the interest payment was made and, because it is helpful in showing the number of days that had passed between each due date–*i.e.* it is easily recognized from the dates listed that interest accrued over a period of 30 days in November 2007 (11/**30**/2007) and 31 days in December 2007 (12/**31**/2007).

[38] Interest is calculated based on the number of days in a month and a year of 360 days. This differs from the interest calculation under the Hidden Lakes/UDF III Notes, which use a year of 365 days, as noted above in fn.27. Under the Texas Finance Code, parties can agree to calculate interest based on a 360-day year. Tex. Fin. Code Ann. § 306.003 (Vernon 2009). Such an agreement does not affect the usury analysis, which uses a 365-day year. *See, e.g., Lawler,* 691 S.W.2d at 596; *Fed. Sav. & Loan Ins.,* 968 F.2d at 505.

**The sum of these amounts represents the amount of interest properly charged under this Note. As such, the Court finds that $344,202.57 has been charged under the Southern Colony/UDF III Notes.**

(7) Conclusion: What is the threshold aggregate amount of UDF III's Claims under the Hidden Lakes/UDF III Notes and the Southern Colony/UDF III Notes ?

The Court has found that the amount of principal actually advanced of the Hidden Lakes/UDF III Notes to be $3,201,570.00. The Court has also found the total amount of interest due under the Hidden Lakes/UDF III Notes to be $202,710.97. The result is a total claim of $3,404,280.97 for UDF III under the Hidden Lake Notes.

The Court has found that the total principal actually advanced under the Southern Colony/UDF III Notes is $1,894,920.43. The Court has also found the total amount of interest due under the Southern Colony/UDF III Notes to be $256,637.37. The sum of these two figures results in a total claim of $2,151,557.80 for UDF III under the Southern Colony/UDF III Notes.

The aggregate claims under the UDF III Notes is $5,555,838.77. These findings are summarized in Table 4, below:

**Table 4**

| Applicable Notes | Principal Actually Advanced | Interest still owed as of April 11, 2008 | Threshold Total Claim |
|---|---|---|---|
| Hidden Lake/UDF III Notes | $3,201,570.00 | $202,710.97 | $3,404,280.97 |
| Southern Colony/UDF III Notes | $1,894,920.43 | $256,637.37 | $2,151,557.80 |
| **Both Sets of Notes** | | | **$5,555,838.77** |

52

Due to the mechanical nature of the above analysis, the Court estimates that there is a 0%

probability of reaching a materially different result in a full trial on the merits. Accordingly, the

Court does not discount UDF III's claims on the basis of the analysis above.

*ii. Are the Hidden Lakes/UDF III or Southern Colony Loans Usurious?*

The Plaintiffs contend that the loans made by UDF III to Hidden Lakes and Southern Colony

charge a usurious amount of interest as contracted for, charged, or received in connection with

the loan, and that the penalties resulting under Tex. Fin. Code §305.001(a-1) should be set off

against the claim of $5,555,838.77 under the UDF III Notes. The Plaintiffs make two assertions

to support their argument that the interest rate is usurious: (1) the interest charged on the

principal actually advanced (as found by the Court, above) is usurious; and (2)(i) even if the

interest charged on this amount is not usurious, the various fees associated with the loan, which

the Court characterized as principal actually advanced in section C(i) of the Conclusions of Law,

must be *recharacterized* as interest for the purposes of usury law; (2)(ii) furthermore, as a result

of this recharacterization, the total amount of interest charged or collected on the "true principal"

rises to usurious levels. This second assertion entails a characterization of these fees that is

specific to the usury analysis, and does not otherwise affect the amount of principal actually

advanced as found by the Court in section C(i) of the Conclusions of Law.[39]

---

[39] *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1206 (5th Cir. 1985) ("Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note *to determine whether a loan is usurious*.") (emphasis added), *citing First State Bank of Bedford*, 563 S.W.2d at 575 ("'In cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly *in testing for usury*."), *quoting Tanner Dev. Co.*, 561 S.W.2d at 782-83. Even if the Court finds that usurious interest is contracted for, charged, or received, the Notes remain valid and enforceable by UDF and UDF III, "provided allowance is made for the penalty." *Vordenbaum*, 611 S.W.2d at 465, *citing Wall*, 526 S.W.2d at 151-54. Finally, Texas law requires no forfeiture of principal for usurious interest for commercial loans. Tex. Fin. Code Ann § 305.001(a-1) (Vernon 2009). How Perry's obligation (as a guarantor) to UDF III would be affected, if at all, by the assessment of usury penalties in this case is addressed below, along with the

The Defendants dispute the Plaintiffs' argument and assert the following defenses: (1) Perry,

as guarantor, has no standing to assert a defense of usury; (2) Hidden Lakes and Southern Colony

are equitably estopped from claiming UDF III contracted for, charged, or received usurious

interest; (3) the savings clauses in the Hidden Lakes/UDF III Notes and the Southern

Colony/UDF III Notes are effective to prevent usurious interest from being contracted for,

charged, or received; (4) in the alternative, Perry is not entitled to setoff resulting from a usury

penalty because setoff requires mutual obligations; and (5) in the alternative, if Perry is entitled

to setoff due to usury penalties, the amount of setoff is limited to the amount which would be

distributed to Perry due to his equity interest in Perry Properties. Each contention is taken in turn.


<u>(1) Are the UDF III Notes usurious if all principal actually advanced is characterized as principal</u>

<u>for the usury analysis?</u>

Texas law applies to the question of whether the notes at issue are usurious, pursuant to the

choice of law clauses in the UDF III Notes. The applicable usury ceiling in accordance with

Chapter 303 is 18% *per annum*.[40] Under Tex. Fin. Code, § 306.004, to determine whether a

commercial loan is usurious, the interest rate is computed  by amortizing or spreading, using the

---

defenses to the usury claims which UDF III has raised.

