desire to keep an oversight over its doings." *Krivo Indus. Supply Co.*, 483 F.2d at 1105, *quoting Chi. Mill & Lumber Co. v. Boatmen's Bank*, 234 F. 41 (8th Cir. 1916).

Nor does there appear to be any "fraud, illegality, or breach of fiduciary duties." There has been no allegation by the Plaintiffs that the foreclosure sale of the Hidden Lakes Property violated the requirements of Texas law; UDF III never owed Hidden Lakes any fiduciary duties; and although the Plaintiffs hint at collusion between UDF and the purchaser at the foreclosure sale, no fraud has been directly alleged. As such, the first prong of the three-part test is not satisfied.

<u>(2) The second prong: Claimant's misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.</u>

The Fifth Circuit has stated "that in the absence of actual harm, equitable subordination is inappropriate." *In re SI Restructuring, Inc.*, 532 F.3d at 361, *citing In re Mobile Steel Co.*, 563 F.2d 692, 701, 706 (5th Cir. 1977). This rule has been interpreted by the Fifth Circuit to be synonymous with the statement that "the offending party's claim will be subordinated only to those who can show actual injury." *In re SI Restructuring, Inc.*, 532 F.3d at 361, *quoting* 4 COLLIER ON BANKRUPTCY ¶ 510.05[3][e].510-31 (15th ed. revised).  On account of these mandates, this Court discerns no avenue for the Plaintiffs to satisfy the second prong of the test. The Plaintiffs do not assert, except in the broadest terms possible, actual injury to Perry or Perry's creditors resulting from the acts of UDF and UDF III. Moreover, there is no evidence before the Court tending to show that the alleged bad acts of UDF and UDF III caused actual injury to Perry or Perry's creditors, or conferred any kind of unfair advantage on the claimants

(*i.e.*, UDF and UDF III). On the contrary, as already noted, the majority of UDF and UDF III's

actions (again, if UDF III can be considered to have taken any action at all) appear to be directed

toward completing construction on the Hidden Lakes Property to a point where it was

commercially viable, which could be of benefit to Perry and his other creditors. In any event, the

Plaintiffs have the burden of showing either actual injury to Perry's creditors or unfair advantage

to UDF and UDF III, and they have failed to prove either. Therefore, the second prong of the

three-part test is also not satisfied.


<u>(3) The third prong: equitable subordination of the claim must not be inconsistent with the
provisions of the Bankruptcy Code.</u>

The Code confers an equity jurisdiction upon the bankruptcy courts. *In re Tex. Consumer

Fin. Corp.*, 480 F.2d 1261, 1265 (5th Cir. 1973). But this jurisdiction "merely empowers the

Referee to employ the principles of equity in the exercise of his statutory jurisdiction." *Id.* The

"[j]urisdiction of the Bankruptcy Court is framed by statute according to the particular

proceeding involved under the Bankruptcy Act, and the Bankruptcy Court's exercise of its

equitable powers must be strictly confined within the prescribed limits of the Bankruptcy Act."

*Id.* "This element recognizes that the doctrine is not a mechanism to be used by courts to alter the

statutory scheme in an effort to reach a result the court considers more equitable than the

distribution scheme provided for in the Bankruptcy Code." *In re Sunbeam Corp.*, 284 B.R. 355,

364 (Bankr. S.D.N.Y. 2002). Insofar as the Court has already concluded that the first two prongs

of the test have not been satisfied, the Court sees no reason to address whether the third element

could be met. For all of these reasons, the Court concludes that the claims of UDF III should not be equitably subordinated.

### (4) Defenses to equitable subordination asserted by the Defendants

The Defendants have asserted that equitable subordination is improper because (1) the conduct of which the Plaintiffs complain was directed against Hidden Lakes, not Perry (*i.e.* the Debtor); and (2) the Code does not allow the subordination of UDF III's claim to Perry's equity interest, such as it is. Without ruling directly on the first argument, this Court agrees with the Defendants that it does not have the power to subordinate UDF III's claim to Perry's equity interest. Under the express language of 11 U.S.C. 510(c), the Court may not subordinate a claim to an equity interest; it may only subordinate one claim to another claim and one equity interest to another equity interest. *In re C.R. Amusements*, LLC, 259 B.R. 523, 529 (Bankr. D.R.I. 2001).

### (5) Conclusion: equitable subordination is not proper.

Considering that the Plaintiffs have failed to satisfy the first two prongs of the test by a good measure, the Court finds that equitable subordination is not proper and estimates a 0% probability of reaching a different result in a full trial on the merits. Thus, the Court will not discount the claims of UDF III on this basis.

*iv. Does Perry have a right to setoff as a result of the foreclosure sale of the Hidden Lakes Property?*

The Plaintiffs contend that Perry, as guarantor of the loan between UDF III and Hidden Lakes, is entitled to a setoff under Tex. Prop. Code § 51.003 because the fair market value of the Hidden Lakes Property on the date of the foreclosure sale was in excess of the sale price.

However, this section does not apply to UDF III because UDF III does not seek a deficiency judgment against Hidden Lakes or Perry. UDF III had no relation to the foreclosure sale under the Deed of Trust because it was never a lienholder on the Hidden Lakes Property. Under Texas law, a deed of trust is simply a mortgage with a power of sale. *In re Rangel*, 408 B.R. 650, 656 n.1 (Bankr. S.D.Tex. 2009); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 351 (Tex.App.–Austin 1996). An adequate description of the property subject to the mortgage or deed of trust is necessary for the validity of a mortgage or deed of trust. *Stone v. Williams*, 358 S.W.2d 151 (Tex.Civ.App.–Houston 1962). The UDF Deed of Trust [Exhibit No. 29] which provided for the foreclosure sale of the Hidden Lakes Property was held by UDF alone, as noted above, in section C(i) of the Conclusions of Law. UDF III *is* secured under the Hidden Lakes/UDF III Notes by the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] which does not contain any description of the Hidden Lakes Property. As such, the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] is inadequate to create a mortgage or a deed of trust under Texas law.

The Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] *is* adequate to create a security interest under Title 1, Chapter 9 of the Texas Business and Commerce Code (Chapter 9 of the Uniform Commercial Code) pursuant to language in this Security Agreement expressly granting a "continuing security interest . . . in all assets" held by Hidden Lakes and Hidden Lakes GP. *See* Tex. Bus. & Com. Code § 9.203 (Vernon 2009). However, a security interest created

84

under Chapter 9 of the Uniform Commercial Code may not include liens on real property (with some small exceptions that are inapplicable to the matter before the Court). *Id.* § 9.109(d)(11). Thus, (1) UDF III was not a party to the UDF Deed of Trust, (2) the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] is neither a mortgage nor a deed of trust under Texas law; and (3) the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] *cannot* grant a lien on the Hidden Lakes Property under Chapter 9 of the Uniform Commercial Code. Accordingly, UDF III has no interest in the Hidden Lakes Property which could give rise to a deficiency judgment. For the Court to find otherwise would be the functional equivalent of allowing the holder of a security interest in a debtor's car to bring a deficiency action on that same debtor's home. For these reasons, Perry is not entitled to any credits against the claims of UDF III due to the foreclosure sale of the Hidden Lakes Property. As the Court is not aware of any case law tending to indicate that a claim against a guarantor such as Perry is a deficiency action that is potentially subject to setoff under the Texas Property Code, the Court estimates a 0% probability of reaching a different result in a full trial on the merits.

*v. Should UDF III's claims be disallowed because they are contingent or unliquidated?*

The Plaintiffs also argue that UDF III's claims are contingent, as the loans were not in default on the date of the filing of Perry's bankruptcy petition. Therefore, the determination of the amount of UDF III's claims is ongoing and still contingent and unliquidated as to Perry's guarantees. The Plaintiffs then argue that the fixing or liquidation of these contingent claims would unduly delay the administration of Perry's Chapter 11 case, and thus request that the claims be disallowed.

Courts, particularly bankruptcy courts, fix or liquidate contingent claims quite frequently. As stated by one bankruptcy court: "A guaranty is a classic example of a contingent obligation . . . [c]ontingent obligations are allowable and entitled to estimation . . . ." *Matter of Fox*, 64 B.R. 148, 153 (Bankr.N.D.Ohio 1986). Furthermore, the public policy underlying claims estimation under the Code is to facilitate the timely administration of the case by making an expeditious assessment of the value of certain claims which would otherwise unduly delay administration. Section 502(c) provides that contingent or unliquidated claims which would unduly delay the administration of the case shall be estimated by this Court. 11 U.S.C. § 502(c) (2006). Contingent claims such as those held by UDF III are exactly the type of claims an estimation hearing is meant to handle.