[40] All of the UDF III Notes contain identical language providing that the "ceiling shall be the 'weekly ceiling' as defined in the Texas Finance Code." Tex. Fin. Code § 303.002 provides that "parties to a written agreement may agree to an interest rate . . . that does not exceed the applicable weekly ceiling." Tex. Fin. Code § 303.002 (Vernon 2009). The weekly ceiling, true to its name, varies week to week, and is published by the Secretary of State in the Texas Register. *Id.*; *Id.* § 303.011. When parties elect to use the weekly ceiling, the relevant ceiling is the weekly ceiling which was in effect on the date the agreement was originally executed. *Reagan v. City Nat. Bank, N.A.*, 714 S.W.2d 425, 428 (Tex.App.–Eastland 1986). Tex. Fin. Code § 303.009(a) provides that "[i]f the rate computed for the weekly, monthly, quarterly, or annualized ceiling is less than 18 percent a year, the ceiling is 18 percent a year." Tex. Fin. Code Ann. § 303.009(a) (Vernon 2009) The parties agree that this 18% ceiling is applicable to the UDF III Notes [Exhibits No. 3, 13, 22 & 40].

actuarial method during the stated term of the loan, all interest at any time contracted for, charged, or received in connection with the loan. Tex. Fin. Code Ann. § 306.004 (Vernon 2009); *see also* Tex. Fin. Code Ann. § 302.101(Vernon 2009). Compound interest is not usurious under Texas law. *Bair Chase Property Co. v. S & K Dev. Co.*, 260 S.W. 3d 133, 141 (Tex. App.-Austin 2008). Interest which has matured may bear interest at the highest lawful rate, which is 18% in the instant dispute. *Id.*

The first step in the analysis is to determine whether the parties contracted for usurious interest. The UDF III Notes explicitly contract for compound interest. [Exhibit No. 3 p.6]; [Exhibit 12, p. 6 ¶ 12]; [Exhibit 22 p.8]; [Exhibit 40 ¶3]. In addition, the UDF III Notes [Exhibits No. 3, 13, 22 & 40] charge only 15% interest accrued and compounded monthly, so it is clear that, under Texas law, UDF III has not *contracted* for usurious interest.

The second step in the analysis is to determine if usurious interest was charged or received under the UDF III Notes [Exhibits No. 3, 13, 22 & 40]. As just noted, compound interest is allowed on matured interest at the highest rate allowable by law. *Bair Chase Property Co.*, 260 S.W. 3d at 141. A usury ceiling calculated based on matured interest as well as "X" amount of principal will be greater than a usury ceiling calculated based solely on that same "X" amount of principal. As a result, the ability to charge compound interest under the usury statute effectively increases the maximum dollar amount of interest that a creditor may charge over time. This fact favors UDF III in this analysis because, having contracted for compound interest, UDF III is effectively afforded a higher usury ceiling under the UDF III Notes [Exhibits No. 3, 13, 22 & 40]–*i.e.*, UDF III may legally charge or receive more interest in absolute dollar terms than would be the case if it had not contracted for compound interest. However, on the facts of this particular

55

dispute, UDF III does not even need to take advantage of the effectively higher usury limit allowed by compounding matured interest because the amount of interest charged or received under the UDF III Notes [Exhibits No. 3, 13, 22 & 40] is less than the 18% *per annum* ceiling even if the Court treats all interest charged or received as borne by the amount of advanced principal alone.

In order to calculate the applicable dollar amount of the 18% *per annum* ceiling according to the actuarial method during the stated term of the loan, the analysis starts with the multiplication of the amount of applicable advanced principal (*i.e.*, pre-petition principal – $1,481,250.00 for the Hidden Lakes/UDF III Notes; $1,871,500.00 for the Original Southern Colony/UDF III Note from February 21,2007 to June 6, 2007; $1,847,496.93 for the Original Southern Colony/UDF III Note from June 7 to August 22, 2007; and $1,894,920.43 for the Amended Southern Colony/UDF III Note)[41] by 18%. The resulting products represent the maximum legal dollar amount of interest that may be legally charged under each Note each year.

- Hidden Lakes/UDF III Notes:

---

[41] The Court approaches this portion of the usury analysis of the Southern Colony/UDF III Notes by calculating the interest ceiling for three discrete periods, each bearing interest on different pre-petition amounts of principal actually advanced: (1) $1,871,500.00 under the Original Southern Colony/UDF III Note from February 21, 2007 to June 6, 2007; (2) $1,847,496.93 from June 7 to August 22, 2007 (the period between the payment of $24,696.27 on June 7, 2007 and August 21, 2007, the day prior to the execution of the Amended Southern Colony/UDF III Note); and (3) $1,894,920.43 under the Amended Southern Colony/UDF III Note from August 22, 2007 to April 11, 2008 (the period between the execution of the Amended Southern Colony/UDF III Note and the filing of Perry's Chapter 11 petition). In reality, there are actually four discrete pre-petition periods, each with a different amount of principal actually advanced under these Notes. On May 11, 2007, a $693.20 legal fee was added to the amount of principal actually advanced under the Original Southern Colony/UDF III Note. Thus, technically speaking, there is a fourth period with a different amount of principal actually advanced spanning May 11, 2007 to June 6, 2007. Taking this fourth period into account would require a fourth set of calculations for the Southern Colony/UDF III Notes, but the difference in the usury ceiling calculated between the three part analysis delineated above and a four part approach taking this fourth period into consideration is infinitesimal. As a result, the Court treats this $693.20 legal fee as being advanced on June 7, 2007 to maintain the three step analysis and avoid undue complexity. This three-step approach results in a marginally lower usury ceiling, but does not affect the end result of this analysis. Finally, the Hidden Lakes/UDF III Notes have only one amount of principal actually advanced from the execution of the Note to the filing of Perry's Chapter 11 petition on April 11, 2008.

- $1,481,250.00 (pre-petition principal) x 0.18 (interest rate ceiling)

    = $266,625.00 (Annual Interest Rate Ceiling)

- Original Southern Colony/UDF III Note (February 21, 2007 to June 6, 2007):

    - $1,871,500.00  (pre-petition principal) x 0.18 (interest rate ceiling)

        = $336,870.00 (Annual Interest Rate Ceiling)

- Original Southern Colony/UDF III Note (June 7, 2007 to August 21, 2007):

    - $1,847,496.93  (pre-petition principal) x 0.18 (interest rate ceiling)

        = $332,549.45 (Annual Interest Rate Ceiling)

- Amended Southern Colony/UDF III Note:

    - $1,894,920.43 (pre-petition principal) x 0.18 (interest rate ceiling)

        = $341,085.68 (Annual Interest Rate Ceiling)

The next step is to determine a per diem ceiling by dividing each Annual Interest Rate Ceiling, calculated above, by 365 days.