*vi. Should the Court consider the ability of the borrower to pay the obligation in estimating  the dollar amount of Perry's Guarantees?*

The Plaintiffs argue that in estimating the amount Perry owes under his guarantees, the Court should take into account the ability of the primary obligor to pay the obligation.

Courts have much latitude in estimating a guaranty claim. The Bankruptcy Code provides no guidance on how a Court should estimate claims which are contingent or unliquidated. *Matter of Fox*, 64 B.R. at 153.  In making an estimation of a claim, the Court "should use whatever method is best suited to the circumstances of the case." *In re Mona Lisa at Celebration, LLC*, 410 B.R. 710, 717 (Bankr. M.D.Fla. 2009), *citing Bittner*, 691 F.2d at 136. So this Court is certainly permitted, under the Code, to consider the ability of the principal obligor to pay the obligation. Moreover, there is case law supporting this approach. In *Matter of Fox,*  the court noted that "[i]n

estimating a guaranty claim, the court should take into account the ability of the primary obligor to pay the obligation. . . . [t]his involves looking at the assets and liabilities of the obligor and the value of property securing the lender's debt." 64 B.R. at 153 *citing in re Zucker* 5 BCD 433 (Bankr. S.D.N.Y. 1979).

However, under Texas law, a guaranty of payment is "absolute rather than conditional, primary rather than secondary, and guarantees of payment rather than guarantees of collection." *Universal Metals & Mach., Inc. v. Bohart*, 539 S.W.2d 874, 877-78 (Tex. 1976). Under Texas law, "one who guarantees payment of a note and waives the requirement that the holder of the note exhaust its rights against the maker, becomes an absolute guarantor." *Greenway Bank & Trust of Houston*, 679 S.W.2d at 595; *Universal Metals & Mach. Inc.*, 539 S.W.2d at 876-78. The lender may bring an action against the absolute guarantor without joining the principal obligor. *Ferguson v. McCarrell*, 582 S.W.2d 539, 541-42 (Tex.Civ.App.–Austin 1979, *writ ref'd n.r.e.*, 588 S.W.2d 895 (Tex. 1979) (*per curiam*)). Thus, if Perry's guarantees are guarantees of payment, then UDF III may bring an action against him without joining either Hidden Lakes or Southern Colony. Under these circumstances, the Court would not look to the ability of any principal obligor in estimating the amount of any claim against Perry based on his guarantees.

The facts in this dispute indicate that Perry's guarantees to UDF III are guarantees of payment. The identical language of the UDF III Guaranty Agreements [Exhibits No. 10 & 25] makes this conclusion abundantly clear: "[e]ach Guarantor hereby absolutely and unconditionally guarantees, and becomes surety for, the full, timely and complete payment when due . . . ." The UDF III Guaranty Agreements [Exhibits 10 & 25] further provide that "[e]ach Guarantor's obligation under this Guaranty is unconditional, absolute and enforceable, irrespective of . . . whether

87

recovery against Borrower with respect to the Guaranteed Obligations in whole or in part is prevented by bankruptcy, operation of law, or otherwise . . . ." Finally, the UDF III Guaranty Agreements [Exhibits 10 & 25] include an express waiver of the requirement that the holder of the note exhaust its rights against the maker, stating that the "[l]ender may, in its sole discretion and without notice, take or refrain from taking any action that might otherwise be deemed a legal or equitable release or discharge of Guarantors' obligations under this Guaranty, without either impairing or affecting the joint and several liability of Guarantors for the full, timely and complete payment of the Guaranteed Obligations, which actions might include, by way of illustration and not limitation: . . . (c) the absence of any attempt to collect the Guaranteed Obligations from Borrower or any other person or entity primarily or secondarily liable for the Guaranteed Obligations or any other action to enforce Lender's rights with respect to the Guaranteed Obligations."Accordingly, the Court recognizes Perry as an absolute guarantor, and will not look to the ability of the primary obligors to pay in estimating the claims against him.

Texas law is very clear that a creditor need not first attempt to collect from the borrower or other principal obligor before seeking payment from a guarantor of payment. The UDF III Notes are exceedingly clear in stating that UDF III need not attempt to collect from the borrowers on the Notes before seeking payment from Perry. Accordingly, the Court estimates a 0%  probability of reaching a different result in a full trial on the merits.


vii. Is Proof of Claim 45 Duplicative of Proof of Claim 43?

At the Hearing, the Plaintiffs contended that Proof of Claim 45 is a duplicate of Proof of Claim 43.

Bankruptcy Rule 3001(a) states that "A proof of claim is a written statement *setting forth a creditor's claim.*" Bankr. R. 3001(a). Rule 3001(b) requires that "[w]hen a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim." Bankr. R. 3001(b). Code Section 502(a) states that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed unless a party in interest . . . objects." 11 U.S.C. § 502(a) (2006). Section 502(b) holds that when there is an objection to a claim, the Court "shall determine the amount of such claim . . . and shall allow such claim in such amount." *Id.* § 502(b).

The Court has estimated that UDF III has aggregate maximum claims of $3,404,280.97 under the Hidden Lakes/UDF III Notes and $2,151,557.80 under the Southern Colony/UDF III Notes as shown in Table 4, *supra*. UDF III has filed three proofs of claim: Proof of Claim 43, 45, and 46. The estimated amount of UDF III's claim under the Hidden Lakes/UDF III Notes corresponds closely with the amount requested in Proof of Claim number 43 – *i.e.*, $3,619,902.00. Proof of Claim 43 has attached documents summarizing the loan history between Hidden Lakes and UDF III as well, so it is reasonable to conclude that Proof of Claim 43 is a claim for the amount owed under the Hidden Lakes/UDF III Notes. The estimated amount of UDF III's claim under the Southern Colony/UDF III Notes corresponds closely with the amount requested in Proof of Claim 46 – *i.e.*, $2,177,260.03. Proof of Claim 46 has attached documents summarizing the loan history between UDF III and Southern Colony, so it is reasonable to conclude that Proof of Claim 46 is a claim for the amount owed under the Southern Colony/UDF III Notes. There are no other promissory notes in contention between UDF III and the Plaintiffs that correspond with Proof of Claim 45. Moreover, Proof of Claim 45 is identical in all respects to Proof of Claim 43, including attached documents. Because there is no additional documentation for a debt owed to UDF III

89

beyond those supporting Proofs of Claim 43 and 46, and because all evidence indicates that Proof of Claim 45 is an exact copy of Proof of Claim 43, the Court finds that Proof of Claim 45 should be disallowed. The weight of the evidence on this issue is such that the Court estimates a 0% chance of changing its conclusion after conducting a complete trial.

*viii. Conclusion: Estimated Claims of UDF III*

The Court has estimated UDF III's threshold claim under the Hidden Lakes/UDF III Notes to be $3,404,280.97, and under the Southern Colony/UDF III Notes to be $2,151,557.80, for an aggregate threshold claim of $5,555,838.77. The Court has found that it is improper to reduce this aggregate threshold claim on the basis of the Plaintiffs' legal grounds of (1) usury; (2) equitable subordination; (3) right to credits as a result of the foreclosure sale of the Hidden Lakes Property; (4) unliquidated claims; or (5) ability of the borrower to pay the obligation. The Court has also found that Proof of Claim 45 is duplicative of Proof of Claim 43, and accordingly concludes that Proof of Claim 45 should be disallowed in its entirety.

The Court has estimated a 5% probability of reaching a different result in a full trial on the sub-issue of whether usurious interest was charged or received under the UDF III Notes when various fees are recharacterized as interest. This would usually entail some form of discount of UDF III's claims in the amount of 5% of the penalty the Court estimates would be assessed under Texas law. But this is unnecessary, because the Court has found that Perry has no standing to assert a defense of usury or obtain setoff from usury penalties under Texas law. Furthermore, this Court has estimated a 0% probability of reaching a different result in a full trial on the issue of Perry's standing to assert usury or obtain setoff from usury penalties. Perry's inability to obtain

setoff from any usury penalties means that no reduction to UDF III's claims can result from a usury defense. As a result, the Court will not discount UDF III's claims on the basis of the probability of reaching a different result on the recharacterized interest sub-issue.