- Hidden Lakes/UDF III Notes:

    - $266,625.00 (Annual Interest Rate Ceiling) / 365 (Days)

        = $730.48 (Interest Accrued Per Diem Ceiling)

- Original Southern Colony/UDF III Note (February 21, 2007 to June 6, 2007):

    - $336,870.00 (Annual Interest Rate Ceiling) / 365 (Days)

        = $922.93 (Interest Accrued Per Diem Ceiling)

- Original Southern Colony/UDF III Note (June 7, 2007 to August 21, 2007):

    - $332,549.45 (Annual Interest Rate Ceiling) / 365 (Days)

        = $911.09 (Interest Accrued Per Diem Ceiling)

- Amended Southern Colony/UDF III Note
  - $341,085.68 (Annual Interest Rate Ceiling) / 365 (Days)

    = $934.48 (Interest Accrued Per Diem Ceiling)

The next step is to multiply each Interest Accrued Per Diem Ceiling by the number of days interest was accruing. The Hidden Lakes/UDF III Notes accrued interest from May 22, 2007 to April 11, 2008–a total of 325 days. The Southern Colony/UDF III Notes, as noted in footnote 41, have three discrete periods, each with a different ceiling – (1) a period under the Original Southern Colony/UDF III Note running from February 21, 2007 to June 6, 2007 (a total of 106 days); (2) another period under the Original Southern Colony/UDF III Note from June 7, 2007 to August 21, 2007 (a total of 75 days); and (3) a period under the Amended Southern Colony/UDF III Note running from August 22, 2007 to April 11, 2008 (a total of 234 days). Multiplying the number of days that each of these Notes was in effect by the per diem ceiling provides the ceiling dollar amount for lawful interest for each period:

- Hidden Lakes/UDF III Notes
  - $730.48 (Interest Accrued Per Diem Ceiling) x 325 (Days accruing interest)

    = $237,406.00 (Total Allowable Interest Under Notes)
- Original Southern Colony/UDF III Note (February 21, 2007 to June 6, 2007):
  - $922.93 (Interest Accrued Per Diem Ceiling) x 106 (Days accruing interest)

    = $97,830.58 (Total Allowable Interest Under Note)
- Original Southern Colony/UDF III Note (June 7, 2007 to August 21, 2007):
  - $911.09 (Interest Accrued Per Diem Ceiling) x 75 (Days accruing interest)

    = $68,331.75 (Total Allowable Interest Under Note)

- Amended Southern Colony/UDF III Note
  - $934.48 (Interest Accrued Per Diem Ceiling) x 234 (Days accruing interest)

    = $218,668.32 (Total Allowable Interest Under Amended Southern Colony/UDF

    III Note )

The final step is to aggregate the amounts of interest allowable under the three periods in

which different amounts of principal actually advanced bore interest under the Southern

Colony/UDF III Notes in order to find the interest ceiling for the full pre-petition term of these

Notes so that this amount can be compared to the interest charged on their related loans. This

step is unnecessary for the Hidden Lakes/UDF III Notes because there was only one amount of

principal actually advanced throughout the full pre-petition term of these Notes – *i.e.*,

$237,406.00 represents the entire amount of interest allowable under these particular Notes.

- Southern Colony/UDF III Notes
  - $97,830.58 (Total Allowable Interest Under Original Southern Colony/UDF III Note

    from February 21, 2007 to June 6, 2007) + $68,331.75 (Total Allowable Interest Under

    Original Southern Colony/UDF III Note  from June 7, 2007 to August 21, 2007) +

    $218,668.32 (Total Allowable Interest Under Amended Southern Colony/UDF III Note)

    = $384,830.65 (Total Allowable Interest Under These Particular Notes)

These results for each set of Notes – *i.e.*, $237,406.00 for the Hidden Lakes/UDF III Notes

(the Original Hidden Lakes/UDF III Usury Ceiling), and $384,830.65 for the Southern

Colony/UDF III Notes (the Original Southern Colony/UDF III Usury Ceiling) – represent the

maximum amounts of interest which may be contracted for, charged, or received by UDF III

under each set of Notes. The amount of interest actually charged or received under the Hidden

Lakes/UDF III Notes is $202,710.97 – which is less than the $237,406.00 usury ceiling. The

amount of interest actually charged or received under the Southern Colony/UDF III Notes is

$344,202.57 – which is less than the $384,830.65 ceiling. Therefore, usurious interest was not

charged or received under any of the UDF III Notes. The results of the Court's analysis are

organized in Table 5, below.

**Table 5**

| Notes | Maximum Legally Allowable Interest Under Notes | Interest Actually Due Under the Notes as of April 11, 2008. | Usurious interest charged or received? |
|---|---|---|---|
| Hidden Lakes/UDF III Notes | $237,405.82 | $202,710.97 | No |
| Southern Colony/UDF III Notes | $384,830.65 | $344,439.72 | No |

Due to the mechanical nature of the above analysis, the Court estimates that there is a 0%

probability of reaching a different result in a full trial on the merits. As such, the Court will not

discount the claims of UDF III due to the usury causes of action advanced by the Plaintiffs so

long as principal actually advanced is properly characterized as principal for the usury analysis.


(2) Should the various fees associated with the UDF III Notes be characterized as interest for the
purposes of the usury analysis?

The Plaintiffs assert that the principal actually advanced under the UDF III Notes, as found

by the Court in section C(i) of the Conclusions of Law, should be reduced by characterizing a

number of fees which the Court has found to be part of the principal as interest instead, for the purposes of the usury analysis. The fees that the Plaintiffs contend should be recharacterized are as follows: (1) the $100,000.00 in option payments paid in connection with the purchase of the Southern Colony Property; (2) the $150,000 extension fee paid in connection with the Southern Colony Property; (3) the 2% consulting fee in the amount of $28,500.00 to Winchester Equities, LLC; (4) the commitment fees to UDF III in the amounts of $56,250.00 and $38,200.00; (5) the extension fee in the amount of $87,345.00 paid in connection with the Amended Southern Colony/UDF III Note [Exhibit No. 14]; (6) the legal fees in the amount of $3,383.60 and $263.75 in connection with the Amended Southern Colony/UDF III Note; (7) the Miscellaneous Fees in the amount of $2,400.00 in connection with the Southern Colony/UDF III Note; and (8) the administrative fee to UDF III in the amount of $4,115.00.[42] All of these reductions are taken directly from items on the Settlement Statement for Purchase of the Southern Colony Property [Exhibit No. 17] and the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35].

Under Texas law, front-end fees paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note to determine whether a loan is usurious. *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1206 (5th Cir. 1985), *citing First State Bank of Bedford v. Miller*, 563 S.W.2d 572, 575 (Tex. 1978); *Nevels v. Harris*, 102 S.W.2d 1046, 1048 (Tex. 1937). However, *bona fide* fees paid to parties other than the lender are neither "characterized as interest nor are deductible from the principal amount." *Perry v. Stewart Title*

---

[42]The Court does not consider recharacterizing the one-half share of the commitment fee to UMTH in the amount of $37,875.00, the interest reserves, or the second lien fee because these items have already been found to be either interest or inapplicable to the loans made by UDF III in section C(i) of the Conclusions of Law.