The Court has estimated the likelihood of reaching a different result on the Plaintiffs' other legal grounds at 0%. Accordingly, for purposes of the plan confirmation hearing to be held in the main case, the Court estimates that UDF III's claim under the Hidden Lakes/UDF III Notes to be $3,404,280.97, and under the Southern Colony/UDF III Notes to be $2,151,557.80, for a total claim of $5,555,838.75. The results of this analysis are summarized in Table 6, below.

**Table 6**

| Applicable Notes | Claim before discount | Discount for probability of reaching a different conclusion in a full trial on the merits | Net Claim |
|---|---|---|---|
| Hidden Lake/UDF III Notes | $3,404,280.97 | $0 | $3,404,280.97 |
| Southern Colony/UDF III Notes | $2,151,557.80 | $0 | $2,151,557.80 |
| **Both Sets of Notes** | | | **$5,555,838.77** |

**D. Conclusions of Law pertaining to the Loans made by UDF**

*i. What is the Proper Amount of Proof of Claim 44?*

The first step in the analysis is to determine the initial proper amount of UDF's claim under Proof of Claim 44 before any reduction due to legal grounds raised by the Plaintiffs. Three issues must be addressed: (1) whether UDF is entitled to post-petition interest and costs; (2) the amount of principal actually advanced on the loans; and (3) the amount of interest due on the amount of principal actually advanced. The Court addresses each in turn.

<u>(1) Is UDF entitled to post-petition interest and costs on the Hidden Lakes/UDF Note?</u>

The Bankruptcy Code is very clear on when creditors are entitled to post-petition interest and costs. Section 506(b) provides that "to the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable costs or charges . . . ." 11 U.S.C. § 506(b) (2006). The definition of a "secured claim" is provided in Section 506(a)(1), which provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property." *Id.* § 506(a)(1). Section 506(a)(1) goes on to state that an allowed claim "is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such secured claim." *Id.* Finally, and importantly for the analysis here, Section 502(b) provides that a creditor is not entitled to "unmatured interest" on an unsecured claim. *Id.* § 502(b). Thus, the initial inquiry is to determine the value of the estate's interest in the

92

collateral securing the Hidden Lakes/UDF Note in order to determine the amount, if any, of

UDF's secured claim. If the value of the estate's interest in the collateral is greater than the

amount of UDF's claim, then UDF is entitled to post-petition interest and costs up to the point

that total principal plus interest and costs is equal to the amount of the estate's interest in the

collateral. If the value of the estate's interest in the collateral is less than the amount of UDF's

claim, then some portion of UDF's claim will be an unsecured claim, and UDF will not be

entitled to post-petition interest and costs.

Given the record before this Court, UDF is not entitled to post-petition interest and costs, and

the value of the estate's interest in the collateral should be valued at zero dollars. As noted above,

to be counted towards a secured claim, collateral securing a debt must be in the bankruptcy

estate–*i.e.*, Perry, as the Debtor-in-Possession, must have had an interest in the collateral at the

time of filing. Here, Perry had no interest in any of the collateral securing the Hidden Lakes/UDF

Note under the Deed of Trust [Exhibit No. 29], the Hidden Lakes/UDF Security Agreement

[Exhibit No. 30] or the Hidden Lakes/UDF Pledge Agreement [Exhibit No. 31]. Therefore, the

value of his estate's interest in the collateral must be valued at zero dollars. As a result, UDF has

an unsecured claim and it is not entitled to receive post-petition interest or costs.


(2) What is the dollar amount of principal actually advanced by UDF under the Hidden

Lakes/UDF Note?

Neither party contends that the full face principal value of the Hidden Lakes/UDF Note was

advanced, but there is disagreement over the amount actually advanced. The Plaintiffs contend

that the face principal value of the of the Hidden Lakes/UDF Note was reduced by the following

amounts: (a) an "interest reserve" in the amount of $1,100,000; (b) a one-half share of a "commitment fee" paid to UMTH in the amount of $37,875.00 (the full amount of the fee being $75,750.00); and (c) a "2% consulting fee" of $28,500.00 to Winchester Equities, LLC. All of these reductions are taken directly from items on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. The Plaintiffs therefore assert that these reductions bring the actual principal advanced on the Hidden Lakes/UDF Note to $1,434,375.00, down from a face value of $2,600,750.00. Because the Plaintiffs argue that UDF contracted for, charged, or received usurious interest under the Hidden Lakes/UDF Note, and Texas usury law may require a recharacterization of certain fees as interest, these contentions entail two separate characterizations of these fees by the Court:[48] First, the Court characterizes these fees under Texas contract and applicable non-usury finance law in order to determine UDF's maximum allowable claim under the contract alone; and second, the Court determines whether these fees should properly be characterized as interest under usury law in determining whether the interest contracted for, charged, or received under the Hidden Lakes/UDF Note was in excess of the legal limit. In this section, the Court characterizes the fees under Texas contract law in order to determine the amount of principal actually advanced. The fees are characterized for the usury analysis below, in Section D(ii) of the Conclusions of Law.

---

[48] *See Perry v. Stewart Title Co.*, 756 F.2d at 1206 ("Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note *to determine whether a loan is usurious*.") *citing First State Bank of Bedford*, 563 S.W.2d at 575 ("'In cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly *in testing for usury*."), *quoting Tanner Dev. Co.*, 561 S.W.2d at 782-83. Even if the Court finds that usurious interest is contracted for, charged, or received, the Hidden Lakes/UDF Note remains valid and enforceable by UDF, "provided allowance is made for the penalty." *Vordenbaum*, 611 S.W.2d at 465, *citing Wall*, 526 S.W.2d at 151-54, *rev'd on other grounds*, 533 S.W.2d 918 (Tex. 1976). Finally, Texas law requires no forfeiture of principal for usurious interest for commercial loans. Tex. Fin. Code § 305.001(a-1) (Vernon 2009).

The Defendants, in their Brief of November 11, 2009 [Main Case Docket No. 738], simply make a blanket request that the claims asserted under the Proofs of Claim be allowed in their full amounts. In so doing, the Defendants do not specify an amount advanced as principal, and instead appear to rely on the Hidden Lakes/UDF Note [Exhibit No. 28] and the Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] for the principal actually advanced. The Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] indicates a disbursement of funds to Hidden Lakes on May 22, 2007 in the amount of $1,425,000.00. This is the amount listed as the "Commitment" in the Hidden Lakes/UDF Note [Exhibit No. 28]. The loan history documents do not indicate how this number was derived, but the Court will assume that this number represents the full principal face value of $2,600,750.00, reduced by the interest reserve of $1,100,000.00 and the full commitment fee paid to UMTH of $75,750.00, which results in the amount of $1,425,000.00 stated on the loan history.

By implication, the Court assumes that both parties agree that the interest reserve of $1,100,000.00 does not represent principal actually advanced (pursuant to the express language of this Note) and that at least the $1,434,375.00 of principal was actually advanced (as conceded by the Plaintiffs). The next step in the analysis is the characterization of the two disputed items: (1) the one-half share of a commitment fee paid to UMTH costing $37,875.00 (the full amount of the fee being $75,750.00); and (2) the 2% consulting fee of $28,500.00 to Winchester Equities, LLC.

As the Court explains in greater detail in section D(ii) of the Conclusions of Law, the Hidden Lakes/UDF Note [Exhibit No. 28] is governed by Nevada law. Under Nevada law, "when a contract is clear on its face, it 'will be construed from the written language and enforced as written.' . . . [t]he court has no authority to alter the terms of an unambiguous contract." *Canfora*

95

*v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 603 (Nev. 2005). Accordingly, if the Hidden

Lakes/UDF Note's [Exhibit No. 28] characterization of an item is clear on its face, this Court

must follow that characterization and only resort to the canons of construction or extrinsic

evidence when the Hidden Lakes/UDF Note [Exhibit No. 28] is ambiguous. Each item is

addressed in turn.