Co., 756 F.2d at 1206, *citing Imperial Corp. of Am. v. Frenchman's Creek Corp.*, 453 F. 2d

1338, 1343 (5th Cir. 1972); *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 787 (Tex. 1977);

*Greever v. Persky*, 165 S.W.2d 709, 711 (Tex. 1942). Moreover, a *bona fide* commitment fee is

not interest within the contemplation of the usury statute because such a fee merely purchases an

option permitting the borrower to enter into the loan in the future. *Stedman v. Georgetown Sav. &*

*Loan Ass'n*, 595 S.W.2d 486, 488 (Tex. 1979, *rehearing denied* 1980), *quoting Gonzales County*

*Sav. & Loan Ass'n. v. Freeman*, 534 S.W.2d 903 (Tex. 1976). Such a fee "entitles the borrower

to a distinctly separate and additional consideration apart from the lending of money." *Id.* As a

result, "the lender may charge extra for this consideration without violating the usury laws." *Id.*

Where there is a dispute in the evidence as to whether the charge is a *bona fide* commitment fee

or merely a device to conceal usury, a question of fact is raised. *Id.*; *Greever v. Persky*, 165

S.W.2d 709 (Tex. 1942).

　　Thus, the task before the Court is to determine if the fees associated with the Hidden

Lakes/UDFIII Notes and the Southern Colony/UDF III Notes should be characterized as fees paid

to the lender for initiating or processing the loans, as *bona fide* fees paid to a party other than the

lender, or as *bona fide* fees for separate consideration.

　　The Court finds that the "2% consulting fee" of $28,500.00 to Winchester Equities, LLC paid

in conjunction with the Hidden Lakes/UDF III Notes, the  $100,000.00 in "option payments" and

the $150,000.00 "extension fee" paid, and the legal fees in the amounts of $3,383.60 and $263.75

paid in conjunction with the Southern Colony/UDF III Notes are all properly characterized as

*bona fide* fees paid to a party other than the lender. The consulting fee to Winchester Equities,

LLC is facially so, as it is expressly listed on the Settlement Statement for Purchase of the

Hidden Lakes Property [Exhibit No. 35] as "2% consulting fee to Winchester Equities, LLC."
Moreover, as noted previously, this fee is item 805 on the Settlement Statement for Purchase of
the Hidden Lakes Property [Exhibit No. 35]. Item 805 on a HUD Settlement Statement is used to
itemize inspections done at the request of the lender, so the Court will assume this fee represents
a payment to an inspector of the Hidden Lakes Property. The $100,000.00 in "option payments"
and the $150,000.00 "extension fee" are not described on the Settlement Statement as payments
to third parties quite as explicitly as the consulting fee, but even a modest interpretation of the
Settlement Statement leads to the same result. As noted above, the extension fee and the option
payments are listed as items 208 and 209 on the Settlement Statement for Purchase of the
Southern Colony Property [Exhibit No. 17] under the heading "200. AMOUNTS PAID BY OR
IN BEHALF OF THE LENDER." This section of the Settlement Statement is organized so that
payments on the left side of the table correspond with amounts received by the seller on the right
side. The option payments and extension fee were payments made to the seller – *i.e.*, someone
other than the lender – and so therefore the Court finds them to be *bona fide* fees paid to a third
party. There is little information on the record concerning the legal fees in the amounts of
$3,383.60 and $263.75. However, the Court finds it reasonable to conclude that these legal fees
are payments made to third parties (*i.e.*, private law firms), as UDF III does not have a legal
department.

   The Court also finds that the commitment fee of $56,250.00 connected to the Original
Hidden Lakes/UDF III Note, and the commitment fee of $38,200.00 connected to the Original
Southern Colony/UDF III Note, are *bona fide* commitment fees for which UDF III provided
distinct and separate consideration.  The plain, identical language of the Loan Commitment

Letters [Exhibits No. 3 & 21] explicitly sets this out, stating: "[w]e agree that . . . Lender has

provided separate and distinct consideration for the Commitment Fee and that the Commitment

Fee is not interest or as compensation for the use, forbearance or detention of money." How

parties agree to characterize such a fee is not conclusive, and the Court will look beyond the form

of a transaction to its substance to determine the existence or nonexistence of usury. *Stedman*,

595 S.W.2d at 488-89. However, there is nothing in the record before the Court indicating that

the substance of the transaction was in any way different from the description in the Commitment

Letters, so the Court has no reason to believe otherwise. As such, both commitment fees – that

associated with the Original Hidden Lakes/UDF III Note and that associated with the Original

Southern Colony/UDF III Note – are *bona fide* commitment fees.

The next fee to characterize is the extension fee in the amount of $87,345.00 paid in

connection with the Amended Southern Colony/UDF III Note [Exhibit No. 14]. The extension

fee makes up a portion of the face amount of the Amended Southern Colony/UDF III Note

[Exhibit No. 14], even though not explicitly mentioned in the text of this Note.[43] However, the

Court is persuaded that it is properly characterized as principal for the usury analysis for the same

reasons the commitment fees are properly characterized as principal for the usury analysis. Under

Texas law, "a contract modification," such as the Amended Southern Colony/UDF III Note

[Exhibit No. 14], "must satisfy the traditional requirements of a contract–there must be a meeting

---

[43] The Original Southern Colony/UDF III Note [Exhibit No. 3] has a face value of $1,911,500.00. The Amended Southern Colony/UDF III Note [Exhibit No. 14] has a face value of $2,998,845.00, which, by the express language of this Note, was to "accommodate" the increase to the interest reserve $1,040,000.00. However, the face value of the Original Southern Colony/UDF III Note [Exhibit No. 3], $1,911,500, added to the increase in the interest reserve under the Amended Southern Colony/UDF III Note [Exhibit No. 14], *i.e.*, $1,000,000.00 (from $40,000 to $1,040,000.00), results in a sum of $2,911,500.00, which is $87,345.00 less than the face amount of the Amended Southern Colony/UDF III Note [Exhibit No. 14]. This additional amount of $87,345.00 is explained by the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18], which records a "LOC Ext Fee," in the exact amount of $87,345.00, charged against principal on "08/22/2007."

of the minds supported by consideration. . . . [w]hen a party agrees to do no more than that which he is already bound to do under an existing contract, the consideration is not sufficient to support a modification." *Arthur J. Gallagher & Co. v. Dietrich*, 270 S.W.3d 695, 702 (Tex.App.–Dallas 2007) (*internal citations omitted*). As far as the Court can tell, there is no other form of consideration provided by Southern Colony in connection with the Amended Southern Colony/UDF III Note [Exhibit No. 14]. Accordingly, it is reasonable to assume that the extension fee in the amount of $87,345.00 was a fee paid in consideration for the amendment of the Original Southern Colony/UDF III Note [Exhibit No. 14], in which the payment period of the loan was extended. As such, this Court views the extension fee in the amount of $87,345.00 as a *bona fide* extension fee representing separate consideration for the amendment of the Original Southern Colony/UDF III Note [Exhibit No. 14] and the extension of the pay period for the loan governed by the Southern Colony/UDF III Notes [Exhibits No. 3 & 14]. Accordingly, the Court finds that the extension fee in the amount of $87,345.00 is properly characterized as principal for the purposes of the usury analysis.