The first item to be characterized is the one-half share of a commitment fee paid to UMTH in

the amount of $37,875.00 (the full amount of the fee being $75,750.00). Under the Hidden

Lakes/UDF Note [Exhibit No. 28], a commitment fee in the amount of $75,750.00 is

contemplated at Section 2(c)-"Loan Expenses; Fees – Commitment Fee." This paragraph clearly

characterizes the commitment fee as principal. In plain language, it states that "Borrower agrees

that such amount *shall automatically constitute principal* outstanding hereunder and caused [*sic*]

*a corresponding increase in the aggregate outstanding amount of Borrower's obligations*

*hereunder.*" Furthermore, the amount listed as paid to UMTH in item 807 of Settlement

Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] is also listed as the UDF

commitment fee at item 104. As such, the Court finds that the commitment fee paid to

UMTH/UDF in the amount of $75,750.00 is properly characterized as principal actually advanced

as the Commitment Fee under the Hidden Lakes/UDF Note [Exhibit No. 28]; therefore, the one-

half share in the amount of $37,875.00 was improperly removed by the Plaintiffs.

The second item to be characterized is the 2% consulting fee of $28,500.00 to Winchester

Equities, LLC. This fee is item 805 on the Settlement Statement for Purchase of the Hidden Lakes

Property [Exhibit No. 35]. Item 805 on a HUD Settlement Statement is used to itemize

inspections done at the request of the lender, so the Court will assume this fee represents a

payment to an inspector of the Hidden Lakes Property. As with the commitment fee above, the Hidden Lakes/UDF Note [Exhibit No. 28] clearly contemplates such fees. Section 2(a) states that "Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all expenditures . . . in connection with any of the following: (i). . . the closing . . . of any loan or creditor facility represented by or secured by the Loan Documents, including . . . inspection services and disbursements." Unlike the language in Section 2(c) of the Hidden Lakes/UDF Note [Exhibit No. 28] (concerning the commitment fee), this paragraph does not specifically designate such expenses as principal. But Section 2(f) –"Loan Expenses; Fees – Advance of Certain Fees"– clearly contemplates the payment of such fees by advances out of the Commitment of $1,425,000.00. Therefore, the Court finds that the 2% consulting fee of $28,500.00 to Winchester Equities, LLC constitutes principal actually advanced as part of the Commitment under the Hidden Lakes/UDF Note [Exhibit No. 28].

To reach the final tally for principal actually advanced under the Hidden Lakes/UDF Note [Exhibit No. 28], the Court starts with the amount disbursed on May 22, 2007 – *i.e.*, $1,425,000.00. This amount was actually advanced according to the Loan History [Exhibit No. 36], and corresponds to the principal portion of the Commitment as designated in the Hidden Lakes/UDF Note [Exhibit No. 28]. The $1,425,000.00 is not reduced by any fee, but is partially composed of the 2% consulting fee of $28,500.00 to Winchester Equities, LLC, as designated under the Hidden Lakes/UDF Note [Exhibit No. 28]. The Court then adds the full amount of the $75,750.00 commitment fee to UMTH. This is a separate component of principal, designated as the Commitment Fee under the Hidden Lakes/UDF Note [Exhibit No. 28]. The facts in this dispute indicate that each of these components was actually advanced. These two separate

97

components of principal–the Commitment and the Commitment Fee–are combined by the Court

to determine the total amount of principal actually advanced under the Hidden Lakes/UDF Note

[Exhibit No. 28]. This combination provides an aggregate sum total of principal advanced under

the Hidden Lakes/UDF Note [Exhibit No. 28] of $1,500,750.00.


(3) What is the dollar amount of interest due on the principal actually advanced under the Hidden
Lakes/UDF Note?

The accuracy of the Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] has not

been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes

Property [Exhibit No. 35], is the only record of the transactions that occurred in connection with

the loan transaction.  As such, the Court will assume the Loan History of UDF on Loan of Hidden

Lakes [Exhibit No. 36] to be an accurate statement of the interest charged (all interest that

matured on this Note), and the interest still due on the Hidden Lakes/UDF Note [Exhibit No. 28],

for the purposes of this claims estimation procedure to the extent that it is not contradicted by

other evidence in the record. As noted above, UDF is not entitled to post-petition interest, so the

Court need only calculate interest up to the date Perry filed his Chapter 11 petition (*i.e.*, up to

April 11, 2008).  The Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] gives the

dollar amounts of interest accrued each month up to April 1, 2008 as shown in Table 7, below.

The Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] does not indicate any

payments made by Hidden Lakes; thus, all interest charged is also interest still due under the

Hidden Lakes/UDF Note [Exhibit No. 28].  The interest accrued between April 1, 2008 and April

11, 2008, and the aggregate interest accrued up to the date Perry filed his Chapter 11 petition, April 11, 2008, is also shown in Table 7, below.

### Table 7

| Due Date | Interest Accrued since Last Due Date[49] |
|---|---|
| June 1, 2007 | $12,493.15 |
| July 1, 2007 | $37,835.61 |
| August 1, 2007 | $40,133.77 |
| September 1, 2007 | $41,224.53 |
| October 1, 2007 | $40,978.96 |
| November 1, 2007 | $43,458.66 |
| December 1, 2007 | $43,201.35 |
| January 1, 2008 | $45,816.58 |
| February 1, 2008 | $47,061.79 |
| March 1, 2008 | $45,222.08 |
| April 1, 2008 | $49,569.89 |
| Date Perry Filed his Ch. 11 Petition | Interest accrued since last due date |
| April 11, 2008 | $16,430.25 |
| **Sum Total of interest:** | **$463,426.62** |

**The sum of these amounts represents the amount of interest properly due under this Note. As such, the Court finds that $463,426.62 has accrued under the Original and Amended Hidden Lakes/UDF Notes as of April 11, 2008.**

---

[49]Interest accrues based on a 365-day year.

(4) Conclusion: What is the threshold amount of UDF's Claims under the Hidden Lakes/UDF

Note?

The Court has found that the total principal actually advanced under the Hidden Lakes/UDF

Note [Exhibit No. 28] is $1,500,750.00. The Court has also found the total amount of interest due

under the Hidden Lakes/UDF Note [Exhibit No. 28] to be $463,426.62. This results in total

maximum claim of $1,964,176.62 for UDF under the Hidden Lakes/UDF Note [Exhibit No. 28].

The results are organized in Table 8, below.

### Table 8

| Note | Interest Accrued as of April 11, 2008 | Principal Actually Advanced | Maximum Total Claim Under the Note |
|------|----------------------------------------|------------------------------|-------------------------------------|
| **Hidden Lakes/UDF** | $463,426.62 | $1,500,750.00 | **$1,964,176.62** |

The mechanical nature of this analysis, along with the clarity of the record on this issue, leads

the Court to estimate a 0%  probability of reaching a different result in a full trial on the merits.


*ii. Is the Hidden Lakes/UDF Loan Usurious?*

The Plaintiffs contend that interest under the Hidden Lakes/UDF Note [Exhibit No. 28] is

usurious as contracted for, charged, or received. out, and that the penalties resulting under  Tex.

Fin. Code §305.001(a-1) should be set off against UDF's claims against Perry.


(1) What law governs the Hidden Lakes/UDF Note?

The threshold issue for this analysis is the determination of whether the Hidden Lakes/UDF

Note [Exhibit No. 28] is governed by Nevada law or Texas law. Both parties agree that Nevada

law has no interest rate usury ceiling applicable to the Hidden Lakes/UDF Note [Exhibit No. 28].

It is also not in dispute that the applicable interest rate usury ceiling under Texas law in

accordance with Chapter 303 of the Texas Finance Code is 18% *per annum*.[50] The interest rate

contracted for in the Hidden Lakes/UDF Note [Exhibit No. 28] may be as high as 32%,[51] so the

consequences of each state's law applying is clear: if Texas law applies, UDF may be subject to

usury penalties; if Nevada law applies, UDF will not. The Hidden Lakes/UDF Note [Exhibit No.

28] itself contains a choice of law clause in Section 19, stating that this Note will be governed by

Nevada law. Thus, the Court must determine if the choice of law clause in the Hidden Lakes/UDF

Note [Exhibit No. 28] will be given effect.

When determining what law to apply to a contract, a federal court must use the choice of law

provisions of the forum in which the court sits. *Kucel v. Walter I. Heller & Co.*, 813 F.2d 67, 73

(5th Cir. 1987) *citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under

Tex. Bus. & Com. Code. Ann. § 271.005, "[t]he law of a particular jurisdiction governs an issue

relating to a qualified transaction if (1) the parties to the transaction agree in writing that the law

of that jurisdiction governs the issue, including the validity or enforceability of an agreement

relating to the transaction or a provision of the agreement; and (2) the transaction bears a

reasonable relation to that jurisdiction." Tex. Bus. & Com. Code. Ann. § 271.005 (Vernon 2009).