The next items to be characterized for the purposes of the usury analysis are the Miscellaneous Fees in the amount of $2,400.00 in connection with the Southern Colony/UDF III Notes. The description of these fees in the Loan History of UDF III on Loan to Southern Colony [Exhibit No. 18] is not helpful in characterizing the fees. Moreover, there is no other evidence in the record which would assist in a characterization. Under Texas law, the party making a claim of usury has the burden of proof. *Ravkind v. Mortgage Funding Corp.*, 881 S.W.2d 203, 205-06 (Tex.App.–Houston [1st Dist.] 1994); *Amaya v. First State Bank of San Diego*, 570 S.W.2d 95, 96 (Tex.Civ.App.–San Antonio 1978). In addition, there is a presumption "that a borrower has

65

received the entire amount of the principal called for in any note executed by him." *Amaya*, 570 S.W.2d at 96, *quoting* 58 Tex.Jur.2d Usury § 73 (1964). The Court therefore finds that the Plaintiffs have failed to carry their burden of showing that the Miscellaneous Fee should be characterized as interest. The Miscellaneous Fee has been characterized as principal under Texas contract law, and the Plaintiffs have not introduced any evidence tending to show that this fee should be recharacterized. Accordingly, the Court finds that the Miscellaneous Fee should be characterized as principal for the purposes of the usury analysis.

Conversely, the Court finds that the administrative fee to UDF III in the amount of $4,115.00 to constitute interest charged in relation to the Original Southern Colony/UDF III Note. Texas law holds that "front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note to determine whether a loan is usurious." *Perry v. Stewart Title Co.*, 756 F.2d at 1206, *citing First State Bank of Bedford*, 563 S.W.2d at 575 ("'In cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly in testing for usury.'"), *quoting Tanner Dev. Co.*, 561 S.W.2d at 782-83. In the Original Southern Colony/UDF III Note [Exhibit No. 3], Section 2(b) expressly sets out that the fee is in consideration of "administrative costs and expenses incurred by Lender in connection with Commitment Advances." While it is true that Section 2(b) of the Original Southern Colony/UDF III Note [Exhibit No. 3] goes on to state that "the Loan Administration fee is fully earned by Lender at the closing of this Note . . ." and that "such amount . . . shall automatically constitute principal outstanding," the mere characterization of such a fee as

principal is not conclusive of how the fee should be characterized in the usury analysis. *See Stedman*, 595 S.W.2d at 488-89; *Delta Enters. v. Gage*, 555 S.W.2d 555 (Tex.Civ.App.–Fort Worth 1977, *writ ref'd n.r.e.*). Texas courts have often held that "courts will look beyond the form of the transaction to its substance in determining the existence or nonexistence of usury." *See Stedman*, 595 S.W.2d at 488-89, *quoting Gonzales County Savs. & Loan Assoc. v Freeman*, 534 S.W.2d 903 (Tex. 1976). In *Stedman*, the Supreme Court of Texas specifically concluded that, for the purposes of the usury analysis, the express language of a contract characterizing a commitment fee as "interest" did not control in finding that a fee was not properly labeled interest according to the substance of the transaction. 595 S.W.2d at 489. This Court is persuaded that, on this relatively sparse record, the substance of the transaction contravenes the express language of the Original Southern Colony/UDF III Note, and instead indicates that the administrative fee paid to UDF III in the amount of $4,115.00 is properly characterized as interest.

The Court reaches this conclusion for two reasons: (1) the express language of this Note specifically states that the fee is "in consideration for administrative costs and expenses incurred by Lender in connection" with the advances under the loan, which closely tracks the language of *Perry v. Stewart Title Co.* in describing the very sort of fees courts are to characterize as interest in the usury analysis;[44] and (2) there is no evidence in the record indicating that the administrative fee was in consideration for any kind of extraordinary or separate administrative

---

[44] *Compare* the language in Section 2(b) of the Original Southern Colony/UDF III Note [Exhibit No. 3] ("In consideration of administrative costs and expenses incurred by Lender in connection with Commitment Advances, Borrower agrees to pay Lender a Loan Administration Fee") *with Perry v. Stewart Title Co.*, 756 F.2d at 1206 ("Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note to determine whether a loan is usurious.").

actions taken in conjunction with the loans which might substantiate an argument that the administrative fee was in consideration for services separate from the loan, or which might be outside the scope of the "front-end" fees that Texas courts recharacterize as interest. Therefore, the Court finds that the administrative fee to UDF III in the amount of $4,115.00 will be characterized as interest for the purposes of the usury analysis.

The recharacterization of the administrative fee for the usury analysis means that the amount of the fee (*i.e.*, $4,115.00) must be removed from the principal actually advanced under the Southern Colony/UDF III Notes, and added to the interest charged or received under these Notes. The subtraction of the amount of this administrative fee from the principal actually advanced under the Southern Colony/UDF III Notes reduces this principal amount from $1,894,920.00 on the date Perry filed his Chapter ll petition (*i.e.*, April 11, 2008) to a recharacterized principal amount of $1,890,805.00 (*i.e.*, $1,894,920.00 – $4,115.00 = $1,890,805.00). The addition of the amount of this administrative fee increases the interest charged or received under the Southern Colony/UDF III Notes from the amount of $344,202.57 up to the amount of $348,317.57 in recharacterized interest (*i.e.*, $344,202.57 + $4,115.00 = $348,317.57).

In order to determine if these Notes are usurious under this set of circumstances, the Court must first calculate the usury ceiling for the Southern Colony/UDF III Notes for the recharacterized principal (the Recharacterized Southern Colony/UDF III Usury Ceiling). The Court reaches the Recharacterized Southern Colony/UDF III Usury Ceiling by calculating the portion of the Original Southern Colony/UDF III Usury Ceiling ($384,830.65), as calculated in Section C(ii)(1) of the Conclusions of Law, that can be ascribed to the $4,115.00 Administrative Fee, and then reducing the Original Southern Colony/UDF III Usury Ceiling by this amount, as

68

shown below. The approach to finding the amount the administrative fee contributed to the Original Southern Colony/UDF III Usury Ceiling is identical to the approach to finding the Original Southern Colony/UDF III Usury Ceiling, as explained in Section B(ii)(1), above.