Thus, there are three elements which must be satisfied for a choice of law clause to be given effect

under Tex. Bus. & Com. Code. Ann. § 271.005: (1) the transaction must be a qualified

---

[50] *See* fn. 40, *supra*.

[51] The Hidden Lakes/UDF Note [Exhibit No. 28] defines the "Base Rate" as "the lesser of (i) thirty-two percent (32.0%), accrued monthly and compounded quarterly, or (ii) the Highest Lawful Rate. If the Court were to find that the savings clause in this Note is not to be given effect, then the interest rate contracted for under the Note would be 32.0%.

transaction; (2) the parties to the qualified transaction must agree to the choice of law provision in writing; and (3) the transaction must bear a reasonable relation to the chosen jurisdiction.

The first element is clearly satisfied for the transaction relating to the Hidden Lakes/UDF Note [Exhibit No. 18]. A transaction is a "qualified transaction" under the statute if "a party . . . lends, advances, or receives . . . money or credit with an aggregate value of at least $1 million." *Id.* § 271.001. The loan under the Hidden Lakes/UDF Note [Exhibit No. 28] is a qualified transaction because more than $1 million was lent, so the first element of Tex. Bus. & Com. Code. Ann. § 271.005 is satisfied.

The second element of an agreement in writing is clearly satisfied by the Hidden Lakes/UDF Note [Exhibit No. 28], which contains the choice of law clause, and evidences the agreement of all parties to the loan transaction.

The third element of a reasonable relation to the transaction is further explained in Section 271.004 of the Texas Business & Commerce Code, which provides five circumstances in which a transaction will be found to bear a reasonable relation to a particular jurisdiction:

> A transaction bears a reasonable relation to a particular jurisdiction if:
>     (1) a party to the transaction is a resident of that jurisdiction;
>     (2) a party to the transaction has the party's place of business or, if that party has more than one place of business, the party's chief executive office or an office from which the party conducts a substantial part of the negotiations relating to the transaction, in that jurisdiction;
>     (3) all or part of the subject matter of the transaction is located in that jurisdiction;
>     (4) a party to the transaction is required to perform in that jurisdiction a substantial part of the party's obligations relating to the transaction, such as deliver payments; or
>     (5) a substantial part of the negotiations relating to the transaction occurred in that jurisdiction and an agreement relating to the transaction was signed in that jurisdiction by a party to the transaction.

*Id.* § 271.004.

In the dispute at bar, only the first circumstance – where a party is a resident of that jurisdiction – is salient to the analysis. *Id.* § 271.001(b)(1). "Resident" is not defined in Chapter 271 of the Texas Business and Commerce Code.  Nor are there any cases interpreting the meaning of the term "resident" as it applies to legal entities, such as a partnership or corporation. Therefore, the Court must turn to the rules of statutory interpretation and Texas cases interpreting the term "resident" in other contexts in order to determine if the choice of law clause will be given effect. UDF was formed under the laws of Nevada, the chosen jurisdiction under the choice of law provision. Thus, the pertinent question before the Court is whether an entity formed under the laws of a state is a resident of that state for the purposes of Tex. Bus. & Com. Code § 271.004. *Id.*

A legal entity is an "inhabitant" of the state under whose laws it is formed. *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.3d 337, 342 (Tex. App.–Houston [14th Dist.] 2004). There is Texas case law stating that "it is a general rule that a corporation is an inhabitant of the state under whose law it is incorporated but that it has a residence wherever it conducts its ordinary business." *Nat'l Truckers Serv., Inc. v. Aero Sys., Inc.*, 480 S.W.2d 455, 457 (Tex.Civ.App.–Ft. Worth 1972); *see also Reddy Ice Corp.*, 145 S.W.3d at 342. This pronouncement would seem to indicate that the terms "inhabitant" and "resident" have different meanings. However, the terms "resident" and "inhabitant" have been found to be synonymous for the purposes of the Texas venue statute. *Reddy Ice Corp.*, 145 S.W.3d at 342, *citing Pittsburg Water Heater Co. of Texas v. Sullivan*, 282 S.W. 576, 578 (Tex. 1926); *Taylor v. Wilson*, 93 S.W. 109, 109 (Tex. 1906); *Pearson v. West*, 77 S.W. 944, 945 (1904); *see also Nat'l Truckers Serv., Inc.*, 480 S.W.2d at

103

457, *quoting* Fletcher Cyc. Corp. Per. Ed. Vol. 8, Sec 4029 ("As a general rule, for jurisdictional purposes, corporations are deemed 'residents' or 'inhabitants' of particular places, and such place is usually the jurisdiction in which it was incorporated."). The term "inhabitant" was further defined in *Reddy Ice Corp.*, where the court interpreted the term as used in Tex. Ins. Code art. 21.42. In its analysis, the court stated that "[i]t is a well established general principle that a corporation is an inhabitant only of the state where it is incorporated," but recognized an occasional exception to this rule that "[t]he inhabitancy of a corporation has been extended to include its principal place of business, usually by statute . . . ." *Reddy Ice Corp.*, 145 S.W.3d at 342. "Residence" for a legal person has *also* been defined as the place where it maintains its principal place of business. *Nat'l Truckers Serv., Inc.*, 480 S.W.2d at 458 ("[a] corporation's residence, in legal contemplation, is the place where it maintains its office and transacts its business – its principal place of business. Its place of residence is the place where its corporate affairs are conducted . . . .").

Texas law provides that, when interpreting a statute, a court should "try to give effect to legislative intent." *Reddy Ice Corp.*, 145 S.W.3d at 341. The court "look[s] first to the plain and common meaning of the statute's words." *Id.* "If the meaning of the statutory language is unambiguous," a court is to adopt, "with few exceptions, the interpretation supported by the plain meaning of the provision's words and terms." *Id.* "Further, if the statute is unambiguous," a court "must not use rules of construction or other extrinsic aids to create ambiguity." *Id.* Here, Tex. Bus. & Com. Code § 271.004 is ambiguous because it is not clear which parties qualify as "residents" from simply looking at the plain language of the statute. This ambiguity is further borne out by looking at Texas case law, which, as described above, has at various times defined

104

"residence" as: (1) wherever a legal person conducts its ordinary business; (2) the jurisdiction where a legal person's principal place of business is located; or (3) the jurisdiction under whose laws a legal person is formed. In some areas, "inhabitant" is synonymous with "resident" under Texas law, but in other areas it is not.

As a result, the Court turns to the rules of construction to clarify the meaning of the term "resident" in Tex. Bus. & Com. Code § 271.004. Of particular importance here is the requirement that the Court "give effect to all the words of a statute and not treat any statutory language as surplusage if possible." *City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1998). Pursuant to this mandate, Tex. Bus. & Com. Code § 271.004(b)(2) proves to be the key to determining whether UDF III is considered a "resident" of Nevada. Tex. Bus. & Com. Code § 271.004(b)(2) provides that: "[a] transaction bears a reasonable relation to a particular jurisdiction if . . . a party to the transaction has the party's place of business or, if that party has more than one place of business, the party's chief executive office or an office from which the party conducts a substantial part of the negotiations relating to the transaction, in that jurisdiction." Tex. Bus. & Com. Code § 271.004(b)(1) (Vernon 2009). If the Court were to interpret "residence" for the purposes of the Tex. Bus. & Com. Code § 271.004(b)(1) as wherever a legal entity conducts its ordinary business, as defined in *Reddy Ice Corp.* and *Nat'l Truckers*, § 271.004(b)(2) would be rendered meaningless. Every condition in § 271.004(b)(2) would also satisfy the conduct of ordinary business standard, which is a much broader and easier standard to meet. Defining "residence" as a legal person's principal place of business would also render every part of § 271.004(b)(2) meaningless with the exception of the clause "an office from which the party conducts a substantial part of the negotiations relating to the transaction." Thus,

the only definition of "resident" under Texas law that does not render all or part of § 271.004(b)(2) mere surplusage, is where "residence" for a legal entity is found in the jurisdiction under whose laws the legal entity was formed.

This interpretation is supported when construing § 271.004(b)(1) and § 271.004(b)(2) in context with each other. As noted above, certain statutes have extended "inhabitant" status in a given jurisdiction in two distinct situations: (1) when a party is formed under the laws of the jurisdiction; or (2) when a party's principal place of business is located in that jurisdiction. *See Reddy Ice Corp.*, 145 S.W.3d at 342. Under this Court's interpretation, § 271.004(b)(1) and § 271.004(b)(2) do just that. Together, they provide a party the ability to choose the law of the jurisdiction under whose laws the party was formed, or the laws of the jurisdiction where its principal business is located.