- $4,115.00 (Recharacterized Fee) x 0.18 (Interest Rate Ceiling)

    = $740.70 = (Annual Interest Rate Ceiling)

- $740.70 (Annual Interest Rate Ceiling) / 365 (Days)

    = $2.03 (Interest Accrued Per Diem Ceiling)

- $2.03 (Interest Accrued Per Diem Ceiling) x 415 (Days accruing interest)

    = $842.17 (Total portion of the Original Southern Colony/UDF III Usury Ceiling contributed by the Recharacterized Administrative Fee)

The final step in calculating the Recharacterized Southern Colony/UDF III Usury Ceiling is to reduce the Original Southern Colony/UDF III Usury Ceiling by the portion contributed by the recharacterized fee:

- $384,830.65 (Original Southern Colony/UDF III Usury Ceiling) − $842.17 (Total portion of the Original Southern Colony/UDF III Usury Ceiling contributed by the Recharacterized Administrative Fee)

    = $383,988.48 (Recharacterized Southern Colony/UDF III Usury Ceiling)

As noted above, after recharacterizing the administrative fee, the amount of interest charged or received under the Southern Colony/UDF III Notes [Exhibit No. 3 & 13] is increased by the

amount of the administrative fee (*i.e.*, $4,115.00) from $344,202.57 to $348,317.57. This amount is still approximately $35,000.00 less than the Recharacterized Southern Colony/UDF III Usury Ceiling of $383,988.48, calculated above. The Court notes that the interest charged on the recharacterized principal is not usurious, even *without* considering the greater dollar amount which would be allowed to be charged if the Court was to calculate the ceiling for interest compounded monthly, as contracted for in the Southern Colony/UDF III Notes.

In conclusion, the Court finds that no usurious interest was contracted for, charged, or received under the UDF III Notes [Exhibits No. 3, 14, 22, & 40]. Because many of the fees are easily characterized as principal for the purposes of the usury analysis and because there is still a substantial cushion between the amount of recharacterized interest charged and the Recharacterized Southern Colony/UDF III Usury Ceiling, the Court estimates a low chance reaching a different result in a full trial on the merits. However, the Court recognizes that the record is incomplete for certain items that have been characterized, and thus estimates a 5% chance of reaching a different result in a full trial.

(3) UDF III's various defenses to the Plaintiffs' claims of usury.

The Defendants have raised the following defenses to the Plaintiffs' claims of usury, as noted above: (1) Perry, as guarantor, has no standing to assert a defense of usury; (2) Hidden Lakes and Southern Colony are equitably estopped from claiming UDF III contracted for, charged, or received usurious interest; (3) the savings clauses in the UDF III Notes are effective to prevent usurious interest from being contracted for, charged, or received; (4) in the alternative, Perry is not entitled to setoff resulting from a usury penalty because setoff requires mutual obligations; and (5) in the alternative, if Perry is entitled to setoff due to usury penalties, the amount of setoff

70

is limited to the amount which would be distributed to Perry due to his equity interest in Perry Properties. The merit, or lack thereof, of these defenses will not change the result the Court has reached based upon the calculations about the absence of usury discussed already herein. Rather, the Court addresses these defenses as an important part of discounting the Plaintiffs' claims based on the percentage chance of reaching a different result in a complete trial. The greater the number of meritorious defenses raised by UDF III, the less likely that this Court's decision that no usury penalty should be applied against Perry's obligations will be discounted. The defenses are addressed in turn.

- (a) Standing of Perry, as Guarantor, to obtain setoff as a result of usury penalties

The Defendants contend that Perry, as Guarantor, cannot assert a claim of usury, even if Southern Colony or Hidden Lakes could prove usury under the UDF III Notes; and further, even if Hidden Lakes or Southern Colony do succeed on their usury claims, Perry is not entitled to setoff for those penalties. Texas law does not allow absolute guarantors to obtain setoff based on usury penalties. *Greenway Bank & Trust of Houston v. Smith*, 679 S.W.2d 592, 595 (Tex.App.–Houston [1st Dist.] 1984) *citing Houston Sash & Door, Inc. v. Heaner*, 577 S.W.2d 217 (Tex. 1979). This principle of Texas law has been recognized by the Fifth Circuit, which has stated, "Texas law does not permit a guarantor to escape its obligation by asserting a usury defense based on a usurious principal obligation." *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 534 (5th Cir. 1994). The reasons given for precluding guarantors from this defense are two-fold. *Greenway Bank & Trust of Houston*, 679 S.W.2d at 595. First, because the applicable usury statute is penal in nature, "it should be strictly construed to provide relief only 'to immediate parties of the transaction creating the usury defense.'" *Id., quoting Houston Sash &*

*Door, Inc.*, 577 S.W.2d at 222. Second, an absolute guarantor is completely liable on the guaranteed obligation, and is "prohibited from prosecuting an action to recover a usury penalty" under the usury statutes. *Id.*, *quoting Houston Sash & Door, Inc.*, 577 S.W.2d at 222.  As a result, an absolute guarantor will not have standing to assert a defense of usury, unless "the guaranty agreement also contains the usurious provision." *Bair Chase Prop. Co.*, 260 S.W. 3d at 145.  As this Court discusses in Section C(vi) of the Conclusions of Law, *infra,* Perry is an absolute guarantor of the UDF III Notes [Exhibits No. 3, 13, 22 & 40], and Perry thus will not have standing to assert a defense of usury or obtain setoff from usury penalties unless the Notes themselves contain a usurious provision.

On the facts in this dispute, Perry does not have standing to assert a defense of usury, nor is he permitted to obtain setoff resulting from any usury penalties. Neither of the UDF III Guaranty Agreements [Exhibits No. 10 & 25] make any reference to interest at all, let alone specific interest rates which might constitute the "usurious provision" spoken of in *Bair Chase Prop. Co.*, 260 S.W. 3d at 145. As a result, the Court finds that the UDF III Guaranty Agreements [Exhibits No. 10 & 25] do not contain a usurious provision. Hence, Perry, as guarantor, does not have standing under Texas law to assert usury as a defense against UDF III. Because Texas law consistently holds that a guarantor has no standing to raise a claim of usury unless the usurious provision is contained in the guaranty agreement itself, and because there is no evidence of any such provision in Perry's UDF III Guaranty Agreements [Exhibits No. 10 & 25], the Court estimates a 0% probability of reaching a different result in a trial on the merits.

- (b) Equitable Estoppel

72

The Defendants contend that the Plaintiffs should be equitably estopped from asserting claims of usury, based on opinion letters prepared by Locke, Liddell, & Sapp, LLP [Exhibit No. 108], and Coats | Rose PC [Exhibit No. 109] (together, the Opinion Letters). The Defendants assert that, because the Opinion Letters were prepared and delivered to UDF III by the two law firms, at the request of the Plaintiffs, and because the Opinion Letters contain opinions to the effect that both the Original Hidden Lakes/UDF III Note and the Original Southern Colony Note are not usurious, the Plaintiffs should be equitably estopped from asserting that the Notes are usurious.