Accordingly, the Court finds that UDF is a Nevada resident as defined under Tex. Bus. & Com. Code § 271.004(b)(1), and thus the loan transaction bears a reasonable relationship to Nevada, the chosen jurisdiction in the choice of law provision. All three requirements of Tex. Bus. & Com. Code § 271.005 are therefore satisfied by the transaction.

However, a choice of law clause will not be given effect if it is a subterfuge, even if the transaction bears a reasonable relation to the chosen jurisdiction. *Cook v. Frazier*, 765 S.W.2d 546, 549 (Tex.App.–Fort Worth 1989, *no writ*). In *Cook*, the only relationship the transaction had to Utah, the chosen jurisdiction, was the borrower's incorporation in Utah, which was required by the lender as a condition of the loan. The *Cook* court stated that "a party's choice of law will be held to constitute a sham or subterfuge when the contacts between the transaction and the chosen state are not reasonably related *or* when the contacts themselves are contrived in order to

106

substantiate the choice of law." *Cook*, 765 S.W.2d at 549 (*emphasis added*). The court's use of

the disjunctive "or" indicates that a choice of law can be reasonably related to a transaction, but

still be a sham or subterfuge if the contacts leading to the reasonable relation are contrived by the

parties for the sole purpose of obtaining the choice of law. The court found that the borrower's

incorporation under Utah law was not a valid contact with Utah because it was simply a means to

avoid Texas law and substantiate the choice of law provision.

Conversely, there is "nothing inherently violative of public policy in contracting for another

state's usury laws to apply." *Saturn Capital Corp. v. Dorsey*, No. 01–04–00626–CV

(Tex.App.–Houston [1st Dist.] June 29, 2006, *no pet.*); *Woods-Tucker Leasing Corp. of Ga. v.

Hutcheson*, 642 F.2d 744, 750-51 (Tex.App.–Houston [1st. Dist.] 2006) (so long as the

transaction bears a reasonable relationship to the transaction, and the contacts with the chosen

state are not contrived for that singular purpose, "'[t]hat the intent of [the parties'] choice of law

provision was to avoid the usury laws of some interested jurisdiction is immaterial[;] they are

perfectly free to do just that.'"). This Court has already found that the loan transaction between

UDF and Hidden Lakes bears a reasonable relation to the chosen jurisdiction of Nevada. The

question now before the Court is whether that reasonable relation was contrived for the purpose

of circumventing the usury law of Texas.

The Plaintiffs, in Debtor's Post Trial Brief [Main Case Docket No. 735], assert that *Cook* is

directly on point with the loan transaction between UDF and Hidden Lakes. However, whereas in

*Cook* it was clear from the record that the borrower had never transacted business, maintained an

office, or had employees in Utah, the jurisdiction of choice in that case, there is no evidence in

the record here regarding whether or not UDF maintains an office, has any employees, or

transacts business in Nevada. *See Cook*, 765 S.W.2d at 550-51. Furthermore, there is no evidence

of what this Court finds to be the most relevant fact in *Cook*–that the business entity was formed

in the jurisdiction of choice to ensure that there was no usury ceiling for the transaction. *Cook*,

765 S.W.2d at 550-51. There is no evidence in the record before this Court that UDF was

brought into existence solely for the purpose of circumventing Texas law in this transaction. As a

result, this Court cannot find that UDF's status as a Nevada resident was contrived for the

purpose of circumventing the usury law of Texas on the current record.

In conclusion, the Court finds that the choice of law clause in the Hidden Lakes/UDF Note

[Exhibit No. 28] will be given effect. The loan transaction between UDF and Hidden Lakes is a

qualified transaction under Tex. Bus & Com. Code § 271.001 because more than $1,000,000.00

was advanced by UDF. The Hidden Lakes/UDF Note [Exhibit No. 28] is a written agreement

between the parties containing a choice of law provision designating Nevada law as governing

the agreement. The state of Nevada bears a reasonable relation to the Hidden Lakes/UDF Note

[Exhibit No. 28] under Tex. Bus & Com. Code § 271.004 because UDF is a resident of Nevada

under Tex. Bus & Com. Code § 271.004(b)(1).  As such, the Court finds that the choice of law

clause in the Hidden Lakes/UDF Note [Exhibit No. 28] must be given effect, that Nevada law

governs this Note, and that, because Nevada has no interest rate usury ceiling applicable to the

Hidden Lakes/UDF Note [Exhibit No. 28], there is no usury under this Note. Because there is a

dearth of sources interpreting the meaning of "resident" under Tex. Bus & Com. Code § 271.004,

and because of the lack of evidence in the record on UDF's contacts with Nevada, the Court

estimates that there is a 20%  probability of reaching a different result in a full trial on the merits.

(2) UDF's various defenses to the Plaintiffs' claims of usury.

In the event the Court is mistaken in its finding that Nevada law governs the Hidden Lakes/UDF Note [Exhibit No. 28], and instead, Texas law governs this Note,[52] the Defendants have raised certain defenses which may defeat the Plaintiffs claims of usury: (1) Perry, as guarantor, has no standing to assert a defense of usury; (2) Hidden Lakes and Southern Colony are equitably estopped from claiming UDF contracted for, charged, or received usurious interest; (3) the savings clauses in Hidden Lakes/UDF Note [Exhibit No. 28] are effective to prevent usurious interest from being contracted for, charged, or received; (4) in the alternative, Perry is not entitled to setoff resulting from a usury penalty, because setoff requires mutual obligations; and (5) in the alternative, if Perry is entitled to setoff due to usury penalties, the amount of setoff is limited to the amount which would be distributed to Perry due to his equity interest in Perry Properties. The merit, or lack thereof, of these defenses does not change the conclusion the Court has reached regarding the applicability of Nevada law (and therefore the absence of usury), but the Court addresses them as an important part of estimating the  probability of reaching a different result in a full trial on the merits. The greater the number of meritorious defenses raised by UDF, the less likely that this Court's decision now that no usury penalty should be applied against Perry's obligations will be discounted (based on the probability of reaching a different result in a full trial on the merits). The Court's analysis of UDF's defenses is largely identical to the defenses posed by UDF III, as discussed in Section B(ii), above, so that analysis is referred to where appropriate. The defenses are addressed in turn.

---

[52] If the choice of law provision were not given effect, Texas law would govern the Hidden Lakes/UDF Note [Exhibit No. 28], because Texas is the state with "the most significant relationship to the issues presented for determination." *Reddy Ice Corp.*, 145 S.W.3d at 340.

- (a) Standing of Perry, as Guarantor, to obtain setoff resulting from usury penalties

The Defendants contend that Perry, as guarantor, may not assert a claim of usury, even if Hidden Lakes could prove usury under the Hidden Lakes/UDF Note [Exhibit No. 28], and further, even if Hidden Lakes does succeed on its usury claims, Perry is not entitled to setoff from those penalties. For the same reasons as delineated in Section C(ii) of the Conclusions of Law, above, Perry does not have standing to assert a defense of usury, nor is he entitled to any setoff resulting from usury penalties. Perry is, again, an absolute guarantor under the UDF Guaranty Agreement [Exhibit No. 34]. The UDF Guaranty Agreement [Exhibit No. 34] does not include any reference to interest rates, let alone a specific rate or fees which could possibly constitute a usurious provision; and, as a result, Perry does not have standing, as guarantor, to raise a defense of usury or obtain a setoff resulting from usury penalties. For the same reasons the Court gave in analyzing the UDF III Notes, the Court estimates a 0% probability of reaching a different result in a full trial.


- (b) Equitable Estoppel

The Defendants contend that the Plaintiffs should be equitably estopped based on an opinion letter prepared by Locke, Liddell, & Sapp, LLP [Exhibit No. 107](the UDF Opinion Letter). The Defendants assert that, because the UDF Opinion Letter was prepared and delivered to UDF by Locke, Liddell, & Sapp, LLP at the request of the Plaintiffs, and because the UDF Opinion Letter contains opinions to the effect that the Hidden Lakes/UDF Note [Exhibit No. 28] is not usurious, the Plaintiffs should be equitably estopped from asserting that this Note is usurious.