The Fifth Circuit recognizes that Texas law generally defines estoppel as "conduct which causes the other party to materially alter his position in reliance on that conduct." *Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 311 (5th Cir. 2005). The elements of equitable estoppel are: "(1) a false representation or concealment of material facts made with knowledge (actual or constructive) of those facts, (2) with intention that it should be acted on, (3) to a party without knowledge, or means of knowledge of those facts, (4) who detrimentally relied upon those representations. *Id.* By the Defendants' own admission, Texas courts have imposed greater restrictions on the use of equitable estoppel in the context of usury claims, by adding an additional element that the plaintiff actually participated in the deception on the lender. *Miro v. Allied Fin. Co.*, 650 S.W.2d 938, 944 (Tex. App. – Houston [14th Dist.] 1983); *Am. Century Mortgage Investors v. Reg'l Ctr., Ltd.*, 529 S.W.2d 578 (Tex.Civ.App.–Dallas 1975, *writ ref'd n.r.e.*). The Defendants contend that this extra element is satisfied because Hidden Lakes and Southern Colony directed "their attorneys" to deliver the Opinion Letters to UDF III, and

therefore, if the opinions are now disavowed, Hidden Lakes and Southern Colony participated in a deception of UDF III.

The Defendants have failed to prove at least the first element required for this Court to equitably estop the Plaintiffs' claims. The first element requires a false representation or concealment of material facts made with actual or constructive knowledge of those facts. The Defendants allege that Southern Colony and Hidden Lakes' misrepresentation or concealment of material facts was the act of having the Opinion Letters delivered on their behalf with actual or constructive knowledge that they would disavow the opinions in the Opinion Letters in the event there was conflict over the UDF III Notes. This argument fails for the reason that there is no evidence in the record indicating that at the time the Opinion Letters were delivered, Hidden Lakes or Southern Colony had any knowledge, constructive or otherwise, that they would later contradict the opinions in the Opinion Letters. Accordingly, the Court cannot find that any misrepresentation or concealment was made with actual or constructive knowledge. Hence, the first element is not met and equitable estoppel is not appropriate.

It is true that in at least one other jurisdiction, Florida, an opinion letter provided by a borrower has been adequate to bar usury claims. *See In re Vision Dev. Group of Broward County*, 411 B.R. 768, 771-72 (Bankr. S.D.Fla. 2009). However, this Court notes that the standard for equitable estoppel is different in this jurisdiction–"[e]quitable estoppel requires: (1) acts or conduct by a party causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts or conduct; and (3) detrimental reliance by the other party upon the state of things so indicated." *Id.* Under this standard, it is possible that equitable estoppel might be appropriate on the record before the Court. It is not impossible that

74

this Court could find that the Plaintiffs were at least negligent with respect to whether they would later repudiate the opinions provided in the Opinion Letters. Texas law, however, requires *knowledge* on the part of the party alleging usury, a higher standard which, given the state of the record in the dispute at bar, is not satisfied.

In conclusion, the Court finds that equitable estoppel of the Plaintiffs' usury claims is not appropriate. Because there is not a wealth of case law on the topic of promissory estoppel on the basis of opinion letters, and because the current record is quite sparse with respect to facts salient to this analysis, the Court estimates a 20% probability of reaching a different result in a full trial on the merits.

- ### (c) Effect of the Savings Clause

The Defendants assert that the savings clauses in each of the UDF III Notes prevent UDF III from contracting for, charging, or receiving usurious interest. The Court has concluded, above, that UDF III has not contracted for usurious interest, but in case this conclusion is incorrect, the Court undertakes the following analysis–which assumes usury has occurred. Under Texas law, "[s]avings clauses are favored by the law and will be given effect if reasonably possible." *Kennon v. McGraw*, 281 S.W.3d 648, 652 (Tex.App.–Eastland 2009); *Woodcrest Assocs., Ltd. v. Commw. Mortgage Corp.*, 775 S.W.2d 434, 437-38 (Tex.App.–Dallas 1989) (*writ den'd*). The effect of a savings clause turns "on the construction of the terms of the whole transaction in light of the surrounding circumstances. *Id*. "Usury is a matter of intention, and a savings clause is evidence of an intent not to charge usurious interest." *Kennon*, 281 S.W.3d at 652; *Robert Joseph Phillips Living Trust v. Scurry*, 988 S.W.2d 418, 421 (Tex.App.–Eastland 1999, *pet. denied*). "A

party may not, however, escape penalty by disclaiming the intention to do what was clearly done." *Kennon*, 281 S.W.3d at 652; *C&K Invs. v. Fiesta Group, Inc.*, 248 S.W.3d 234, 244 (Tex.App.–Houston [1st Dist.] 2007); *Nevels*, 102 S.W.2d at 1049. The purpose of this rule is to prevent a "creditor from freely contracting for usurious interest knowing that for the few debtors who complain, the creditor will escape penalty by mere reference to a savings clause and refund of the usurious amounts. *C&K Invs.*, 248 S.W.3d at 244; *Kaplan v. Tiffany Dev. Corp.*, 69 S.W.3d 212, 220 (Tex.App.–Corpus Christi 2001, *no pet.*) However, if it is reasonably possible to give some effect to the savings clauses, this Court must interpret them in a manner which would deny the right to collect usurious interest. *Woodcrest Assocs., Ltd.*, 775 S.W.2d at 438; *Nevels*, 102 S.W.2d at 1049.

Texas courts have held that usury savings clauses will not save a usurious transaction when notes are usurious on their face (*i.e.*, the savings clause is directly contrary to the explicit terms of the contract) or when there is no evidence of the lender attempting to effectuate the savings clause. *Armstrong v. Steppes Apartments, Ltd.*, 57 S.W.3d 37, 47 (Tex.App.–Fort Worth 2001). Further, any lender who continues to charge usurious interest after receiving notice that the borrower objects to the charged interest as usurious, will not be protected from a claim of usury by a usury savings clause. *Kennon*, 281 S.W.3d at 652. Finally, lenders who structure transactions in a manner that evinces an intent to charge a usurious amount of interest, and make no effort to effectuate the savings clause will also not be protected by a savings clause. *C&K Invs.*, 248 S.W.3d at 245.