110

The facts at issue with the UDF Opinion Letter are nearly identical to those at issue with the Opinion Letters that were delivered to UDF III–the only difference being that the Plaintiffs' contentions contradict the opinion that the Hidden Lakes/UDF Note [Exhibit No. 28] is governed by Nevada law, as opposed to contradicting the opinion that the Original Hidden Lakes/UDF III and Southern Colony/UDF III Notes are not usurious. As a result, for the same reasons set forth in Section C(ii) of the Conclusions of Law, the Court finds that equitable estoppel of the Plaintiffs' usury claims is not appropriate. Further, for the same reasons the Court gave in analyzing the UDF III Notes, the Court estimates a 20% probability of reaching a different result in a full trial.

- ### (c) Effect of the Savings Clause

The Defendants assert that the savings clauses in the Hidden Lakes/UDF Note [Exhibit No. 28] prevent UDF from contracting for, charging, or receiving usurious interest. This Court has concluded, above, that UDF has not contracted for usurious interest, but in the event this conclusion is incorrect, an analysis of the savings clause may prove important. The savings clauses in the Hidden Lakes/UDF Note [Exhibit No. 28], and the facts at issue for the loan between Hidden Lakes and UDF, are almost identical in all respects material to this analysis. Therefore, the Court finds that, as such, it is proper for the Court to find that the savings clauses in the Hidden Lakes/UDF Note [Exhibit No. 28] have legal effect, and preclude UDF from being subject to usury penalties resulting from this Note.[53] For the same reasons this Court gave in its

---

[53]Because UDF charged and received interest pursuant to the Hidden Lakes/UDF Note [Exhibit No. 28], which contains the savings clauses, it will not be liable for usury penalties resulting from charging or receiving those amounts, so long as whatever interest above and beyond the legal limit is returned to Hidden Lakes. *See C&K Invs.*, 248 S.W.3d at 244; Tex. Fin. Code Ann. § 305.101 (Vernon 2009).

analysis of the savings clauses in the UDF III Notes (Section C(ii) of the Conclusions of Law),
the Court estimates that there is a 20% probability of reaching a different result in a full trial on
the merits.

*iii. Is UDF barred from bringing a deficiency action in connection with the Hidden Lakes
Property by Nevada law?*

The Plaintiffs contend that if Nevada law does govern the Hidden Lakes/UDF Note [Exhibit
No. 28], UDF is barred from seeking a deficiency action on this Note in connection with the
foreclosure sale of the Hidden Lakes Property by Nev. Rev. Stat. § 40.455. Nev. Rev. Stat. §
40.455 (2009).

Nev. Rev. Stat. § 40.455 provides that a deficiency action may be brought by a creditor
within six months after a foreclosure or trustee's sale, or else it is barred. Nev. Rev. Stat. §
40.455, *see, e.g., Murphy v. Federal Deposit Ins. Corp.*, 787 P.2d 370 (Nev. 1990). Nevada law
holds that guarantors of promissory notes secured by real property which has been sold under a
deed of trust are entitled to the protection of the hearing and the limitations period of Nev. Rev.
Stat. § 40.455. *First Interstate Bank of Nev. v. Shields*, 730 P.2d 429, 431 (Nev. 1986)
("[O]bligors are assured that creditors in Nevada may not reap a windfall at an obligor's expense
by acquiring the secured realty at a bid price unrelated to the fair market value of the property
and thereafter proceeding against available obligors for the difference between such deflated
price and the balance of the debt."). The foreclosure sale of the Hidden Lakes Property took
place on March 3, 2009. The limitations period under Nev. Rev. Stat. § 40.455 expired on
September 3, 2009.

Simply looking at Nevada law, it appears that UDF would in fact be barred from bringing a

deficiency action against Perry or Hidden Lakes in connection with the Hidden Lakes Property.

However, UDF contends that 11 U.S.C. § 108(c) extends the limitations period of Nev. Rev.

Stat. § 40.455 to the latter of the expiration of the period or 30 days after notice of the

termination of the automatic stay. The automatic stay in the main case went into effect on April

11, 2008, prior to the natural expiration of the limitations period under Nev. Rev. Stat. § 40.455,

and has not yet terminated. Therefore, if 11 U.S.C. § 108(c) has extended the limitations period

of Nev. Rev. Stat. § 40.455, UDF can bring a deficiency action. Conversely, if it has not

extended the limitations period (as the Plaintiffs contend), UDF is barred from doing so.

The issue before the Court is rather novel: is a statute of limitations, limiting the period in

which a deficiency action may be brought, extended when the guarantor of the loan the

deficiency is sought to satisfy files a petition under Chapter 11 before the limitations period

expires? The Plaintiffs contend that, because the automatic stay under 11 U.S.C. § 362 never

prevented UDF from initiating a deficiency action against Hidden Lakes (the borrower) within

the limitations period of Nev. Rev. Stat. § 40.455, 11 U.S.C. § 108(c) should not operate to

extend the limitations period for bringing deficiency action against Perry (the guarantor).

The Court finds *McCartney v. Integra Nat'l Bank, N.*, instructive on this issue. 165 B.R. 18

(Bankr. W.D.Pa. 1994). The facts of *McCartney* are as follows: The creditor in the case, Integra,

made a loan to a restaurant which was guaranteed by McCartney, the debtor in the case. The

guaranty was secured by a second mortgage lien on two parcels of real property owned by the

McCartney. Some years later, McCartney filed a petition under Chapter 13. Subsequently, a

sheriff's sale of the restaurant's property took place at which Integra purchased all of the

113

property. Integra later filed a proof of claim for the deficiency on the loan that McCartney had

guaranteed. Integra did not file under the applicable Pennsylvania deficiency judgment statute

and the limitations period expired. McCartney asserted that Integra had failed to comply with the

Pennsylvania Deficiency Judgment Act by failing to file a petition in the Court of Common Pleas

to fix the fair market value of the restaurant property within six months of the Sheriff's sale, and

therefore Integra's claim was released and satisfied. Integra asserted that it did not file a petition

under the deficiency judgment act because: (1) the restaurant owned nothing other than the

property sold at the sheriff's sale; and (2) McCartney, as guarantor of the debt, was a necessary

party to the action and was protected against any state court proceedings by virtue of the

automatic stay, and (3) even if a state court deficiency proceeding was appropriate, the deadline

for the initiation of such a proceeding had been suspended by 11 U.S.C. § 108(c).

The *McCartney* court acknowledged that if there had been no bankruptcy filing, Integra

would clearly be barred from pursuing a deficiency action against McCartney. However, the

court found that with the bankruptcy of McCartney, the guarantor of the loan, it was necessary to

extend the limitation period under 11 U.S.C. § 108(c). The court noted, that, were Integra to

pursue a deficiency action against the restaurant, it would be required to join McCartney as a

necessary party and serve him with notice thereof – an action which would violate the automatic

stay provisions of 11 U.S.C. § 362.

The same analysis applies in the case before this Court. Nev. Rev. Stat. § 40.457 requires

that: "[b]efore awarding a deficiency judgment under Nev. Rev. Stat. § 40.455, the court shall

hold a hearing . . . . [n]otice of such hearing shall be served on *all defendants . . . against whom a*

*deficiency judgment is sought . . . .*". Nev. Rev. Stat. § 40.457(1) (2009).  The consequence of the

114

requirement in Nev. Rev. Stat. § 40.457 that notice be served on all defendants against whom a deficiency judgment is sought is that, if the automatic stay did not extend the limitations period, UDF would face the same dilemma Integra faced in *McCartney*: if UDF were to bring a deficiency action against both Perry and Hidden Lakes within the six month limitations period, it would violate the automatic stay under 11 U.S.C. § 362. On the other hand, if UDF were to seek a deficiency action against (only) Hidden Lakes within the limitation period, it would waive its ability to seek a deficiency judgment against Perry by not joining him to the action and failing to provide him the required notice.

Provisions of the Code preempt state laws when they conflict, as they do here. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963) (state law is preempted by federal law when "compliance with both federal and state regulations is a physical impossibility," for example, it would be physically impossible for a party to comply with both state and federal regulations if "the federal orders forbade the picking and marketing of any avocado testing more than 7% oil, which the California test excluded from the State any avocado measuring less than 8% oil content."). Therefore, the Court finds that, pursuant to 11 U.S.C. § 108(c), the automatic stay has extended the limitations period for UDF to pursue a deficiency action in connection with the Hidden Lakes Property.