In view of the preceding law, the loans in question, and the language of each set of Notes as a whole, this Court is persuaded that the usury savings clauses should be given effect, and if the

Notes were usurious as contracted for, charged, or received, the Defendants would be protected

from usury penalties by these savings clauses. In reaching this conclusion, the Court is persuaded

by much the same reasons as the Texas Court of Appeals in *Woodcrest Associates*, which stated:

> From our review of the loan documents, and in particular, the savings clauses, we
> conclude that the manifest intent of the parties was to structure the entire
> transaction so as to avoid contracting for, charging, or receiving usurious interest.
> The testimony at trial revealed that both parties were well aware of the potential
> usurious nature of the transaction, especially with regard to the various loan fees.
> The aggressive draftsmanship of the documents reflects an intent that
> Commonwealth collect as much of the agreed upon fees as possible without
> violating the usury laws. Therefore, if at all possible, we must give effect to this
> intent in the present case.

775 S.W.2d at 438-39.

The UDF III Notes evince a similar intent to structure the transactions in order to avoid

contracting for, charging, or receiving usurious interest. The UDF III Notes contain a very careful

characterization of various fees as principal rather than interest, and expressly state whenever

separate consideration has been provided for these fees.[45] Indeed, the splitting of the Hidden

Lakes transaction between two loans – one governed by Texas law and a usury ceiling of 18%

*per annum*, and the other governed by Nevada law and not subject to any usury ceiling – evinces

an intent to structure the transaction in order to avoid violating usury laws. Finally, savings

clauses can be found in at least three places in both the Original Hidden Lakes/UDF III Note

[Exhibit No. 22] and the Original Southern Colony Note [Exhibit No. 3].[46] As such, it is proper

---

[45] *See, e.g.*, the Original Southern Colony/UDF III Note [Exhibit No. 3] §2(b); §2(c).

[46] *E.g.*, in the Original Southern Colony/UDF III Note [Exhibit No. 3]: "'***Base Rate***' shall mean the lesser of (i) fifteen percent (15.0%), accrued and compounded monthly, or (ii) the Highest Lawful Rate." [§ 1]; "if any fees or expenses charged or chargeable to Borrower hereunder are determined to constitute interest, and such fees or expenses, when added to the interest charged hereunder, would cause the aggregate interest charged hereunder to exceed the Highest Lawful Rate, then Section 11 of this Note shall automatically apply to reduce the interest charged hereunder .

for the Court to find that the savings clauses have legal effect and preclude UDF III from usury penalties resulting from the UDF III Notes.[47] On the other hand, because this Court assumes that usury has occurred (for the purposes of this subsection only), it is possible that this Court would conclude, after a complete trial, that UDF III's lack of action to correct the problem constituted proof of intent to charge or receive usurious interest. Accordingly, this Court estimates a 20% probability of reaching a different result in a full trial on the merits.

### iii. Should the Court equitably subordinate the claims of UDF III?

The Plaintiffs contend that UDF III, in conjunction with UDF, has engaged in inequitable conduct as an "insider" which has resulted in injury to Perry's creditors or conferred an unfair advantage to UDF III.

Pursuant to Section 510(c) of the Code, this Court has the power to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c) (2006). Equitable subordination has been recognized as "an unusual remedy which should be applied only in limited circumstances." *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1466-1467 (5th Cir. 1991) *citing Holt v. FDIC (in re CTS Truss, Inc.)*, 868 F.2d 146, 148-49 (5th Cir. 1989). Furthermore, the doctrine of equitable subordination is "remedial, not penal, and should be

---

. . ." [§2(d)]; "this Note shall never bear interest in excess of the Highest Lawful Rate, and (ii) if at any time the rate at which interest is payable on this Note is limited by the Highest Lawful Rate . . . then this Note shall bear interest at the Highest Lawful Rate . . . ." [§ 4(b)].

[47]Because UDF III charged and received interest pursuant to the UDF III Notes containing the savings clauses, it will not be liable for usury penalties resulting from charging or receiving those amounts, so long as whatever interest above and beyond the legal limit is returned to Hidden Lakes or Southern Colony. *See C&K Invs.*, 248 S.W.3d at 244; Tex. Fin. Code Ann. § 305.101 (Vernon 2009).

applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *Matter of Fabricators, Inc.*, 926 F.2d at 1466-1467.

The Fifth Circuit has laid out a three-pronged test to determine "whether and to what extent a claim should be equitably subordinated: (1) the claimant must have engaged in some sort of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 697 (5th Cir. 1990) *citing Matter of Missionary Baptist Found. of Am., Inc.*, 796 F.2d 752, 760 (5th Cir. 1986). In the event that all three prongs are satisfied, the Court is *permitted*, but *not required*, to subordinate a claim. *Matter of Fabricators, Inc.*, 926 F.2d at 1464-65 n.9. The Fifth Circuit unequivocally requires that, when a bankruptcy court subordinates a claim, the determination "must be supported by specific findings and conclusions with respect to each requirement." *In re SI Restructuring, Inc.*, 532 F.3d 355, 361-365 (5th Cir. 2008), *citing In re Fabricators*, 926 F.2d at 1465. This Court's analysis of the three prongs follows below.


(1) The first prong: inequitable conduct of the claimant

The *Clark Pipe* Court went on to state that three types of conduct "have been recognized as sufficient to satisfy the first prong of the three part test: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; and (3) a claimant's use of the debtor as a mere instrumentality or alter ego." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d at 697. The Plaintiffs have made no allegations of undercapitalization, so this Court instead focuses on (1) fraud, illegality, or

79

breach of fiduciary duties, and (3) claimant's use of the debtor as a mere instrumentality or alter ego in analyzing the first prong of the three prong test.

In order to use an entity as a mere instrumentality or alter ego, a creditor must have "actual, participatory, total control of the debtor." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d at 699, *quoting Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1105 (5th Cir. 1973), *modified factually,* 490 F.2d 916 (5th Cir. 1974) *(elaborated in Valdes v. Leisure Res. Group,* 810 F.2d 1345, 1354 (5th Cir. 1987)).

The facts currently on the record lead the Court to find that equitable subordination is not proper for the claims of UDF III. Though, from the record, it appears that after Perry filed his Chapter 11 petition, UDF (and perhaps UDF III) became somewhat more involved in completing the Hidden Lakes Property than it was prior to the filing of Perry's petition, it by no means appears that this behavior rose to the level of "actual, participatory, total control of the debtor." The Fifth Circuit has held that "[m]erely taking an active part in the management of the debtor corporation does not automatically constitute control . . . by the creditor corporation." The evidence on the record before this Court probably does not even establish that UDF or UDF III took an "active part in the management" of Hidden Lakes, and in no case can it be cconcluded from the record that UDF and UDF III exceeded this standard. The majority of UDF and UDF III's actions (if UDF III can be considered to have taken any action at all) were directed toward oversight of the completion of construction on the Hidden Lakes Property to a point where it was commercially viable. [Finding of Fact No. 21.] These actions seem to be nothing more than a "large creditor, . . . interested in the prosperity of the company," who "most naturally should