The Court is quite comfortable with the reasoning provided in *McCartney*, and so estimates a low probability of reaching a different result in a full trial on the merits. But the Court also recognizes that there is limited case law on this issue, and *McCartney*, persuasive though its reasoning may be, is nonetheless a district court decision from a different jurisdiction. As a

result, the Court estimates that there is a 15% probability of reaching a different result in a full trial on the merits.

*iv. Should the Court equitably subordinate the claims of UDF?*

The Plaintiffs contend that UDF has engaged in inequitable conduct as an "insider" which has resulted in injury to Perry's creditors or conferred an unfair advantage to UDF. These allegations are identical to those leveled against UDF III, as already discussed herein. Hence, the Court's analysis and conclusion is the same. The Fifth Circuit has laid out a three-pronged test to determine "whether and to what extent a claim should be equitably subordinated: (1) the claimant must have engaged in some sort of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d at 699, *citing Matter of Missionary Baptist Found. of Am., Inc.*, 796 F.2d at 760. The record does not indicate that: (1) UDF engaged in any sort of inequitable conduct, or (2) that the misconduct resulted in injury to Perry's creditors or conferred an unfair advantage on UDF. Therefore, two prongs of the *Clark Pipe* test are not met and, accordingly, the Court should not equitably subordinate the claims of UDF. For the same reasons set forth by this Court in analyzing the claims of UDF III, the Court estimates a 0% probability of reaching a different result in a full trial on the merits.

*v. Does Perry have a right to a credit as a result of the foreclosure sale of the Hidden Lakes Property?*

116

Under Tex. Prop. Code § 51.003, any person against whom a deficiency is sought is entitled to a credit for the difference between the amount of liens against the property and the fair market value of the property on the date of the foreclosure. Tex. Prop. Code Ann. § 51.003(b) (Vernon 2010). The Fifth Circuit and at least one Texas state appellate court have held that the provisions of Tex. Prop. Code § 51.003 providing for an offset apply to guarantors like Perry. *LaSalle Bank N.A. v. Sleutel*, 289 F.3d 837, 840 (5th Cir. 2002), *citing Long v. NCNB-Texas Nat. Bank*, 882 S.W.2d 861 (Tex.App.-Corpus Christi 1994).  However, in the UDF Guaranty Agreement [Exhibit No. 34] pertaining to the Hidden Lakes/UDF Note [Exhibit No. 28], Perry waives his right to any "circumstances that might otherwise cause a legal or equitable discharge or defense." The Fifth Circuit, interpreting Texas law, has held that such contractual waivers will be given effect. *LaSalle Bank N.A.*, 289 F.3d at 840. In *LaSalle Bank*, the Fifth Circuit observed that although Tex. Prop. Code 51.003 does not itself address waiver, other provisions of the Texas Property Code do, but only to specifically prevent waiver of those provisions. *Id.* at 841. Applying the principle of statutory construction of *inclusio unius est exclusio alterius* – meaning that it is to be assumed that the purposeful inclusion of a term implies the purposeful exclusion of a term that is absent – the Fifth Circuit held that the exclusion of a term specifically preventing waiver of set off rights in the language of Tex. Prop. Code § 51.003 indicates the Texas Legislature's intent that offset rights can be contractually waived with respect to guarantors. A Texas appellate court concurred with the Fifth Circuit's analysis of Tex. Prop. Code § 51.003 in dicta while finding that a guarantor can waive its rights under Tex. Prop. Code 51.005 for reasons that are identical to those given in *LaSalle. Segal v. Emmes Capital, L.L.C.*, 155 S.W.3d 267, 279-81 (Tex.App.-Houston [1st Dist.] 2004). Therefore, following the precedent of the Fifth

117

Circuit, this Court finds that Perry waived his right to offset under Tex. Prop. Code 51.003 and, accordingly, is not entitled to any offset on that basis.

On the basis of Fifth Circuit precedent and the abundant clarity of the language of the Hidden Lakes/UDF Note [Exhibit No. 28] that legal defenses such as deficiency setoff are waived, this Court estimates a 0% probability of reaching a different result in a full trial on the merits.

*vi. Should the Court consider the ability of the borrower to pay the obligation in estimating the dollar amount of Perry's Guarantees?*

The Plaintiffs argue that, in estimating the amount of Perry's Guarantees, the Court should take into account the ability of the principal obligor to pay the obligation. As noted above, under Texas law, a guaranty of payment (or absolute guaranty) is "absolute rather than conditional, primary rather than secondary, and guarantees of payment rather than guarantees of collection." *Universal Metals & Mach., Inc.*, 539 S.W.2d at 877-78. Under Texas law, "one who guarantees payment of a note and waives the requirement that the holder of the note exhaust its rights against the maker, becomes an absolute guarantor." *Greenway Bank & Trust of Houston*, 679 S.W.2d at 595; *Universal Metals & Mach. Inc.*, 539 S.W.2d at 877-78. The lender may therefore bring an action against the guarantor of payment without joining the principal obligor. *Ferguson*, 582 S.W.2d at 541-42. If Perry's guaranty of the Hidden Lakes/UDF Note [Exhibit No. 28] is a guaranty of payment, then he is a principal obligor under Texas law, and UDF may bring an action against him without joining either Hidden Lakes or Southern Colony. Under these circumstances, the Court will not look to the ability of any principal obligor in estimating the amount of any claim against Perry.

The facts in this dispute indicate that Perry's guarantees to UDF are guarantees of payment. The identical language of the Hidden Lakes/UDF Guaranty Agreement [Exhibit No. 34] makes this conclusion abundantly clear: "[e]ach Guarantor hereby absolutely and unconditionally guarantees, and becomes surety for, the full, timely and complete payment when due . . . ."The Hidden Lakes/UDF Guaranty Agreement [Exhibit No. 34] further provides that "[e]ach Guarantor's obligation under this Guaranty is unconditional, absolute and enforceable, irrespective of . . . whether recovery against Borrower with respect to the Guaranteed Obligations in whole or in part is prevented by bankruptcy, operation of law, or otherwise . . . ." Finally, the Hidden Lakes/UDF Guaranty Agreement [Exhibits No. 34] includes an express waiver of the requirement that the holder of the note exhaust its rights against the maker, stating, "Lender may, in its sole discretion and without notice, take or refrain from taking any action that might otherwise be deemed a legal or equitable release or discharge of Guarantors' obligations under this Guaranty, without either impairing or affecting the joint and several liability of Guarantors for the full, timely and complete payment of the Guaranteed Obligations, which actions might include, by way of illustration and not limitation: . . . (c) the absence of any attempt to collect the Guaranteed Obligations from Borrower or any other person or entity primarily or secondarily liable for the Guaranteed Obligations or any other action to enforce Lender's rights with respect to the Guaranteed Obligations."Accordingly, the Court recognizes Perry as an absolute guarantor, and will not look to the ability of primary obligors to pay in estimating the claims against him. For the same reasons provided by this Court in analyzing the claims of UDF III, the Court estimates a 0% probability of reaching a different result in a full trial.

119

*vii. Conclusion: UDF's claims*

The Court has found that UDF has a maximum claim under the Hidden Lakes/UDF Note [Exhibit No. 28] of $1,964,176.62. The Court has also found that UDF's claim should not be reduced on the Plaintiffs' legal grounds of (1) usury; (2) actions to recover deficiency being barred by Nevada law; (3) equitable subordination; (4) right to setoff as a result of the foreclosure sale of the Hidden Lakes Property; or (5) ability of the borrower to pay the obligation.

The Court has estimated that after a full trial on the merits, there is a 20% probability of changing its conclusion on the issue of usury, and a 15% chance of changing its conclusion on the issue of whether Perry has a right to setoff as a result of the foreclosure sale of the Hidden Lakes Property. However the Court will not discount UDF's claim due to the probability of changing its conclusion on the usury issue because the Court has found that Perry does not have standing to raise a defense of usury or to obtain setoff from any usury penalties for the same reasons as discussed in analyzing UDF III's claims. On the other hand, the Court will discount UDF's claims on the basis of the estimated 15% probability of reaching a different result in a full trial on the merits on the issue of whether Perry has a right to setoff as a result of the foreclosure sale of the Hidden Lakes Property.

To do so, the Court calculates the probable reduction of UDF's claim should this Court ultimately conclude that Perry is entitled to such a setoff. Tex. Prop. Code § 51.003(c) provides that "[i]f the court determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, the persons against whom recovery is sought are entitled to an offset against the deficiency in the amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real

120